**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT PETERSON, on his own behalf, and on behalf of his minor children, F.P., G.P., and S.P., and REBECCA PETERSON, on her own behalf, and on behalf of her minor children, H.P., D.P., A.P., F.P., G.P., S.P., and D.B. | ) ) ) ) Civil Action No. 2:21-cv-00078 ) ) |
| Plaintiffs, | ) ) |
| v. | ) **JURY TRIAL DEMANDED** ) |
| ALLEGHENY COUNTY, MELISSA SCHMIDT, DESIREE BIRDSEYE, STEPHANIE SCHMIDT, ERIN SNYDER, MARGIE REMELE, DENISE LEE, ANN SCHLEGEL, JACKI HOOVER, MARC CHERNA, JOHN ZUBRYD, THREE RIVERS ADOPTION COUNSEL, LYNETTA WARD, KELLY RYAN-SCHMIDT,  ALLEGHENY HEALTH NETWORK, MCCANDLESS TOWNSHIP, ERIC EGLI, NORTH ALLEGHENY SCHOOL DISTRICT, AMANDA MATHIESON, ERIN CRIMONE,KATHERINE JENKINS, NORTERN REGIONAL JOINT POLICE BOARD, MATTHEW DURZO, ALLEGHENY FORENSIC ASSOCIATES, DR. TERRY O'HARA, DOE POLICE OFFICERS 1-50, JOHN DOES 1-50 and Others as yet unknown, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) ) ) |

**FIRST AMENDED COMPLAINT**

AND NOW, come Plaintiffs, Robert Peterson, individually and on behalf of his minor children, S.P., G.P., and F.P., and Karen Peterson, individually and on behalf of her minor children, H.P., D.P., A.P., F.P., G.P., S.P., and D.B. ("Plaintiffs"), by and through their counsel Jason J. Blake, Esquire and Sarah E. Cobbs, Esquire, and file this First Amended Complaint averring as follows:

**PARTIES**

1. At all times material hereto, Rebecca Peterson (a fictitious name is used herein to protect the minor Plaintiffs' privacy) (hereinafter "Mother") is an adult individual and a resident of Pennsylvania, residing in Allegheny County, Pennsylvania.

2. At all times material hereto, Robert Peterson (a fictitious name is used herein to protect the minor Plaintiffs' privacy) (hereinafter "Father") is an adult individual and a resident of Pennsylvania, residing in Allegheny County, Pennsylvania.

3. Mother and Father were married in 2015 and remain a married couple under the laws of the Commonwealth of Pennsylvania.

4. H.P. is a minor. H.P. is the biological child of Mother and stepchild of Father. H.P. is currently in the legal custody of Allegheny County Office of Children, Youth and Families ("OCYF") and physical custody of S.M., H.P. 's maternal grandmother.

5. D.P. is a minor. D.P. is the biological child of Mother and stepchild of Father. D.P. is currently in the custody of Mother.

6. A.P. is a minor. A.P. is the biological child of Mother and stepchild of Father. A.P. is currently in the custody of Mother.

7. F.P. is a minor. F.P. is the biological child of Mother and Father. F.P. is currently in the custody of Mother.

8. G.P. is a minor. G.P. is the biological child of Mother and Father. G.P. is currently in the custody of Mother.

9. S.P. is a minor. S.P. is the biological child of Mother and Father. S.P.is currently in the custody of Mother and Father.

10. D.B. is a minor. He is the biological child of Mother and stepchild of Father. He is currently in the legal custody of Mother and T.B., his biological father. D.B. is in the physical custody of T.B.

11. At all times applicable herein, Defendant Allegheny County was and is a public entity (hereinafter "County" or "Allegheny County").

12. Allegheny County Department of Human Services (hereinafter "DHS") is the agency of Allegheny County that is responsible for the oversight of the Office of Children Youth and Families.

13. Defendant Marc Cherna is the Director of DHS, the department that houses OCYF. Upon Information and belief, he is responsible for the policies, practices, customs and operation of OCYF, and for ensuring that OCYF complies with the applicable provisions of federal and state law. He was at all relevant times hereafter mentioned acting under color of state law. He is sued in his personal capacity.

14. Defendant John Zubryd (hereinafter "Zubryd") is an individual and, at all times relevant to this complaint, was employed by DHS as a Regional Program Director. He was at all times relevant hereafter mentioned acting under color of state law. He is sued in his personal h capacity.

15. Hereinafter, when referred to collectively, the Defendants in Paragraphs 13 through 14 will be referred to as "DHS Defendants."

16. Office of Children Youth and Families (hereinafter "OCYF") is an agency of Allegheny County.

17. Defendant Desiree Birdseye (hereinafter "Birdseye") is an individual and, at all times relevant to this complaint, was employed by OCYF as a Caseworker and at all relevant times was operating under color of state law. Birdseye is sued in her individual capacity.

18.  Defendant April Hayden (hereinafter "Hayden") is an individual and, at all times relevant to this complaint, was employed by OCYF as a Caseworker and at all relevant times was operating under color of state law.  Hayden is sued in her individual capacity.

19.  Defendant Melissa Schmidt (hereinafter "M. Schmidt") is an individual and, at all times relevant to this complaint, was an Intake Supervisor of OCYF and at all relevant times was operating under color of state law.  Defendant M. Schmidt is sued in her individual capacity.

20.  Defendant Erin Snyder (hereinafter "Snyder") is an individual and, at all times relevant to this complaint, was a Caseworker Supervisor of OCYF and at all relevant times was operating under color of state law.  Defendant Snyder is sued in her individual capacity.

21.  Defendant Margie Remele (hereinafter "Remele") is an individual and, at all times relevant to this complaint, was a Regional Director of OCYF and at all relevant times was operating under color of state law.  Remele is sued in her individual capacity.

22.  Defendant Stephanie Schmidt (hereinafter "S. Schmidt") is an individual and, at all times relevant to this complaint, was a caseworker of OCYF and at all relevant times was operating under color of state law.  S. Schmidt is sued in her individual capacity.

23.  Defendant Denise Lee (hereinafter "Lee") is an individual and, at all times relevant to this complaint, was a Clinical Manager of OCYF and at all relevant times was operating under color of state law.  Lee is sued in her individual capacity.

24.  Defendant Anne Schlegel (hereinafter "Schlegel") is an individual and, at all times relevant to this complaint, was the Assistant Deputy Director of OCYF and  at all relevant times was operating under color of state law.  Schlegel is sued in her individual capacity.

25.  Defendant Jacki Hoover (hereinafter "Hoover") is an individual and, at all times relevant to this complaint, was the Deputy Director of OCYF and  at all relevant times was operating under color of state law.  Hoover is sued in her individual capacity.

26. Hereinafter, when referred to collectively, the Defendants in Paragraphs 17 through 25 will be referred to as "OCYF Defendants."

27. Defendant Three Rivers Adoption Council (hereinafter "TRAC") is an agency providing foster and adoption services to Allegheny County and is located at 1600 W Carson St, Pittsburgh, PA.

28. Defendant Lynetta Ward (hereinafter "Ward") is an individual and, at all times relevant to this complaint, was a therapist of TRAC. Ward is sued in her individual capacity.

29. Defendant Kelly Ryan-Schmidt (hereinafter "Ryan-Schmidt") is an individual and, at all times relevant to this complaint, was a therapist of TRAC. Ryan-Schmidt is sued in her individual capacity.

30. Hereinafter, when referred to collectively, the Defendants in Paragraphs 27 through 29 will be referred to as "TRAC Defendants."

31. Defendant Allegheny Health Network is a medical services provider that operates Jefferson Hospital (hereinafter "AHN").

32. Defendant North Allegheny School District ("NASD") is political subdivision of the Commonwealth of Pennsylvania. The School District acts by and through its School Board and officials.

33. Defendant Katherine Jenkins ("Jenkins") was, at all relevant times, employed by NASD as the principal of Carson Middle School and was acting under color of state law. In her capacity as the principal of Carson Middle School, Jenkins was responsible for ensuring that the school and its officials act in conformity with the United States Constitution, the Pennsylvania Constitution and all applicable federal and state laws. Jenkins is sued in her official capacity.

34. Defendant Erin Crimone ("Crimone") was, at all relevant times, employed by NASD as the assistant principal of Carson Middles School, and was acting under color of state law. In her capacity as the assistant principal of Carson Middle School, Crimone was responsible for ensuring that the school and its officials acted in conformity with the United States Constitution, the Pennsylvania Constitution, and all applicable federal and state laws. Crimone is sued in her official capacity.

35. Defendant Amanda Mathieson ("Mathieson") was, at all relevant times, employed by NASD the principal of Hosack Elementary School and was acting under color of state law. In her capacity as the principal of Hosack Elementary School, Mathieson was responsible for ensuring that the school and its officials acted in conformity with the United States Constitution, the Pennsylvania Constitution, and all applicable federal and state laws. Mathieson is sued in her official capacity.

36. Hereinafter, when referred to collectively, the Defendants in Paragraphs 32 through 35 will be referred to as "NASD Defendants."

37. Defendant NRJPB Board (hereinafter "NRJPB") is a local governmental agency organized pursuant to the laws of the Commonwealth of Pennsylvania and is vested with the responsibility of enforcing the laws and providing police services within four municipalities: Pine Township, Richland Township, Marshall Townships and Bradford Woods Borough in Allegheny County, Pennsylvania. The NRJPB is vested with the management and administration of law enforcement in Pine Township, by and through its agency, the Northern Regional Police Department, in which it is further vested with the supervision of the Department's police officers.

38. Defendant Matthew Durzo (hereinafter "Durzo") was at all times relevant to this Complaint a Detective employed by the NRJPB Board by and through its agency, the Northern Regional Police Department. Durzo is sued in his individual capacity. At all times relevant to this Complaint, Durzo was acting within the scope and course of his employment, and under the color of state law, with the NRJPB and/or the Northern Regional Police Department.

39. Hereinafter, when referred to collectively, the Defendants in Paragraphs 37 through 38 will be referred to as "Northern Regional Defendants".

40. Defendant Township of McCandless (hereinafter "McCandless Township") is, upon information and belief, a township and political subdivision of the Commonwealth of Pennsylvania with offices located at 9955 Grubbs Road, Wexford, PA 15090.

41. At all times relevant hereto, McCandless Township was acting by and through its agents, servants, workers, and employees, including, but not limited to, its police officers and detectives, all of whom were acting within the course and scope of their employment for and on behalf of McCandless Township.

42. Defendant Eric Egli (hereinafter "Egli") was at all times relevant to this Complaint a Detective employed by McCandless Township by and through its agency, the McCandless Police Department. He is sued in his individual capacity.

43. Defendant Doe Police Officers, were at all times relevant to this Complaint police officers employed by McCandless Township, by and through its agency, the McCandless Police Department. They are sued in their individual capacity.

44. Hereinafter, when referred to collectively, the Defendants in Paragraphs 40 through 43 will referred to as McCandless Defendants.

45. Defendant Allegheny Forensic Associates (hereinafter "AFA") provides mental health evaluations and other services on behalf of County of Allegheny and OCYF.

46. Defendant Dr. Terry O'Hara (hereinafter "O'Hara") is an individual and, at all times relevant to this complaint, was a forensic psychologist employed by AFA located at 1600 W Carson St, Pittsburgh, PA. O'Hara is sued in his individual capacity.

47. Hereinafter, when referred to collectively, the Defendants in Paragraphs 45 through 46 will be referred to as AFA Defendants.

48. Defendants DOES 1 through 50 are sued as fictitious names, their true names and capacities being unknown to Plaintiffs. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for, and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and

includes all Defendants sued under fictitious names. On information and belief, Plaintiffs make all allegations contained in this Complaint against all Defendants, including Does 1 through 50. Whenever a reference is made to any act of Defendants, such allegations shall be deemed to mean that all named Defendants and DOES 1 through 50, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, and/or tenants, did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

49. At all times herein mentioned, and with respect to the specific matters alleged in this Complaint, Plaintiff is informed and believes that each Defendant (including Does 1 through 50), was a parent, subsidiary, affiliate, alter ego, partner, agent, franchisee, licensee, employee, employer, controlling franchiser, controlling licensor, principal, and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, control and/or joint venture, and each defendant has ratified, approved, conspired in, profited from and/or authorized the acts of each of the remaining Defendants and/or failed to present such acts when having the power and/or duty to do so, with full knowledge of said acts.

50. At all times, OCYF Defendants, and DHS Defendants, were acting within the course and scope of their duties. Upon information and belief, Defendants' actions were due to improper training and/or supervision by OCYF.

51. All of Defendants' actions set forth herein were undertaken pursuant to OCYF policies, practices and/or customs and under the color of state law.

## JURISDICTION & VENUE

52. This action arises under the Constitution and law of the United States and under the Constitution and laws of the Commonwealth of Pennsylvania. This Court has subject matter jurisdiction

pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

53.        This action arose from actions and occurrences, which took place in Allegheny County, Pennsylvania. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### A.  FIRST ILLEGAL SEIZURE OF MINOR-PLAINTIFFS IN VIOLATION OF THE 4TH AMENDMENT

54.        On January 15, 2019, a Childline report was filed with OCYF regarding minor child, D.P (hereinafter, "D.P. Childline").

55.        Allegedly, D.P. made statements regarding an unknown person to a child on the school bus. Another child allegedly overhead D.P. and reported it to her mother, who reported it to the guidance counselor, who reported it to OCYF. The perpetrator was listed as "unknown" on the D.P. Childline.

56.         Upon information and belief, on January 15, 2019, Birdseye visited Hosack Elementary School and Carson Middle School. Birdseye did not provide advance notice to Mother and Father nor did Birdseye obtain Plaintiff-parents' consent, or a judicial warrant, when she contacted school officials and had H.P., D.P., D.B., and A.P. summoned to their respective school offices, wherein she conducted a lengthy "interview" with H.P., D.B., D.P., and A.P., asking numerous questions invasive of Plaintiffs' familial privacy. Mother and Father were also informed, and therefore believe, that Birdseye "assessed" H.P., D.B., D.P., and A.P. for numerous different types of abuse, including sexual abuse. Birdseye also conducted an examination of minor-Plaintiffs H.P., D.B., D.P. and A.P.'s persons. Birdseye did not have parental authorizations, a warrant, or court order authorizing her to commit such actions outside of the presence of minor-Plaintiff H.P., D.B., D.P., and A.P.'s parents. In addition, there were no exigent circumstances justifying said warrantless search, seizure, and/or interrogation of H.P., D.B., D.P., and A.P.

57.        Upon information and belief, Birdseye demanded and obtained H.P., D.B., D.P., and A.P.'s school records without a warrant, parental consent, or exigent circumstances. NASD improperly produced

H.P., D.B., D.P., and A.P.'s school records without first requiring an authorization and/or court order to release these records. NASD violated Plaintiffs' right to privacy and freedom from government interference. NASD improperly produced the school records knowing that OCYF would conduct an improper investigation. Based upon the information contained within the school records, Birdseye was able to, and did, contact Father by phone.

58.     H.P., D.B., D.P., and A.P. were each separately removed from their classrooms by school personnel and escorted to a room where Birdseye waited for them. H.P., D.B., D.P., and A.P. had never been taken from class and escorted to the school office or interview room prior to January 15, 2019.

59.     Upon information and belief, it is the policy, practice, and/or custom of NASD to permit OCYF workers and/or other third parties to interview students without parental consent or notice and over minor-children's objections.

60.     Upon information and belief, it is the OCYF's policy, practice, and/or custom to interview children without notification or authorization of their parents and to interview them at school whenever possible and without making a determination of probable cause or exigent circumstances.

61.     H.P., D.B., D.P., and A.P. were told by NASD personnel that it was "okay" to answer Birdseye's questions and encouraged H.P., D.B., D.P., and A.P. to speak with Birdseye.

62.     Behind closed doors and with a complete stranger, H.P., D.B., D.P., and A.P. were subjected to 30 minutes to an hour of intimate questioning by Birdseye.

63.     H.P., D.B., D.P., and A.P. were not given the opportunity to call their parents, they were not told that they could leave, they were not told that they could decline to answer questions and they were not permitted to leave by themselves. H.P., D.B., D.P., and A.P. did not feel as though they could leave the questioning of Birdseye.

64.     All children, including H.P., denied that any abuse ever occurred. D.P. specifically denied ever making the statements that were attributed to him in the D.P. Childline.

65.     Birdseye then contacted Father to inform him that she had already interviewed the children and was required to visit the family home. Upon arrival at the family home, Birdseye informed the family that she had to complete a home inspection to determine if the children were safe.

66.     Plaintiff-parents were not informed that they could refuse the home inspection and were told by Birdseye that she would not allow the children to remain in the home if Plaintiff-parents did not allow her to walk through their home. Over Plaintiff-parents objections, Birdseye walked through the family home.

67.     Following the home inspection, Birdseye conveyed to the parents that she had no concerns regarding the D.P. Childline and would close the case. However, she still required Mother and Father to sign authorizations for release of information for each of the minor-Plaintiffs before she would close the case.  Mother and Father were informed. and believed, that Birdseye would remove the minor-Plaintiffs if they did not sign the medical authorizations

68.     The interview of H.P., D.B., D.P., and A.P. violated Plaintiff-parents' expectation of privacy in intimate family matters and caused stress and anxiety in Plaintiffs.

69.     After performing a short investigation, OCYF determined that the D.P. Childline and the allegations contained therein were "unfounded" and closed the investigation.

B.   **NEGLIGENT DISCLOSURE OF D.P. CHILDLINE**

70.     On or about January 15, 2019, Birdseye and OCYF negligently forwarded the D.P. Childline to the Northern Regional Police Department instead of the McCandless Police Department. At all times relevant hereto, Plaintiffs resided within the boundaries of the McCandless Police Department.

71.     Upon information and belief, Durzo read the D.P. Childline and disclosed information contained therein to his daughter, G.D.

72.     G.D. attends school with H.P. and informed H.P. that G.D.'s father was "investigating" H.P.'s family and the basis of the allegations.

73.     G.D. further informed H.P. that G.D. was no longer allowed to speak to H.P. at the direction of her father, Durzo.

74.     Upon information and belief, G.D. also informed other students at their school about the nature of the investigation, causing H.P. to suffer humiliation, great emotional distress, and alienation.

75.     Upon information and belief, Durzo appeared at H.P.'s school in order to monitor the contact between H.P. and G.D.

76.     H.P. felt harassed and stalked by Durzo's appearances at the school.

77.     At no point were Durzo or the Northern Regional Police Department officially involved in the investigation of the D.P. Childline or any of its underlying facts or circumstances.

78.     Mother reported her concerns about this negligent disclosure to Birdseye and Zubryd.

79.     Both Birdseye and Zubryd apologized for OCYF's improper dissemination of the D.P. Childline and the sensitive information contained therein. Zubryd informed Mother that "it happens" and that DHS and OCYF couldn't control what Durzo did with the negligently and improperly disseminated information.

80.     DHS dismissed Mother's concerns about the improper disclosure of the D.P. Childline and the violation of D.P. and H.P.'s right to privacy.

C. **ALLEGATIONS BY H.P. AND SECOND ILLEGAL SEIZURE OF MINOR-PLAINTIFFS IN VIOLATION OF MINOR-PLAINTIFFS' 4TH AMENDMENT RIGHTS**

81.     On February 6, 2019, H.P. alleged abuse by Father to her school guidance counselor, Chance Petro. H.P. stated that the abuse had not occurred in over two (2) years.

82.     Following H.P.'s disclosure, Mr. Petro filed a Childline report with OCYF (hereinafter "H.P. Childline"). Mr. Petro also asked H.P. if she felt safe going home, to which H.P. responded that she was safe at home.  H.P. rode the school bus from Carson Middle School to the family home following her allegations. No immediate safety concerns were reported to OCYF.

83.	On the evening of February 6, 2019, Birdseye visited the family home, wherein she again spoke with all Plaintiffs.

84.	Birdseye represented to Plaintiff-parents that she had to speak with the minor-Plaintiffs alone or she would seek court intervention. Birdseye assured Mother and Father that the children were not being removed from the family home and that Birdseye just wanted to speak with them.

85.	Prior to speaking with H.P., Birdseye asked Mother and Father if there was any concerning behavior related to H.P. Mother and Father related an incident in 2017 wherein H.P. was caught sending an explicit email to an unknown recipient. Mother and Father further disclosed that H.P. recently expressed dissatisfaction with Mother's recent pregnancy announcement and was upset at the thought of sharing Mother with another person. Mother further informed Birdseye that immediately prior to the February 6, 2019 visit, H.P. also asked Mother if OCYF could make people leave the house.

86.	During that evening visit, H.P. told another dramatically enhanced version of her allegations to Birdseye.

87.	Birdseye relayed H.P.'s new allegations to Mother and demanded to know what Mother thought.  Birdseye interrogated Mother, repeatedly asking Mother what Mother had seen between Father and H.P. Mother conveyed that she never saw anything that made her think H.P. was being abused. Birdseye then informed Mother that H.P. alleged that H.P. told Mother in 2017 about the abuse and that the abuse never occurred again after H.P. informed Mother. Mother became inconsolable and denied the allegations made by H.P.

88.	Father, upon hearing Mother's cries, came into the room, where Birdseye refused to speak to him.  Mother informed Father of H.P.'s allegations, which Father also adamantly denied.

89.	Birdseye requested that Mother come up with "safety plans" or Birdseye and OCYF would seek emergency custody of Mother's children and place them in separate foster homes away from each other.

90.     Under duress, Mother requested that Birdseye provide her with guidance because Mother did not know what a "safety plan" was. Birdseye asked Mother what Mother intended to do to keep minor-Plaintiffs safe. Mother suggested three separate safety plans which included Father leaving the home and/or Father being supervised by another adult at all times. Father also volunteered to leave the family home immediately and remain separate and apart from his family.

91.     Birdseye stated that she had to speak with her supervisor, M. Schmidt, regarding these proposed "safety plans" and would return momentarily. Birdseye placed a call to M. Schmidt outside of the family home. Birdseye also later completed several calls within the family home to M. Schmidt for guidance and direction. Upon information and belief, M. Schmidt directed Birdseye to illegally remove minor-Plaintiffs. Upon her return to the family home, Birdseye was accompanied by two members of the McCandless police.

92.     Without first obtaining a court order, the McCandless police entered the family home uninvited and over the objection of Mother and Father. Ms. Birdseye requested that the police take custody of the children without first obtaining a court order authorizing the removal of the children. The McCandless police declined to take custody of the minor-Plaintiffs. Upon information and belief, the McCandless police did not assume protective custody of the minor-Plaintiffs at any time.

93.     However, when Mother attempted to go to the children, she was physically restrained by the police and Mother and Father were kept inside their home office against their will. The McCandless police constructively took custody of the children by refusing Mother and Father contact with the children and falsely imprisoned them within the family home.

94.     Despite the initial refusal of the McCandless police, Birdseye, with the acquiescence and approval of M. Schmidt, falsely represented to an Allegheny County Judge that the police had taken protective custody of the children.

95.     Upon information and belief, Birdseye willfully and maliciously told M. Schmidt that Mother did not have the best interest of the children in mind, despite Mother and Father offering to have Father leave and remain outside of the family home.

96.     On February 6, 2019, and throughout the entirety of the case, OCYF willfully and maliciously continued the false narrative that Mother stated that she did not believe H.P., when Mother made no such statements. Mother was not asked if she believed H.P. when Birdseye was at the home, and offered to have Father leave the home voluntarily.

97.     In an effort to justify the unlawful removal of the children, Birdseye fabricated the allegation that Mother did not believe H.P.

98.     Birdseye continued to willfully and maliciously allege that Mother did not believe H.P. up until the time of her termination by OCYF. M. Schmidt then intentionally continued Birdseye's false narrative.

99.     Upon information and belief, the County, OCYF defendants, and DHS defendants were aware of the falsification of allegations by Birdseye and M. Schmidt and encouraged and assisted with the cover-up by terminating Birdseye.

100.     Based upon Birdseye's malicious, willful, and reckless false representations, the Judge granted an Emergency Custody Authorization and removed the children from the family home that evening, placing them in the legal custody of OCYF and/or the Commonwealth of Pennsylvania.

101.     Mother, S.M., and Birdseye took H.P, D.B., D.P., A.P., F.P., and G.P. to UPMC Passavant Hospital in McCandless Township for intake physicals as required by OCYF. Mother was not informed by OCYF that she could decline the physicals on behalf of the children.

102.     While speaking with Mother in the hallway of UPMC Passavant Hospital, Birdseye loudly disclosed the confidential health information related to H.P, D.B., D.P., A.P., F.P., and G.P. in the presence of unaffiliated hospital workers and other patients and visitors that were present.

103.	Once Mother requested that Birdseye lower her voice and not discuss private matters in the presence of third parties and visitors, Birdseye stated, "Oops, I shouldn't have done that" and apologized to Mother.

104.	At UPMC Passavant Hospital, H.P, D.B., D.P., A.P., F.P., and G.P. were subjected to invasive and humiliating physicals and questioning.

105.	Mother only consented to the physicals of the children because Birdseye told Mother that she did not have a choice. Birdseye threatened Mother with obtaining a court order and labelling Mother as "non-compliant" and as acting contrary to the best interest of the children if she did not consent.

106.	Mother and the minor Plaintiffs' endured severe emotional trauma and mental anguish due to the physical examinations and disclosure by Birdseye of minor-Plaintiffs' confidential information.

D.	**SHELTER CARE HEARING**

107.	On February 7, 2019, H.P. sent Mother an email apologizing for her false statements, stating that she just wanted Father to leave the house. H.P. also informed McCandless detectives of this sentiment during Father's preliminary hearing in May 2019.

108.	On February 8, 2019, at the Shelter Care Hearing in this matter, Mother offered the email to Birdseye, who declined to look at it.

109.	Birdseye failed to present this exculpatory evidence to Hearing Officer Cancilla during the February 8, 2019 Shelter Care Hearing. Instead, Birdseye continued to represent that Mother did not believe H.P.'s allegations to ensure that the children were removed from the family home and placed into foster care.

110.	Following the Shelter Care Hearing, Birdseye, in the presence of Mother, falsely stated to the OCYF Solicitor and the Guardian Ad Litem for the children that Mother refused to provide her with the email from H.P. Mother again offered the email, but all parties refused to look at it.

111.     Following the Shelter Care Hearing , wherein Mother and Father were excluded from their residence, forensic interviews and physical evaluations were scheduled to take place at ACP. Mother and Father were ordered to have no contact with the children until the examinations occurred.

112.     Birdseye was instructed by the Court to schedule visitations between the children and Mother and Father once the forensic evaluations occurred.

113.     The dependency petition as to minor-Plaintiffs H.P., D.B., D.P., A.P., F.P., and G.P. was not filed by OCYF until February 13, 2019.  M. Schmidt, in her supervisory capacity, signed the dependency petition.

114.     Following the filing of the dependency petitions, the adjudicatory hearing of minor-Plaintiffs H.P., D.B., D.P., A.P., F.P., and G.P. did not occur until on or about April 11, 2019 and was continued until May 23, 2019. The minor-Plaintiff's remained in shelter care from February 6, 2019 through May 23, 2019.

115.     M. Schmidt and Snyder acted as OCYF policymakers when they approved the late filing of the petitions and scheduling of hearing dates.  Such activities were undertaken in an administrative capacity.

E.     **FORENSIC EXAMINATIONS OF H.P, D.B., D.P., A.P., F.P., and G.P.**

116.     On February 13, 2019, forensic interviews and physical examinations of H.P, D.B., D.P., A.P., F.P., and G.P. occurred at A Child's Place (hereinafter "ACP").  OCYF caseworkers Birdseye and April Hayden were present for the forensic interviews of the minor-Plaintiffs. Upon information and belief, OCYF Caseworkers and ACP forensic interviewers met and discussed the questioning of the minor-Plaintiffs and OCYF's desired outcome of the interviews prior to their initiation.  In furtherance of their agreed upon plan, ACP framed their interrogation of the children in furtherance of their agreement with OCYF's stated desire that the children be found dependent.

117.     OCYF excluded Mother from the physical examinations of the children, causing emotional and mental anguish to Mother and H.P, D.B., D.P., A.P., F.P., and G.P.

118.     Further, Birdseye informed Mother that OCYF would not allow Mother to be present in the waiting area following the examination of the children.

119.     In a deliberate, wanton, and malicious manner, Birdseye and Hayden falsely reported to the forensic examiner that D.P. named Father as the perpetrator in the D.P. Childline, even though the perpetrator was listed as "unknown," that D.P. never named Father as the alleged abuser, and the report was marked as "unfounded" by OCYF.

120.     M. Schmidt was aware of, and supported, the deliberate, wanton, and malicious false statements of Birdseye and Hayden in an effort to bolster OCYF's case against Mother and Father.

121.     These reckless and malicious statements were then repeated throughout the entirety of the forensic reports and Mother and Father's subsequent appeal, despite being outright lies intentionally created by M. Schmidt and wholly unsupported by the record.

122.     At the forensic evaluation, Birdseye and Hayden, with the knowledge of M. Schmidt, willfully, intentionally, and maliciously informed the evaluators that Mother had refused a forensic evaluation of the children following the D.P. Childline, knowing that Birdseye had never requested any such evaluations. Such statements were made by OCYF in a deliberate effort to portray Mother in a negative light.

123.     H.P.'s allegations during the forensic evaluations at ACP were once again inconsistent with previous allegations.

124.     Minor-Plaintiffs were subjected to humiliating and invasive physical examinations that required them to completely disrobe in front of the personnel at ACP.

125.     Prior to February 13, 2019, Mother objected to the highly invasive physical examinations of D.B, D.P., A.P., F.P., and G.P. on the grounds that there were no allegations of abuse regarding the children. Mother requested that the examination of H.P. occur first to determine if any physical evidence of H.P.'s allegations existed prior to subjecting other minor-Plaintiffs to highly invasive physical

examinations. Birdseye again threatened to label Mother as "non-compliant" and ensure Mother never saw minor-Plaintiffs again if Mother refused to cooperate and sign the examination consent forms. At no time did OCYF inform Mother that she had the right to refuse the physical examinations of the children.

126.     Mother requested that her objections be noted in the case file and again refused to sign the consent forms, believing that the highly invasive physical examinations of D.B., D.P., A.P., F.P., and G.P. were not in her children's best interest absent any evidence of the alleged abuse of H.P. Mother was contacted by M. Schmidt who again threatened Mother with the removal of her children unless Mother signed the consent forms. Specifically, M. Schmidt told Mother that the minor-Plaintiffs would be taken from S.M. and placed in foster care if Mother "ma[d]e it hard" for OCYF.

127.     Mother, under duress and fearing retaliation, signed the consent forms, but continued to request that her objections be noted in the case file. Mother again requested to be present with the children during the physical examinations. OCYF told her that under no circumstances were Mother and/or Father to be present and that the police would be called if Mother attended the physical examination.

128.     As a result of OCYF's coercion in obtaining Mother's signature on the consent forms for ACP, minor-Plaintiffs were subjected to highly invasive and harassing physical examinations of their genital and rectal areas. As a result of OCYF's coercion, minor-Plaintiffs' right to privacy was violated and they were denied the love, care and comfort of Mother. As a result of the actions of OCYF and a ACP, minor-Plaintiffs suffered from, and continue to suffer from, significant mental and emotional anguish, including PTSD.

129.     The physical examinations of all of the minor-Plaintiffs revealed no signs of abuse, consistent with the children's denials that any abuse ever occurred and disproving H.P.'s allegations.

130.     At no time did OCYF Defendants, present this exculpatory evidence to the Court. Further, once informed by Mother and Father of the existence of this exculpatory evidence, OCYF Defendants made no efforts to confirm the existence of said evidence with ACP.

131.     Minor-Plaintiffs have been emotionally damaged and continue to suffer from severe fright, worry, apprehension and fear. This was proximately and actually caused by the OCYF Defendants, DHS Defendants, and Allegheny County's failure to exercise reasonable care. Minor-Plaintiffs continue to experience nightmares related to the physical examinations and will require long term therapy to undo the substantial harm they have suffered.  It is unknown at this time whether minor-Plaintiffs will ever fully recover from the emotional harm they suffered at the hands of the Defendants.

F.     **OCYF'S CONTINUED INTERFERENCE WITH THE FAMILY UNIT**

132.     Following the forensic evaluations and despite no disclosures from five of the children, and physical evidence directly disproving H.P.'s allegations, Birdseye refused to grant Mother or Father visitation with any of the children, despite the Court's Order requiring her to do so.

133.     In direct contradiction to Hearing Officer Cancilla's Order on February 8, 2019, and as apparent retaliation for "mak[ing] it hard" for OCYF, Birdseye stated that because Mother and Father retained counsel, they could file motions with the Court if they wanted to see their children.

134.     Birdseye further stated that she had no intent to schedule visitation or allow Mother or Father contact with the children until after the Dependency Hearing on March 6, 2019.

135.     Mother contacted M. Schmidt regarding Birdseye's statements.   Mother further expressed her distress at OCYF making Mother and Father incur legal fees to see the children when OCYF was instructed by the Court to set up visitations following the forensic evaluations.

136.     Mother contacted DHS Regional Director Amber Kalp regarding Birdseye's refusal to initiate visits with the children and the lack of communication from OCYF. Upon information and belief, Amber Kalp referred the matter to Zubryd, and requested that he look into the issues reported by Mother

137.     On February 25, 2019, via email, Zubryd confirmed that Mother was not an alleged perpetrator in this matter and that he could not account for the delay in setting up visits between Mother

and the children. He further stated that OCYF should have ensured that it had the correct physical address prior to sending out sensitive information to third parties, such as the D.P. Childline.

138.    During a follow-up telephone conversation on the same date, Zubryd stated that Birdseye was terminated for her mishandling of Mother's case. Zubryd recommended that Mother "do what OCYF wants" despite acknowledging that the case was mishandled, and Mother was not accused of any misconduct.

139.    Following contact from Zubryd, M. Schmidt apologized for Birdseye's behavior, confirmed that Birdseye was terminated for her conduct related to Mother's case, and scheduled visitation with the children for Mother and Father

140.    Mother requested from M. Schmidt that OCYF produce her complete case file in preparation of the upcoming March 6, 2019 hearing. Upon receipt of the case file , Mother became aware that it was supervisor M. Schmidt that began maliciously, willfully, and intentionally reporting Father as the perpetrator in the D.P. Childline, despite the perpetrator being listed as "unknown" on the ChildLine report. Defendant Birdseye and Defendant M. Schmidt's actions in fabricating and/or falsifying evidence violated Plaintiff-parent's Fourteenth Amendment right.

G.    **OCYF HARASSMENT AND INTIMIDATION OF MOTHER**

141.    S. Schmitt was appointed as the caseworker to the case on March 15, 2019.  S. Schmitt made no effort to contact Mother and Father other than one Teaming Meeting at the end of March 2019.

142.    During this Teaming Meeting, Mother discovered that J.C., her ex-husband, and the biological father of H.P., D.P., and A.P., was physically present for the meeting.  Mother requested that J.C. have a separate Teaming Meeting.  Mother's request was based upon J.C.'s previous criminal conviction for domestic violence against Mother, a previous protection from abuse order and an existing five-year criminal No Contact order issued against J.C. by the trial court that adjudicated his case.

143.     S. Schmidt accused Mother of lying about the domestic violence and the existence of the criminal No Contact order, stating that they could not "find anything on the docket."

144.     In retaliation for Mother's insistence that the meetings be held separately, S. Schmidt made Mother and Father wait in the waiting room while she met with J.C. for over an hour.

145.     When S. Schmidt met with Mother and Father, she again stated that Mother was lying, and that J.C. was a good father. S. Schmidt refused to answer any of Mother's questions during the teaming meeting.

146.     Following the meeting, Mother obtained a copy of the Order that granted the criminal No Contact order against J.C. and provided the information to S. Schmidt to show that Mother was not lying. S. Schmidt informed Mother that all future meetings would be held separately.

H.  **APRIL 11, 2019 DEPENDENCY HEARING**

147.     A dependency hearing was scheduled to occur on March 6, 2019. The Court continued the permanency review hearing until April 11, 2019. As a result of the continuance, Minor-Plaintiffs remained in shelter care from February 6, 2019 through May 2019 in violation of Rule 1510 of the Pennsylvania Rules of Juvenile Court Procedure

148.     Immediately prior to the April 11, 2019 Dependency Hearing, OCYF Solicitor Marcia Cooper (hereinafter "Copper")contacted Mother's counsel and stated that if Mother would stipulate to the minor-Plaintiffs being dependent, OCYF would allow Mother back in the family home with the children if Mother remained separated from Father. Mother was willing to remain separate from Father but was unwilling to stipulate to the dependency of the children as Mother was willing and able to provide care for the children while OCYF completed its investigation.

149.     On April 11, 2019, the Court met with counsel for all parties, off the record, and asked why Mother and Father wanted a hearing when the children were clearly dependent. The Court reached this conclusion prior to hearing any evidence in the case.

150.    Mother and Father refused to stipulate to dependency of the minor-Plaintiffs and waive their right to a hearing. As a result, OCYF Defendants set out to maliciously and willfully retaliate against Mother and Father.

I.   **FALSIFICATION OF INFORMATION BY OCYF, CONSPIRACY, AND HARASSMENT**

151.    At the Dependency Hearing in April 2019, while under oath, S. Schmidt made intentionally misleading representations to the court regarding statements she attributed to Mother and Father.

152.    Specifically, S. Schmidt falsely testified that D.P. named Father as the perpetrator of the abuse in the D.P. Childline, despite knowing that it was untrue, and contrary to OCYF's documentation and investigation.

153.    When confronted with this lie, and the supporting case notes generated by OCYF, S. Schmidt questioned how Mother and Father came to possess the document, implying that Mother obtained the information improperly.

154.    S. Schmidt stated that Mother and Father were not supposed to have the information, as it is OCYF's policy to withhold this information from parents.

155.    During the hearing, the Court stated that Mother was to continue to have unsupervised visitation with all minor-Plaintiffs, except H.P. Following the April 11, 2019 hearing, the Court mistakenly issued an interim written court order ordering supervised visits between Mother and children.

156.    Mother's counsel immediately contacted Cooper for assistance in correcting the Order.

157.    Cooper did not respond to Mother's counsel's emails.

158.    On April 30, 2019, Mother contacted S. Schmidt to set up visits between Mother and her children because the written court order required visitation to be supervised by OCYF.

159.    On May 7, 2019, Mother authored a follow-up email to S. Schmidt asking again that OCYF set up supervised visits so that Mother could see her children.  In the email, Mother included her counsel, Cooper and  Snyder as recipients.

160.     Mother's counsel also prepared and provided a Consent Order to all counsel of record, seeking leave of Court for Mother to exercise unsupervised visitation in accordance with what the Court orally stated on April 11, 2019.

161.     After Mother incurred the expense of having the Consent Order drafted and served, S. Schmidt responded to all that that it was agreed upon by "everyone" that Mother was to continue unsupervised visitation and apologized stating to Mother that she was sorry that "no one told you."

162.     S. Schmidt's refusal to inform Mother or Mother's counsel caused Mother to not see her children for a month.

163.     In furtherance of her harassing behavior towards Father and Mother, S. Schmidt requested an armed guard be present during all Father's supervised visits with his children. Father learned that he was only one of two cases where an armed guard was utilized. S. Schmidt requested a guard for Father's visits in an attempt to embarrass and harass Father. Father has no history of violence or criminal history.

164.     In contrast, S. Schmidt advocated for J.C. to have unsupervised visitation with A.P., D.P., and H.P. despite J.C. having two convictions for assault and multiple PFA's issued against him.

165.     S. Schmidt and/or OCYF Defendants intentionally withheld paperwork from Mother so that Mother did not know to engage specific services for the minor-Plaintiffs. S. Schmidt then testified that Mother refused to sign A.P., D.P., H.P., F.P. and G.P. up for therapy at Pittsburgh Action Against Rape (hereinafter "PAAR") despite never requesting this of Mother or providing her with any information in order to perform this task. S. Schmidt represented to the Court that Mother was willfully noncompliant with OCYF in an effort to paint a negative picture of her and keep the children from Mother.

166.     S. Schmidt deliberately provided false and misleading information to outside contracting agencies about Mother in an effort to turn the outside agencies against Mother. S. Schmidt told various agencies that Mother was uncooperative, would refuse them access to the family home, would refuse to

meet with them, was violent and confrontational, and they should use caution when entering the home. Mother has no history of violent behavior nor has she ever refused OCYF Defendants, or any of its affiliates, access to the family home.

167. Upon information and belief, OCYF Defendants determined their desired outcome of the case prior to May 2019, including but not limited to, the permanent removal of H.P. from Mother's care. Barb Ramsey (hereinafter "Ramsey"), counsel for J.C., disclosed this plan to Mother during a teaming call on December 14, 2020. Defendants took further actions, as outlined herein, in furtherance of OCYF Defendants predetermined plan.

J. **COERCED FAMILY PLANS**

168. OCYF engages in the deceptive custom, policy, and/or practice of asking families to create a "family plan" under the guise that it is voluntary and "just an outline" for the family, while violating parent's 14th amendment rights. Once a family deviates from or challenges the family plan, OCYF uses the deviation as a reason to remove the children from the parents' custody and/or withhold the children from parents in order to ensure the parent's compliance with OCYF's wishes.

169. OCYF did not convey to Mother or Father that any of the services discussed during the teaming meeting would become a binding "family plan."

170. Further, S. Schmidt passed around a blank signature page at the outset of the meeting, and prior to any discussion, stating that it was a sign-in sheet. Upon review of the document, Mother voiced concern that it was, in fact, a document acknowledging the signers' agreement to the information discussed during the teaming meeting. By doing so, S. Schmidt attempted to legally bind Mother and Father to biased and undisclosed terms that would later be drafted by OCYF Defendants after the meeting's conclusion.

171.     Despite having no current document reflecting Mother or Father's agreement to the family plan, S. Schmidt continually and maliciously lied to the Court in an effort to portray Mother in a negative light, stating that Mother refused to comply with the agreed upon plan.

K.  **REQUESTS FOR NEW CASEWORKER**

172.     On or about June 05, 2019, Mother requested a new caseworker because of S. Schmidt's refusal to speak with Mother or Father and her intentionally false statements about Mother and Father to the Judge. Mother's request was denied by Snyder because "requests for new caseworkers occur frequently."

173.     On June 13, 2019, Mia Salter (hereinafter "Salter") with Life'sWork began providing in-home services for the family. During the intake meeting between Salter and Mother, Salter expressed to Mother that Mother was not what Salter expected. Salter then shared the referral note from S. Schmidt wherein S. Schmidt stated that Mother would be uncooperative, refuse to schedule meetings, refuse to sign paperwork, and other derogatory and defamatory statements.

174.     Mother reached out to Snyder on June 14, 2019 to express her dismay at reading the referral note and to request specific examples of when Mother ever behaved in the manner described by S. Schmidt. Mother again requested a new caseworker due to S. Schmidt's apparent disdain for Mother.

175.     Rather than address Mother's concern or the fact that S. Schmidt was attempting to prejudice service providers against Mother and fabricate false evidence, Snyder was upset that Salter shared the referral with Mother. Snyder informed Mother that she had no intention of assigning a new caseworker because she did not have another caseworker with sufficient experience to handle the case.

176.     Snyder made Remele and Lee aware of Mother's concerns and requests for a new caseworker.  Mother asked Snyder why Mother was being "blacklisted" by OCYF when she had complied with everything they asked of her. Mother requested that Snyder appropriately address and handle Mother's concerns. Mother never received a response from Snyder, Remele, or Lee.

177.     Mother was also informed by Remele that Schlegel and Hoover were aware of Mother and Father's case and requests. Upon information and belief, Schlegel and Hoover were part of the OCYF team that made decisions regarding Mother and Father's case and/or the "higher ups" referenced by S.Schmidt on a multitude of occasions.

178.     Throughout the entirety of the case, S. Schmidt, with the knowledge and approval of Snyder, Lee, Remele, Cherna, Schlegel, Hoover, OCYF, and other known and unknown OCYF supervisors, demeaned Mother and Father to third-party providers in the case, portraying them as non-compliant and obstinate in an effort to continue their case.

179.     Despite numerous complaints to DHS Defendants, Cherna, and Defendants Remele, Snyder and Lee regarding S. Schmidt's and Snyder's conduct towards Mother and Father, no investigation was conducted by OCYF supervisors, Schlegel, Hoover, Cherna, and/or DHS Defendants.

180.     On January 13, 2020, Father requested from Snyder that S. Schmidt be removed from the case due S. Schmidt's slanderous and libelous statements made in public about Father.

181.     OCYF Defendants, including specifically Lee, Schlegel, Hoover, and Remele, were aware of S. Schmidt's comments and declined to remove S. Schmidt from the case.

182.     On February 21, 2020, Mother brought her concerns regarding S.Schmidt to the attention of Lee and Cherna. Throughout the entirety of the case, Mother and Father were informed by OCYF and third party service providers that their case was known "district" wide and had multiple levels of review. Upon information and belief, Cherna, Schlegel, and Hoover,  were some of the upper-level reviewers involved in many of the decisions regarding Mother and Father.

L.   **"RIGHTING A WRONG"**

183.     Upon information and belief, Cooper informed Mother's legal counsel that an OCYF supervisor stated that OCYF wanted to "right a wrong" done to J.C. stemming from a previous custody action and that they intended to use the dependency proceeding to do so.  S. Schmidt confirmed to Mother

that the statement was made by OCYF. Upon information and belief, OCYF intended to use the dependency proceeding to remove H.P., A.P., and D.P. from Mother and permanently place H.P., A.P., and D.P. in J.C.'s custody. Mother brought these statements to the attention of Zubryd and the DHS Director's Action Line.

184.     Mother was informed by S. Schmidt that OCYF operates as a team and that there were several higher ups involved in Mother's case.

185.     Upon information and belief, OCYF Defendants and DHS Defendants, conducted meetings with third parties, to the exclusion of Mother and Father. During these meetings, OCYF Defendants and/or DHS Defendants decided to place numerous irrelevant obstacles in Plaintiff-parents' path in an effort to effectuate their plan that they, as a group, created outside of the presence of Plaintiff-parents and/or Plaintiff-parents' counsel, namely to place H.P., D.P., and A.P. outside of Mother's care and custody.

186.     Following the May 2019 hearing, the Court ordered H.P., D.P., A.P., F.P., and G.P. to attend individual therapy. OCYF placed the children on PAAR's waiting list over Mother's objections that the subject matter was inappropriate for the children.

187.      S. Schmidt then refused to provide Mother with the necessary paperwork to enroll the children in PAAR, instead asking J.C. to complete the paperwork. During the September 2019 Dependency Hearing, S. Schmidt told the Court that Mother "refused" to complete the PAAR paperwork and refused to comply with the Court's Order in furtherance of OCYF's stated goal to "right a wrong" on behalf of J.C. by making him appear compliant at the expense of Mother.

188.     OCYF presented a Motion on behalf of J.C. on July 24, 2019, requesting that the Court lift an existing reunification counselling Order that was in place for seven (7) years prior and that predated OCYF's involvement in the matter so that J.C. could see A.P, D.P., and H.P. S. Schmidt also volunteered to personally provide transportation for the children and supervise J.C.'s visits. S. Schmidt refused to extend the same offer to Father, stating that "she didn't care if he ever saw his children again."

189.     During the September 2019 permanency review hearing, OCYF requested that J.C. be excused from anger management therapy, as recommended by Dr. O'Hara. OCYF then requested that the Court order Mother to attend non-offender's counseling, despite Dr. O'Hara finding that Mother did not require any services. OCYF made these requests in an effort to relieve J.C. of any burden and add additional services to Mother so that OCYF could label J.C. "compliant" while labeling Mother as "non-compliant" in furtherance of the plan to "right the wrong" OCYF perceived against J.C.

190.     OCYF Defendants deliberately withheld information from the Court concerning the emotional detriment suffered by the children in an effort to convince the Court to extend the minor-Plaintiffs' placement.

191.     Following the initial evaluations by Dr. O'Hara, Dr. O'Hara recommended J.C. undergo anger management therapy.  Despite this recommendation, OCYF requested that the Court not order anger management for J.C. OCYF also requested that the Court order Mother to non-offender's counselling, despite Dr. O'Hara not recommending it for Mother. OCYF's requests were made in furtherance of their goal to "right the wrong" against J.C. by removing goals from J.C. while requesting additional goals for Mother, thus ensuring the J.C. always appeared compliant while Mother was labeled non-compliant.

192.      On or about December 15, 2020, S. Schmidt conducted a home visit with Mother.  S. Schmidt informed Mother that OCYF Defendants would recommend the Court place the children with whichever parent completed their goals first. Mother inquired how this was fair, when OCYF Defendants actively advocated for J.C. to have fewer goals, despite the recommendations of Dr. O'Hara, while simultaneously requesting Mother have additional requirements added to her list. Mother expressed to S. Schmidt that it was easy for J.C. to be compliant when OCYF Defendants merely required him to attend meetings, while they placed numerous irrelevant goals in Mother's path in order to label her non-compliant.  S. Schmidt laughed at Mother's inquiry, stating "Oh, I know."

193.     OCYF lacked an objectively reasonable suspicion of abuse in order to justify the continued interference with Mother and Father's constitutional rights. Policymakers Lee, Remele, Schlegel, Hoover, Cherna and Snyder were aware of and encouraged S. Schmidt's continued interference with Mother and Father's rights to parent their children and Minor-Plaintiffs' rights to be parented by Mother and Father in the absence of a reasonable suspicion of abuse.

### M.  OCYF's INTERFERENCE IN FAMILIAL RELATIONSHIPS

194.     On or about June 11, 2019, Mother met with Snyder to discuss S. Schmidt's behavior towards Mother. Snyder instead focused on why Mother had not "kicked [Father] out" of their apartment. Snyder informed Mother that if Mother had an apartment and separated from Father, OCYF would return her children to her.  Snyder further stated that if Mother stayed with Father, regardless of outcome of Father's criminal trial, OCYF would not give the kids back to her.

195.     Snyder directed Mother to contact S. Schmidt  in order to obtain resources for an apartment separate from Father so that Mother could "prove" to OCYF that she was not aligned with Father. Mother contacted S. Schmidt, but S. Schmidt refused to provide Mother with the requested information. S. Schmidt then continued to represent to the Court that Mother remained aligned with Father because Mother and Father continued to reside together. S. Schmidt used Mother and Father's cohabitation as a basis for arguing that the children should be kept from Mother.

196.     On June 17, 2019, during a meeting, S. Schmidt also requested that Mother "kick" Father out of their shared apartment.

197.     S. Schmidt informed Mother that OCYF would normally withdraw its dependency petitions as to G.P., F.P., and S.P. if Father's criminal charges were dismissed or he was found not guilty. Regarding H.P., A.P., and D.P., S. Schmidt stated that the agency would likely withdraw the petitions for those children as well. However, S. Schmidt stated that she would make sure that Mother would never regain custody of the children if she remained married to Father. S. Schmidt further threatened to separate

the minor-Plaintiffs in foster care. S. Schmidt admitted that the "ball had been dropped on numerous occasions" by OCYF regarding Mother, but they had to see it through now.

198.     Throughout the course of the foregoing events, Mother contacted the OCYF supervisors, DHS, Cherna, Zubryd, and the Director's Action Line on numerous occasions and advised them of much of the within described acts and omissions by OCYF. However, the OCYF supervisors, DHS, Cherna, and the Director's Action Line failed and refused to take any remedial action and, instead, knowingly acquiesced to the foregoing unconstitutional conduct by ignoring and leaving the matters to the unfettered discretion of OCYF employees, such as Snyder and S. Schmidt.

199.     Plaintiffs suffered from the destruction of their family unit for a period of over two years, as well as mental anguish and harm to their reputations as a result of the within-described acts and omissions.

### N.  VIOLATION OF HIPAA, MOTHER'S RIGHT TO PRIVACY, AND THE ILLEGAL SEIZURE OF S.P.

200.     On June 17, 2019, S. Schmidt informed Mother that OCYF would not seek placement of S.P. after her birth, even though Mother still lived with Father. S. Schmidt did not request that Mother contact her once S.P. was born.

201.     On June 22, 2019, S.P. was born at AHN. Following the birth of S.P., Mother disclosed to the hospital that she took a prescription anxiety medication prior to the birth. The hospital confirmed that Mother had a prescription noted in her medical chart and there were no concerns regarding Mother's use of the prescription. S.P. left the hospital with Mother the following day.

202.     Upon information and belief, two days after the birth of S.P., S. Schmidt contacted AHN and requested Mother's confidential medical information from hospital personnel without Mother's permission.

203.     AHN violated Mother's rights by disclosing to S. Schmidt that Mother took a prescription anxiety medication without Mother's consent or court-order. At no point in time did AHN call in a Childline report to OCYF because there were no concerns about Mother's use of her prescribed medication.

204.     S.P. was not in OCYF custody at the time S. Schmidt spoke with AHN.

205.     Upon information and belief, AHN and OCYF have an agreement that AHN will provide OCYF with information related to pregnant women's narcotic use, even if it is legal and through a valid prescription. Such a practice leads to intrusive and unconstitutional investigations of women, in the absence of any valid child abuse investigation.

206.     After speaking with AHN, S. Schmidt obtained an Emergency Custody Authorization ("ECA"), allowing her to take S.P. from Mother and Father's custody.

207.     Because of AHN's illegal disclosure of Mother's confidential medical records, S.P. was removed from the custody of Mother and Father. At no point in time did S. Schmidt ask Mother about the medication, request a copy of the prescription, or speak with Mother's doctor.

208.     To form a basis for her ECA request, S. Schmidt intentionally deceived Cooper and stated that Mother refused to provide S. Schmidt with a copy of the prescription.

209.     Snyder, as a policy maker for OCYF, condoned the intentional false representations included in the *ex parte* communication when she signed the filing. Snyder did so knowing that the Court would rely upon the false statements made by S. Schmidt

210.     S. Schmidt later denied alleging that Mother refused to provide the prescription and instead stated that Cooper made the false allegation against Mother.

211.     On June 25, 2019, Mother provided S. Schmidt with Mother's prescription information and contact information for her prescribing physician. S. Schmidt stated to Mother that "as long as you have the prescription, there shouldn't be any problems with the Court."

212.     S. Schmidt later admitted to Mother that she had no concerns regarding Mother's use of prescription drugs but would still seek the removal of S.P. from Mother.

213.     Counsel for Mother brought this deception to Cooper's attention on June 25, 2019.

214.     S. Schmidt and/or Cooper intentionally lied to the Court in order to obtain the ECA regarding S.P. Mother was exclusively breast feeding S.P. S. Schmidt told Mother to "get over it" and "give her formula like everyone else."

215.     S. Schmidt refused to contact Mother's physician, choosing instead to continue her false narrative to the Court at the Shelter Care Hearing on June 28, 2019.

216.     Based upon S. Schmidt's representations to the Court during the Shelter Care Hearing, Mother was evaluated for drug and alcohol abuse, despite presenting not only the prescription, but the physician's testimony regarding the prescribed medication.

217.     During the Shelter Care Hearing, S. Schmidt requested that the Court take custody of S.P. due to concerns of "drug abuse" as to Mother.  S. Schmidt stated that OCYF had no concerns over Mother's ability to care for S.P. yet continued to seek placement of S.P. with OCYF and S.M.  OCYF further requested supervised visitation between Mother and S.P., despite Mother having unsupervised visits with the other minor-Plaintiffs.

218.     Based upon S. Schmidt's representations to the Court during the Shelter Care Hearing, legal custody of S.P. was placed with OCYF and physical custody was placed with S.M.

219.     Upon information and belief, Hearing Officer Cancilla found that Mother's "drug issues" were the basis to prevent Mother from maintaining custody of S.P.   Hearing Officer Cancilla refused to contact the prescribing doctor, relying instead on the perjured testimony of S. Schmidt.

220.     Mother was ordered to undergo a drug screening at the Courthouse on June 28, 2019, at the request of OCYF. Mother was subjected to extreme mental and emotional anguish as a result of the

accusations of drug abuse, including but not limited to, humiliating drug screenings conducted under supervision by a county worker. Mother tested negative for all substances.

221.     Mother completed a drug abuse evaluation with POWER on July 10, 2019, wherein she again tested negative for all substances.  No further recommendations were made for Mother.

222.     Mother and Father were deprived of establishing a familial bond with S.P. due to the intentional misrepresentations and improper removal of S.P. from Mother and Father.

223.     Despite removing S.P. from Mother and Father's custody on June 25, 2019, OCYF failed to file the dependency petition until July 17, 2019, in violation of state statute.  Snyder acted as an OCYF policymaker when she approved the late filing of the petitions and scheduling of hearing dates.  Such activities were undertaken in an administrative capacity.

224.     On or about July 24, 2019, OCYF requested a continuance of the adjudicatory hearing regarding S.P., requesting that the child remain in shelter care. The Court rescheduled the adjudicatory hearing to September 4, 2019.

225.     It is the persistent and widespread custom and/or practice of Allegheny County to delay all stages of dependency proceedings in violation of Pennsylvania statute and parents' constitutionally protected rights.  Such custom and/or practice is readily evidenced in this matter by the delayed scheduling of two separate adjudicatory hearings, and multiple delayed and/or continued hearing dates throughout the entirety of the proceedings.

226.     During the adjudicatory hearing of S.P.'s dependency petition, S. Schmidt stated that there were no additional concerns regarding drug abuse as to Mother, but that she would still ask for "status quo" for S.P., including supervised visitation with Mother and no visitation with Father.

227.     Jane Myhers, Guardian *Ad Litum* for the minor-Plaintiffs, requested that the Court defer ruling on dependency petition as to S.P.  if the Court was inclined to return S.P. to Mother. The Court obliged.

228.		Mother had to present a Petition for the release of S.P. to her custody, due to the failure of the Court to rule on OCYF's dependency petition in the statutorily required time period.

229.		On October 30, 2019, the Court granted Mother's petition and *de facto* terminated Father's legal and physical custody of S.P. by awarding sole physical and legal custody of S.P. to Mother.

230.		During a home visit on December 12, 2019, S. Schmidt stated to Mother that OCYF was not going to "push" for S.P.'s hearing on December 18, 2019 because "everyone already knows that she (S.P.) isn't going to be dependent." S. Schmidt further acknowledged that Mother "pissed off" S. Schmidt's supervisors and that they "hold a grudge."

231.		On December 16, 2019, OCYF filed a Motion to Continue the ruling on S.P.'s dependency petition. OCYF requested that the Court defer ruling on S.P.'s dependency petition so that Father was not allowed around S.P. In December 2019, 6 months after taking S.P. into custody, the Court ruled that there was no basis for dependency as to S.P. and dismissed the petition.

O.	**PSYCHOLOGICAL TESTING AND THERAPEUTIC SERVICES**

232.		Mother began attending counselling with the Women's Center and Shelter on June 20, 2019, at the recommendation of OCYF. OCYF refused to confirm or deny that the counselling satisfied their requirement. After completing this therapy, OCYF stated to the court that Mother had not completed a satisfactory trauma based therapy and was "minimally compliant." OCYF refused to provide Mother with a list of "acceptable" service providers.

233.		S. Schmidt referred Mother and Father to Defendant AFA, stating that they were court ordered to attend such evaluations. Neither Mother nor Father were ordered to complete psychological testing.

234.		Defendant Dr. O'Hara contacted Mother and Father on or about July 3, 2019 regarding attending their "court ordered" psychological evaluation. Mother and Father completed the evaluations at the request of OCYF.

235.     H.P., D.P., and A.P. attended private therapy from March 2019 through May 2019 until OCYF requested that Mother stop their private therapy so that the minor-Plaintiffs could attend PAAR. D.P. and A.P. attended PAAR from May 2019 through December 2019. H.P. attended PAAR from May 2019 through March 2020.   Minor-Plaintiffs were forced to attend weekly therapy sessions, regardless of whether they wished to attend or not.

236.     An evaluation with Holy Family Institute (hereinafter "HFI") occurred in February 2020. Mother and H.P. both willingly participated in the evaluation. The evaluator informed Mother and H.P. that the family was not in need of services.  Consistent with the evaluator's verbal statements, Mother received a letter from HFI on February 19, 2020, stating that the family was not in need of any services.  Salter also received the letter and informed S. Schmidt that HFI was not recommending any services.

237.     S. Schmidt requested that Salter send her the letter and HFI contact information. Upon information and belief, after receiving and reading the HFI letter, S. Schmidt contacted HFI to request that they change their recommendations for the family. HFI subsequently reissued their recommendation letter, recommending that the family continue with PAAR and TRAC, as requested by S. Schmidt and/or the OCYF team. S. Schmidt subsequently represented to the court that Mother refused the services of HFI.

238.     S. Schmidt further testified during the August 2020 hearing that the agency had concerns about H.P.'s inconsistent attendance at therapy, despite knowing that H.P. attended weekly private therapy sessions and family therapy. S. Schmidt intentionally misrepresented H.P.'s attendance at therapy in order to keep the children dependent and in an effort to have H.P. ordered to attend therapy at TRAC.

239.     Mother and Father bore the cost of all of the children's private therapy once PAAR ended in December 2019 for D.P. and A.P. and March 2020 for H.P.  Mother and Father have also privately paid for family therapy for Mother and H.P. since June 2020, due to OCYF's failure and/or refusal to identify appropriate therapeutic providers for the family.

240.     S. Schmidt previously assured Mother that OCYF did not seek specific mental health information, but only sought to speak to the therapists in order to inform the Court that the children were participating in therapy. On November 2, 2020, S. Schmidt requested all mental health treatment notes regarding A.P., H.P., and D.P. from their therapists.

241.     Mother initially objected to signing releases for the childrens' mental health records, so that the children could have privacy regarding their mental health treatment. OCYF informed the Court that Mother refused to sign the releases and asked the Court to force Mother to execute the releases provided by OCYF.

242.     The Court ordered Mother to grant OCYF boundless access to private and sensitive mental health information to the detriment of the children and in violation of the minor-Plaintiff's rights.

### P.     REUNIFICATION SERVICES FOR MINOR-PLAINTIFFS

243.     At the insistence of OCYF, reunification therapy was ordered by the Court to occur at TRAC between J.C., H.P., A.P., and D.P.

244.     S. Schmidt arbitrarily scheduled the intake appointment at TRAC without input from Mother.   On the day of the intake appointment and knowing that Mother was unavailable, S. Schmidt informed Mother that if Mother did not attend, S. Schmidt would tell the Court that Mother was non-compliant and recommend that Mother be removed from the family home and all visits be supervised by OCYF.

245.     Upon information and belief, S. Schmidt, prior to Mother's arrival, informed TRAC Defendants that Father was guilty of the abuse allegations proffered by H.P. and that Mother would never have the children back.

246.     Throughout the entirety of the dependency proceedings, OCYF Defendants and TRAC Defendants discussed OCYF's desired outcome for the case and way in which TRAC could assist OCYF "right the wrong" done to J.C.  In furtherance of their agreed upon goal of keeping the children from Mother, TRAC issued a retaliatory report against Mother, advising that the children be placed in foster

care.  TRAC's recommendations were unsupported by any of the mental health professionals involved in the case and, upon information and belief, issued at the request and direction of OCYF.

247.     S. Schmidt intentionally excluded counsel for Mother and Father from the emails between herself and TRAC Defendants, while including Ramsey and Myhers. S. Schmidt intentionally withheld information from Mother and Father in an overt display of bias against Mother and Father.

248.     On November 6, 2019, A.P. and D.P. returned from TRAC overly distressed.  The children informed Mother that Ward asked A.P. and D.P. if they would like a new mother. Mother reached out to Ward, who stated that A.P. and D.P. simply "misunderstood" her statements but could not explain what she had stated to A.P. and D.P. that could have been misunderstood.

249.     Mother reported her concerns regarding Ward's behavior towards her children to Ryan-Schmidt and expressed a desire to file a complaint with the state licensing board. Mother's concerns included Ward's emotional manipulation of D.P.  by Ward and Ward standing in front of doors to prohibit A.P. and D.P. from leaving the room.

250.     Ryan-Schmidt refused to provide the information for the appropriate licensing board to Mother, despite three requests from Mother, and asked Mother to meet with her.  Mother met with Ryan-Schmidt for the first and only time on November 21, 2019 with Ward present for half of the meeting.

251.     Ryan-Schmidt informed Mother that OCYF was only interested in reuniting J.C. with his biological children and Mother should stop fighting OCYF's goal as she "didn't stand a chance." As Mother was exiting the building, Ryan-Schmidt further informed Mother that Ryan-Schmidt intended to state Mother was "interfering" if Mother chose to proceed with filing a complaint against Ward.

252.     Ryan-Schmidt appeared unannounced at D.P. and A.P.'s school on or about March 10, 2020. Without the consent or knowledge of Mother and contrary to their policy, Ryan-Schmidt pulled D.P. and A.P. from their classroom and attempted to hold a therapy session with A.P. and D.P. at school.  At no time did Mother provide consent to NASD to allow TRAC to speak to the children at school.

253.     Ryan-Schmidt became frustrated that A.P. and D.P. did not want to engage with her during the session at school.  Upon information and belief, she then threatened A.P. and D.P. with removal from Mother and Father if they did not agree to see J.C. Ryan-Schmidt later issued a report acknowledging that A.P. and D.P. were "overly stressed" during her appearance at their school.

254.     Ryan-Schmidt conducted this session in a school environment despite knowing that she had potentially been exposed to COVID-19 through a co-worker. Ryan-Schmidt recklessly exposed A.P. and D.P. and their parents and caregivers to COVID-19 without first warning them, or the school, of the risk.

255.     Mother filed complaints against TRAC in November 2019, January 2020, and March 2020 related to the therapists' conduct towards A.P. and D.P.  The State licensing board opened an investigation into Ryan-Schmidt and Ward for their improper and unethical conduct towards A.P. and D.P., including the emotional distress intentionally caused by TRAC.

256.     On March 13, 2020, immediately prior to a Permanency Review Hearing, OCYF produced a 25-page written report from TRAC.  Despite only meeting Mother on one occasion while Mother was filing a complaint against Ward, and having never spoken or met with Father, Ryan-Schmidt issued a retaliatory report making numerous treatment recommendations regarding Mother and Father.

257.     TRAC Defendants further requested that the Court remove A.P. and D.P. from Mother and all maternal family members and place A.P., D.P., and H.P. into foster care so that J.C. could obtain custody of H.P., A.P. and D.P.

258.     During the August 2020 permanency review hearing, S. Schmidt testified that, despite Dr. O'Hara's multiple recommendations for anger management related to J.C., it did not appear to OCYF Defendants that he needed anger management. S. Schmidt represented to the Court that TRAC Defendants conducted an evaluation of J.C. as to his need for anger management and found that he did not require anger management therapy.  Ryan-Schmidt later testified that she never evaluated J.C., but the couple

times she met with him he "seemed fine." In furtherance of their conspiracy, Ryan-Schmidt and S. Schmidt agreed to, and did, recommend that J.C. be relieved from future treatment.

259.     Ryan-Schmidt requested that S. Schmidt join Ryan-Schmidt and A.P. and D.P. for sessions, despite the obvious fear the children experienced around S. Schmidt.  While together, Ryan-Schmidt and S. Schmidt openly mocked the domestic violence committed by J.C. against Mother to the children, asking the children "isn't that funny?" Ryan-Schmidt and S. Schmidt told the children that Mother was lying about the domestic violence and that there were two sides to every story, and they shouldn't believe Mother. Ryan-Schmidt and S. Schmidt discounted the fact that H.P., D.P. and D.B. were present for the domestic violence, telling D.P.  he was too young to remember and that D.P. was making it more than it was.

260.     TRAC Defendants violated A.P. and D.P.'s right to privacy by including third parties in their mental health treatment without the knowledge or consent of Mother.

261.     Despite the Court's August 2020 order and Dr. O'Hara's recommendation that reunification therapy occur outside of TRAC, S. Schmidt later informed Mother that she spoke with TRAC and Ryan-Schmidt in order to have the case restart with TRAC.  OCYF Defendants and TRAC Defendants conspired to keep reunification therapy at TRAC in an effort to improperly remove A.P., D.P., and H.P. from Mother and Father.

262.     Ultimately, TRAC recused themselves from participating in the case due to a pending state investigation based upon their conduct towards A.P., D.P., and H.P.  Despite declining to offer services to H.P., D.P., and A.P., Ryan-Schmidt continued to advocate that A.P. and D.P. be placed in foster care, against the best interests of A.P. and D.P.  Despite acknowledging that Ryan-Schmidt met with Mother on only one occasion, Ryan-Schmidt continued to make slanderous statements regarding Mother in an effort to convince the Court to remove A.P. and D.P. from Mother and Mother's family's care.

Q.   **PAAR**

263.     Following the May 2019 Hearing, the Court ordered the children to attend individual therapy.  OCYF insisted that all of the children attend therapy at PAAR, despite no allegations of abuse as to D.P., A.P., F.P., and G.P. Mother objected to D.P, A.P., F.P., and  G.P.'s therapy occurring at PAAR due to the nature of the therapy provided by PAAR. H.P. began treatment with PAAR in May 2019.

264.     During H.P.'s initial session, therapist Abby Middleton (hereinafter "Middleton") informed H.P. that she was a mandated reporter, and their sessions would be confidential unless H.P. disclosed abuse. Middleton made these representations to H.P. knowing that J.C. signed a release for her to discuss H.P.'s confidential treatment with S. Schmidt. Middleton intentionally misled H.P. in order to gather information for OCYF through Middleton's therapeutic relationship with H.P. Upon information and belief, Middleton conducted weekly telephone calls with S. Schmidt, wherein she discussed H.P.'s confidential mental health information.

After H.P.'s second session, Middleton informed H.P. that she saw no reason why Mother could not return to the family home. Upon information and belief, upon hearing this information, S. Schmidt immediately contacted Middleton and requested that Middleton not make this recommendation to the Court in order to keep Mother out of the house.

265.     In January 2020, H.P. began requesting from Middleton that she be finished with therapy at PAAR. D.P. and A.P. were discharged from therapy in December 2019 and H.P. requested the same. Despite Middleton acknowledging that H.P. was not progressing and/or not participating in therapy and seemed stressed by the therapy, Middleton continued to force H.P. to attend therapy, stating that OCYF required H.P. to participate and there was nothing that H.P. or Middleton could do. Upon information and belief, Middleton was unwilling to end therapy for H.P. because OCYF Defendants requested that it continue.

R.   **CONTINUED HARASSMENT BY OCYF and OTHER DEFENDANTS**

266.     In May 2019, H.P. appeared at the preliminary hearing related to the criminal charges of Father.  Despite H.P. stating that she did not want to testify, H.P. was placed in an interrogation room with the District Attorney and two armed police officers and a detective and questioned for over an hour. When H.P.'s guardian objected to H.P. being questioned, H.P.'s guardian was forcibly removed from the room and the door barred by an armed officer so that she could not re-enter the room to be with H.P. H.P. was informed by the armed officer that she was not allowed to leave the room, despite repeated requests to be allowed to go.

267.     In August 2019, the family suffered an electrical fire at a detached structure at their home. The fire was determined to originate from a faulty electrical outlet behind an appliance within the structure. The day after the fire, S. Schmidt appeared at the family home, unannounced, to investigate the fire. S. Schmidt was seen walking around the back of the family home, uninvited, and peering into the windows of the home. S. Schmidt then parked up the street from the family home and watched potential buyers for the family home view the house with their agent. S. Schmidt engaged in trespass and harassment of the family through her "investigation" of an unrelated fire.

268.     OCYF Defendants and Myhers attempted to have Mother and Father investigated for arson, despite a lack of any evidence suggesting arson.

269.     OCYF presented a Motion to Inform the Court of the fire, implying that Mother or Father intentionally set the fire in the pool house and calling it "highly suspicious."

270.     Mother was already emotionally traumatized by the fire, which occurred late at night, and which Mother had to deal with by herself due to Father's exclusion from the family home. OCYF Defendants' and Myhers' malicious and unfounded accusations against Mother and Father caused additional undue mental and emotional distress during an already stressful event.

271.     During a visit with Father at the OCYF facility, Mother attempted to feed S.P. in the waiting room so that Father could continue his visit with F.P. and G.P.  Mother was sitting in a chair talking to the security guard when S. Schmidt called the guard.

272.     According to the guard, S. Schmidt requested that the guard remove Mother from the building because S. Schmidt did not want her on the premises.  S. Schmidt informed the guards that Mother was violent and to use force, if necessary.  Mother has no history of violence, in general, or towards S. Schmidt.

273.     Mother suffered from extreme embarrassment and mental anguish due to being escorted from the building by armed guards and S. Schmidt's statements.

274.     Neither S. Schmidt, nor any member of OCYF, conveyed any concerns to Father regarding Father's contact with the children. However, OCFY continued to request that Father's visits remain supervised and limited in duration with no articulable basis.

275.     On March 13, 2020, OCYF cancelled all visits with the children, including F.P. and G.P, following the COVID-19 outbreak. Father objected to OCYF interfering with his visits with F.P. and G.P. because Father was enjoying unsupervised visits at that time with F.P. and G.P.

276.     OCYF did not offer any alternatives for Father to see A.P. and D.P.  despite making accommodations for J.C. to see A.P. and D.P. at the OCYF facility during the closure of their facility. No like accommodations were offered to Father at any time.

277.     On March 18, 2020, prior to a motions hearing the bailiff for the Court chased after Father once he exited the Courtroom and verbally threatened Father with bodily harm. The verbal attack was witnessed by two attorneys for the County, both of whom expressed fear of retaliation by the Court if the incident was reported and advised Father to "let it go."

278.     Father reported the incident, and the Court's conduct, to Allegheny County Court of Common Pleas President Judge. However, no action was taken by the President Judge. Upon information

and belief, the President Judge has policy making authority within the Allegheny County Court of Common Pleas. Allegheny County did not investigate the actions of its employee and dismissed Father's claims via mail.

279.     S. Schmidt falsely testified to the Court when she testified that H.P. did not verbally recant her allegations of abuse to S. Schmidt. H.P. recanted the allegations directly to S. Schmidt initially on September 20, 2019, and again on January 22, 2020, when S. Schmidt visited H.P.'s school. OCYF Defendants intentionally withheld exculpatory evidence from the Court in an effort to maliciously keep Mother and Father from the children. Further, H.P. testified during the same hearing and recanted the allegations in open court, in front of S. Schmidt.

280.     OCYF Defendants, and DHS Defendants continually relied upon intentionally false statements, fabricated evidence and perjury as part of a successful effort to keep the minor-Plaintiffs dependent.

281.     OCYF Defendants' history of lying to the Court regarding the children extended the case and was done with malicious, intent, and reckless disregard for the rights of Plaintiffs.

282.     On August 28, 2020, the Court ordered the continued dependency of the minor-Plaintiffs, but granted Father unsupervised, community visits with D.P. and A.P. Three days after the hearing, S. Schmidt contacted Father and informed him that, contrary to the Court Order, no visits were to occur without the approval of S. Schmidt.

283.     S. Schmidt coerced Father into agreeing to terms set forth by S. Schmidt by threatening to take Father back to Court and requesting that visits resume in the supervised visitation center, which was closed due to the pandemic. Father would not be able to see D.P. and A.P., which S. Schmidt knew. Cooper and Snyder were aware of and condoned S. Schmidt's threats towards Father.

284.     On November 3, 2020, S. Schmidt made an unannounced visit to the home while Mother was not present. H.P. was present within the family home. H.P. was afraid to open the door because S. Schmidt was pounding on the door and attempting to force her way into the home.

285.     S. Schmidt proceeded to walk around the entirety of the property and peer into the family's windows. S. Schmidt trespassed upon the family's property and engaged in harassing behavior. H.P. feared that S. Schmidt was going to enter the home uninvited and hid in the house.

286.     On December 14, 2020, S. Schmidt requested a call with Mother, Father, Ramsey, Cooper, Myhers, and A.P. and D.P.'s therapist.  During the call, S. Schmidt informed Mother that Mother would have to transport A.P. and D.P. to visits with J.C.  When Mother voiced concern over being responsible for transportation of the children, S. Schmidt and Cooper informed Mother that OCYF would never recommend the dependency close unless and until A.P. and D.P. visited with J.C.

287.     S. Schmidt, Cooper, and Ramsey further threatened Mother with retaliation from the Court if she did not transport the children.  S. Schmidt, Cooper and Ramsey became so verbally abusive towards Mother that Father left the call because he could not listen to the comments S. Schmidt, Cooper, and Ramsey were making any longer.  Ramsey later disclosed to Mother that "the plan from the beginning" was that Mother would never regain custody of H.P., regardless of what Mother did.  S. Schmidt confirmed Ramsey's statements, over Ramsey's cautions not to say anything more.

288.     On December 15, 2020, during a home visit, S. Schmidt informed Mother that OCYF recommended that the Court remove the minor-children from Mother in order to "get the Court to move." Mother expressed how distressing and traumatic it was to read and hear that OCYF Defendants wanted her children removed from her care permanently.

289.     S. Schmidt informed Mother that OCYF Defendants and DHS Defendants extensively discussed the recommendation and decided that recommending removal was the only way to get the Court to make a decision in the case.  S. Schmidt stated that they "knew" the Court would not take the children

but made the recommendation regardless of the stress it would cause to Plaintiffs and with complete disregard for the risk that the Court may grant the request.

290.     OCYF Defendants exhibited a pattern of harassing and intimidating behavior towards Plaintiffs over the duration of two years that shocks the conscience.

### S.   **DR. TERRY O'HARA**

291.     Upon information and belief, at some point prior to September 4, 2019, OCYF sent a referral for numerous psychological evaluations to Defendant AFA who assigned them to O'Hara.  Upon information and belief, Dr. O'Hara is an employee of AFA.

292.     Dr.  O'Hara completed individual psychological evaluations of Mother, Father, S.M., and J.C. and group psychological evaluations of S.M. with all children, Father with G.P and F.P., Mother with H.P., and Mother and all children prior to the September 04, 2019 hearing.

293.     The psychological evaluations were completed at the request and referral of OCYF and the voluntary participation of the parties.  Dr. O'Hara and/or AFA completed the evaluations as an agent or employee of OCYF, as OCYF referred the parties to AFA and paid for AFA for its services. The Court did not Order the initial psychological evaluations. As such, Dr. O'Hara and AFA were not acting as an agent of the Court.

294.     Despite claiming a role as a "neutral" evaluator, Dr. O'Hara solicited questions for his evaluations from only OCYF. These referral questions were not provided by the Court. Dr. O'Hara refused to provide the questions posed by OCYF so that Counsel for Mother or Father could pose additional questions for O'Hara to address during his evaluations. The evaluations performed by  O'Hara were biased and designed to aid only OCYF in attempting to build a case against Mother and Father.

295.     It is the practice of O'Hara and/or AFA to perform his evaluations based upon the questions posed only by OCYF.

296. O'Hara, as a self-described neutral evaluator, makes findings consistent with the recommendations of OCYF, even when it is contrary to positions previously set-forth by AFA and/or . O'Hara himself.

297. Upon information and belief, AFA trains its psychologists to author biased reports in favor of the desired outcome set forth in OCYF's referral questions.

298. O'Hara completed a total of 24 psychological evaluations in this matter at the request of OCYF.

299. On or about May 20, 2020, Cooper requested that the parties participate in a phone conference with O'Hara. OCYF sought to have O'Hara expand upon his testimony and issue additional recommendations as to Mother and Father.

300. Father objected to the call, and to O'Hara issuing opinions that were not contained within his initial report and that were being made specifically at the request of OCYF.

301. Cooper then represented, on behalf of OCYF, that OCYF was requesting the meeting "to clarify O'Hara's recommendations for the family moving forward." Cooper and S. Schmidt further stated that OCYF was not requesting an amendment to O'Hara's report and that OCYF was "looking for a better understanding of the family's needs and services to move the proverbial ball forward in the case." OCYF had O'Hara's report since January 2020 and did not request "clarification" until the day prior to the hearing in an effort to intentionally delay the proceedings.

302. During the call, Cooper requested that O'Hara issue additional recommendations as to Mother, despite their representations to all parties that they were not requesting amendments to O'Hara's report.

303. At the request of Myhers, the court ordered O'Hara to issue an addendum to his report, causing the May 22, 2020 hearing to be postponed.

304.     O'Hara requested that counsel provide him with the information they wanted included in the report. Father objected to counsel telling O'Hara what to write in his addendum.

305.     At the request of OCYF Defendants, and in retaliation for Father and Mother's counsel objecting to O'Hara taking directives from OCYF, O'Hara altered his initial report to include a recommendation of "non-offender" or trauma-based counseling for Mother, despite never before issuing such an opinion. Upon information and belief, AFA Defendants, including Dr. O'Hara, retaliate against parents who question the relationship between AFA and OCYF.

306.     This recommendation was not based upon any new information and was not proffered until OCYF Defendants specifically requested that O'Hara recommend services for Mother.

307.     Upon information and belief, it is OCYF Defendants' practice, policy and/or custom to request AFA Defendants change and/or otherwise alter and/or falsify their recommendations based upon OCYF Defendants' desired outcome for the case. Upon information and belief, AFA Defendants' reports are dictated and/or guided by the requests and/or questions posed by OCYF Defendants.

308.     Upon information and belief, OCYF Defendants and AFA Defendants held frequent discussions, wherein OCYF and AFA Defendants discussed OCYF Defendant's desired outcome of keeping minor-children from Plaintiff-parents and the ways in which AFA Defendants could assist and further said goal. AFA Defendants took further actions, as outlined herein, in furtherance of the agreed upon goals.

T.   **OCYF HARASSMENT OF H.P.**

309.     S. Schmidt appeared at H.P.'s school on September 20, 2019 and attempted to convince H.P. to testify against Father. H.P. informed S. Schmidt that H.P. did not want to testify because H.P. lied regarding her allegations directed at Father. S. Schmidt requested that H.P. not repeat that statement to anyone else. S. Schmidt then drafted a list of "pros and cons" related to H.P. testifying. This list was handwritten by S. Schmidt. H.P. did not participate in the creation of this list. S. Schmidt later circulated the list to Ramsey, Cooper and Myhers, under the guise that H.P. authored the list. S. Schmidt did not provide the list to Mother or Father.

310.     Upon seeing the list attached to a Motion presented by Ramsey, Mother challenged S. Schmidt regarding the authorship of the list. Mother knows H.P. 's handwriting and the list was not in H.P.'s handwriting. S. Schmidt then acknowledged that H.P. did not, in fact, write the list.

311.     Despite acknowledging that H.P. did not write the list, S. Schmidt represented to the Court that H.P. wrote the list and that Mother should not be allowed to have continued contact with H.P.

312.     A Motion to preclude OCYF from speaking to H.P. due to S. Schmidt's conduct at H.P.'s school was subsequently filed by Ramsey. The Court deferred ruling on the Motion.

313.     On October 22, 2019, H.P. attended an individual evaluation with O'Hara but declined to participate after several minutes.

314.     O'Hara assured H.P. that she did not have to participate if she did not want to participate. O'Hara then reported to OCYF that H.P. failed to appear at her evaluation in order to ensure a second evaluation referral with H.P. OCYF requested a second evaluation of H.P. as "H.P. did not attend the evaluation on October 22, 2020."

315.     Mother objected to the second evaluation, because H.P. attended the first evaluation and spoke to O'Hara. Mother informed Snyder that S. Schmidt and/or OCYF were not acting in H.P.'s best interest by ordering her to attend a second psychological evaluation after H.P. declined to participate in the first evaluation.

316.     H.P. again declined to participate in the second evaluation.

317.     OCYF requested a third individual psychological evaluation of H.P. in December 2020. Following the evaluation, H.P. exited O'Hara's office crying inconsolably. H.P. informed Mother that S.Schmidt told O'Hara that H.P. was "crazy".

318.     OCYF Defendants, DHS Defendants and Allegheny County imposed unnecessary and mentally and emotionally damaging evaluations upon H.P., including ten (10) individual and interactional psychological evaluations.

U. **CONTINUED EMOTIONAL ABUSE BY OCYF**

319.     A teaming meeting occurred on or about November 26, 2019.  Prior to this meeting, Father's criminal charges were withdrawn by the District Attorney.

320.     Despite previously assuring Mother that J.C. would not be present at any future teaming meetings due to the abuse of Mother by J.C., S. Schmidt scheduled the teaming meeting with Mother and J.C. to occur together.

321.      When Mother verbally objected to the joint meeting, S. Schmidt stated she would make sure the Court was aware of Mother's non-compliance with OCYF. S. Schmidt subsequently filed multiple pretrial reports with the Court stating that Mother refused to meet with "the agency" and J.C.

322.     Mother and Mother's counsel again reached out to Zubryd in an effort to determine why OCYF Defendants were now harassing and intimidating Mother in this manner.   Following Zubryd's involvement for a second time, OCYF held separate meetings for Mother and J.C.

323.     On January 16, 2020, Mother became aware that S. Schmidt again scheduled a joint teaming meeting with Mother and J.C.  Mother requested from S. Schmidt, Snyder and Cooper that the meetings be scheduled separately. Mother's request was denied. Mother then contacted Zubryd again about S. Schmidt and Snyder's continued harassment and emotional abuse of Mother.

324.     Zubryd assured Mother he emailed OCYF to resolve the issue.  On January 22, 2020, Zubryd informed Mother that he was assured by OCYF that there would be separate meetings.

325.     On June 19, 2020, S. Schmidt testified regarding Mother's unwillingness to participate in joint meetings and used it as a reason Mother was not fully compliant with the OCYF's plan.  Further, OCYF submitted a court summary stating that "Mother appears to struggle with having teaming meetings that include all parties."

326.     On June 20, 2020, Counsel for Mother reached out to Zubryd, requesting clarification on OCYF's policy related to domestic violence and teaming meetings due to S. Schmidt's continued portrayal

of Mother in a negative light to the Court due to Mother's request for separate teaming meetings. Zubryd directed Mother to contact Zara Carroll, OCYF Manager of Policy and Practice. Ms. Carroll assured Mother that Ms. Carroll reviewed Mother's concerns and that all meetings would be separate.

327.     On January 7, 2021, OCYF again requested that Mother participate in a joint meeting with J.C.

328.     S. Schmidt and/or the OCYF Defendants intentionally and/or negligently inflicted emotional distress upon Mother by forcing Mother to attend teaming meetings with her abuser.

V.     **CONTNUATION OF DECEMBER 2019 PERMANENCY REVIEW HEARING**

329.     Following the September 2019 Permanency Review Hearing, the Court scheduled the next Permanency Review Hearing to occur on December 18, 2019.

330.     OCYF was ordered by the Court to place a referral for Father to attend a psychological evaluation with O'Hara.

331.     During the teaming meeting on or about November 26, 2019, S. Schmidt stated that she did not complete the referral for Father's evaluation with O'Hara due to being "too busy" with her other 19 cases and she was in no rush to schedule the evaluations.  S. Schmidt stated that she would get to the evaluation when she felt like it.

332.     On November 27, 2019, OCYF filed a Motion to Continue the Permanency Review Hearing.

predicated upon the evaluations of Father not being completed due to S. Schmidt's refusal to enter to the referral for Father.

333.     OCYF intentionally delayed the December 2019 permanency review hearing by refusing to enter the referrals for Father in an effort to keep the dependency proceedings open.

334.     The Court granted OCYF's Motion to Continue three weeks prior to the hearing, despite it being clear that OCYF intentionally caused the delay and then requested a continuance in an effort to

postpone the hearing after finding out that Father's criminal charges were *nolle prossed* and that H.P. fully recanted her allegations on multiple occasions.

335. Despite OCYF Defendants previously stating that the dependency complaints would be withdrawn if Father's charges were withdrawn, OCYF instead embarked on a malicious, drawn-out attack upon Mother in a shocking display of gender bias. Following the withdrawal of Father's charges, OCYF's focus shifted completely to reunification with J.C., despite Mother complying with all of OCYF's requirements and Court Orders. Teaming meetings focused solely on TRAC reunification; OCYF requested and obtained additional evaluations with O'Hara to determine if "Mother was interfering in reunification," and Mother was suddenly labeled "minimally compliant" because she refused to attend counseling at TRAC, instead treating with her own therapist. OCYF Defendants also informed the Court that progress could not be made because Mother refused to attend joint teaming meetings with the man who viciously attacked her and because Mother escalated her concerns to superiors.

336. On December 11, 2019, S. Schmidt lied to O'Hara about Father's criminal case, denying that OCYF had been provided with documentation regarding the criminal charges being withdrawn. Father previously provided the documentation at OCYF's request. The OCYF Defendants were aware of, and participated in, the lies perpetuated by S. Schmidt.

W. **NORTH ALLEGHENY SCHOOL DISTRICT**

337. S. Schmidt conducted a surprise visit at Carson Middle School on January 22, 2020.

338. Prior to that date, H.P. informed the school secretary that she did not want to meet with OCYF at the school. H.P. further stated that she did not want to speak with S. Schmidt. On January 22, 2020, H.P. was called to the office and informed that S. Schmidt wanted to speak with H.P.

339. H.P. attempted to run from S. Schmidt by slipping out of a side door into the main school. H.P. returned to her classroom and hid in one of the closets to escape S. Schmidt. The Carson Middle School secretary entered H.P.'s classroom, physically grabbed H.P. and pulled her from the classroom.

340.     School personnel stood in front of the conference room door so that H.P. was not able to leave once the secretary forced her into the room. S. Schmidt refused to allow H.P. to leave the room, despite repeated requests from H.P.

341.     During the meeting, S. Schmidt told H.P. she "knew" H.P. did not want to speak with S. Schmidt because of Mother's influence. H.P. denied this, stating that H.P. did not like S. Schmidt and felt bullied by her. S. Schmidt continued to slander Mother to H.P. and asked H.P. if H.P. liked Mother.

342.     Following the encounter with S. Schmidt, H.P. had a panic attack and had to leave the school due to the anxiety caused by S. Schmidt and school personnel. H.P.'s counsel filed a Motion for Protection against S. Schmidt following the January 22, 2020 encounter due to S. Schmidt's harassment of H.P.

343.     Following the encounter, Mother emailed Carson Middle School regarding the interaction and requesting access to H.P. be restricted on school property. The school refused to protect H.P. from the harassment of OCYF.

X.   **SCHOOL PICKUPS BY S. SCHMIDT**

344.     S. Schmidt began transporting A.P. and D.P. to TRAC after receiving multiple reports from OCYF transport that A.P. and D.P. were extremely upset, crying, and refusing to participate during the TRAC sessions.

345.     S. Schmidt, with the aid of her assistant, Hannah, picked the A.P. and D.P. up from Hosack Elementary School on or about February 13, 2020.

346.     A.P. and D.P. informed Hannah that they did not want to attend the TRAC session. Hannah requested that they tell S. Schmidt at the car. Hannah proceeded to force A.P. and D.P. into the vehicle and S. Schmidt locked the doors so that A.P. and D.P. could not get out. D.P. cried on the ride down to TRAC while A.P. attempted to console him. A.P. and D.P. returned to Mother sullen, withdrawn, and afraid to return to school.

347.     On February 27, 2020, S. Schmidt attempted to pick A.P. and D.P. up from school. A.P. and D.P. refused to enter the vehicle.

348.     It was 37 degrees outside when S. Schmidt forced the children to stand outside of her vehicle for 20 minutes. S. Schmidt only agreed to take the children home instead of to TRAC because "it was too cold for (her) to stand out here." S. Schmidt told the children that the next time they "pulled this crap" she would let them stand outside and freeze before she took them home.

349.     Due to her ability to carry out the threat, minor-Plaintiffs' were afraid of S. Schmidt and her threats of harm against them, such that it caused them severe emotional distress, including nightmares, stomach aches, headaches, sullenness, and loss of enjoyment of life.

350.     On March 5, 2020, S. Schmidt attempted to pick up A.P. and D.P. from school. A.P. and D.P. attempted to flee from her by getting on their school bus. S. Schmidt had them removed from the bus by school personnel and tried to force them into her vehicle. The children refused and began to cry. S. Schmidt informed the children that she would take them from their Mother if they didn't agree to see J.C. and get in her car. Minor-Plaintiffs ran into the school following S. Schmidt's threat of removal from their Mother.

351.     Upon information and belief, S. Schmidt then called Snyder and informed her of the situation. Snyder advised S. Schmidt on how to proceed, including continuing to threaten the children.

### Y.   **INTENTIONAL DELAYS BY OCYF**

352.     Father presented a Motion for Special Relief, requesting that Father be allowed to attend family therapy with H.P. H.P.'s family therapist agreed with Father participating in the family therapy. OCYF Defendants objected to Father's Motion for Special Relief in order to keep Father and H.P. apart longer and further delay the dependency in order to "buy" J.C. additional time.

353.     During the August 2020 Permanency Review Hearing, Father requested that an interactional evaluation occur between himself and H.P. during the August 2020 hearing. The Court requested documentation from H.P.'s therapist stating that it was okay for the interactional evaluation to

occur. OCYF requested that the recommendation come from H.P.'s individual therapist and not the family therapist, who already recommended that Father and H.P. be reunited.

354. Mother presented a Motion for Special relief in November 2020, providing the requested documentation from H.P.'s therapist to the Court and OCYF Defendants. OCYF objected to the letter from H.P.'s therapist, stating that it was not long enough and OCYF needed the opportunity to cross-examine H.P.'s therapist regarding her position. The Court deferred ruling on Mother's Motion, despite Mother providing the requested information from H.P.'s therapist.

355. On August 28, 2020, after four days of testimony, the Court entered an Order for a single additional psychological evaluation related to H.P. On October 23, 2020, OCYF filed a Motion to Inform the Court, incorrectly averring that the Court previously ordered 12 evaluations during the August 2020 permanency review hearing. OCYF requested that the Court issue an Order, requiring Mother, Father, J.C., S.M., and all five children to undergo individual evaluations and for Mother, Father, and S.M. to undergo interactional evaluations with the children.

356. OCYF attempted to maliciously delay the upcoming Permanency Review Hearing by requesting and misrepresenting to the Court that additional evaluations were ordered. By waiting 56 days after the last Permanency Review Hearing, OCYF ensured that these new evaluations could not be completed prior to the next Permanency Review Hearing.

357. Further, Cooper represented to the Court that O'Hara assured OCYF that he would complete the evaluations and issue a report prior to the December 9, 2020. Upon information and belief, O'Hara did not speak with OCYF nor did he assure OCYF that the report would be completed by December 9, 2020.

358. To the contrary, O'Hara denied that the report would be completed in time and further denied ever being contacted by OCYF regarding the report. OCYF intentionally misled the Court in order to

obtain an additional eleven psychological evaluations just weeks prior to the hearing. OCYF attempted to again delay the hearing.

Z. **EXPERT REPORT OF DR. SHANNON EDWARDS**

359.    Counsel for Mother and Father, *pro se*, produced their expert report from Dr. Shannon Edwards on May 21, 2020.

360.    In authoring her report, Dr. Edwards attempted to speak to all of the providers in the case.

361.    OCYF refused to allow Dr. Edwards to speak to S. Schmidt.

362.    TRAC Defendants refused to speak to Dr. Edwards.

363.    Despite their averments that they are a neutral third-party evaluator, TRAC Defendants sought the counsel of Cooper regarding their obligation to speak with Dr. Edwards.

364.    Cooper advised TRAC Defendants to speak with Dr. Edwards.

365.    Upon the legal advice of OCYF, TRAC Defendants spoke with Dr. Edwards, but refused to provide their records.

366.    On May 6, 2020, Mother and Father presented an emergency petition for access to records so that Dr. Edwards could access the same records that OCYF Defendants, Myhers, and Ramsey previously provided to O'Hara, but not to Mother and Father. OCYF Defendants objected to Dr. Edwards' access to the childrens' records.

367.    The Court denied the petition and subsequently criticized Dr. Edwards for not "doing more" to obtain the records. .

368.    Despite receiving Dr. Edwards report on the day before the May 22, 2020 hearing, and considerably longer than they had the TRAC report in March 2020, OCYF objected to the Court considering the report of Dr. Edwards and requested that the hearing proceed without the testimony of Dr. Edwards.

369.    Further, OCYF attempted to have the Court strike the report of Dr. Edwards on the basis that she issued opinions related to J.C.

AA. **OCYF threatens H.P. and the County denies her right to counsel.**

370.     On May 30, 2020, S. Schmidt and another OCYF caseworker came to Mother's house regarding a ChildLine report called in by D.B.'s biological father, T.B.

371.     In an effort to scare Mother, OCYF informed Mother that H.P. might be criminally charged. OCYF had no basis to make such a statement to Mother, as there were no grounds for criminal charges to be filed against anyone, let alone H.P.

372.     Prior to leaving the residence, S. Schmidt reiterated that she would ensure Mother never regained custody of her children as long as she remained with Father.

373.     Mother retained private criminal counsel for H.P. based upon these threats by OCYF and/or S. Schmidt. Once retained, counsel refused to allow OCYF to speak to H.P. privately without being present.

374.     On June 2, 2020, OCYF was made aware that the internet searches occurred primarily at D.B.'s father's house and were conducted by D.B., not H.P.

375.     After reviewing D.B.'s search history and speaking with the school, Mother discovered that D.B. conducted 87 questionable, but not criminal, searches while at his biological Father's home.

376.     D.B. admitted to OCYF that he conducted the searches and that H.P. had nothing to do with the searches on the iPad.

377.     OCYF never requested or obtained the information related to D.B.'s search history after finding out H.P. did not conduct the searches.

378.     Despite D.B.'s admission, OCYF continued to represent to the Court that H.P. performed the searches at Mother's house.

379.     Cooper stated to the Court that the searches showed that H.P. needed therapeutic supports, knowing that H.P. did not conduct the searches.

380.     OCYF filed a Motion to Preclude Mother from retaining private counsel for H.P., insisting that H.P.'s conflict counsel, who does not practice criminal law, could represent H.P.

381.     The Court ruled that H.P. was not entitled to private counsel "as long as she is in my courtroom", and ordered H.P. to meet with OCYF without private representation.

382.     Despite numerous requests, S. Schmidt and/or the OCYF team refused to provide Mother with any information related to the Childline report that they received. Mother requested the information in writing following S. Schmidt's continuous lies and false statements to the Court. S. Schmidt responded to Mother's request that it was the OCYF's policy not to provide information in writing. Snyder and Cooper were included on S. Schmidt's email.

383.     Upon information and belief, OCYF's policy of not providing information in writing arises from OCYF's practice of providing false information to the Court. OCYF ensures that there is no written statements contradicting the lies made to the Court by OCYF Defendants.

384.     S. Schmidt advised T.B. that the OCYF team and/or S. Schmidt were requesting that he withhold all custody of D.B. from Mother.  Due to OCYF's request, D.B. was kept from Mother and his siblings for seven months and counting.  During this time, Mother and minor-Plaintiffs had minimal to no contact with D.B.

385.     D.B. suffered extreme mental and emotional distress as a result of OCYF's request that T.B. withhold custody from Mother, resulting in him running away from T.B.'s house.  D.B. was found entering an interstate highway on his bicycle while attempting to travel to Mother's house.  The profound psychological effects of OCYF's interference with D.B.'s familial relationships are yet undetermined.

BB. **JUNE 2020 PERMANENCY REVIEW HEARING**

386.     The Permanency Review hearing began on June 18, 2020.

387.     During O'Hara's testimony during the June 18, 2020 hearing, he made various recommendations regarding J.C. O'Hara acknowledged that OCYF disregarded his recommendations for J.C.'s anger management classes. O'Hara further acknowledged that it was concerning and unusual that OCYF would ignore J.C.' history of domestic violence and anger issues. Dr O'Hara recommended on four separate occasions that J.C. attend anger management therapy and take responsibility for his actions.

388.     The Court continued the June 2020 permanency review hearing until August 27, 2020.

CC. **UNFOUNDED CHILDLINE**

389.     On April 17, 2020, the H.P. Childline was determined to be unfounded by OCYF.

390.     Despite the Childline being unfounded and H.P. testifying in open court that she lied, the OCYF Defendants and DHS Defendants maliciously continued its efforts to "right" their perceived wrong against J.C. and advocate for the children to be removed from Mother and Father.

391.     At no point in time did OCYF Defendants bring it to the attention of the Court the exculpatory evidence that H.P.'s Childline was closed as "unfounded".

DD. **AUGUST 2020 PERMANENCY REVIEW HEARING**.

392.     The Court resumed the permanency review hearing on August 27, 2020.

393.     During the August 27, 2020 hearing, S. Schmidt testified that OCYF Defendants were recommending the immediate removal of the A.P., D.P., and H.P. from S.M. and placement of those children with J.C.

394.     S. Schmidt acknowledged that this recommendation was against the best interest of the children, but that they would get over it. S. Schmidt further acknowledged that the recommendation would be overly traumatic for the children, who had continually and constantly refused all reunification efforts with J.C. OCYF's recommendation was not recommended by any of the therapists or psychologists involved in the case.

395.     During the hearing, TRAC Defendants, and OCYF Defendants failed to convey to the court the significant emotional distress D.P. and A.P. were experiencing due to TRAC. The Defendants continued to represent to the Court that the minor-Plaintiffs were doing well, so as to continue the dependency proceedings.

EE. **GENDER BIAS**

396.     S. Schmidt informed Mother that OCYF is a "mom-centered" service and their focus is the mother, regardless of who the alleged abuser is.

397.     OCYF Defendants and DHS Defendants have a policy of gender bias and discrimination against woman, requiring women to "prove" that they are fit as parents while allowing the men to complete simple requirements, such as attending quarterly teaming meetings, before determining that OCYF Defendants and DHS Defendants are satisfied with the mens' compliance.

398.     OCYF Defendants refused to make any recommendations as to J.C., willfully ignoring O'Hara's recommendations for anger management for J.C. OCYF Defendants labeled J.C. substantially compliant due to his participation in quarterly meetings.

399.     OCYF Defendants requested the Court order Father to participate in two evaluations and family therapy to satisfy their "concerns."

400.     OCYF Defendants requested the Court order Mother to more 10 different services, despite Mother being accused of no abuse and no finding of abuse occurring at any point throughout the proceedings. Mother was ordered to complete domestic violence counselling, meet with in-home services twice a week, attend drug and alcohol screenings, complete five psychological evaluations, trauma-based therapy, non-offender's therapy, family therapy, and in-home evaluations with mental health providers, despite no mental health concerns, drug abuse history or criminal history for Mother.

401.     Despite completing every requirement asked of her, OCYF Defendants continued to label Mother as "minimally compliant" because Mother refused to participate in teaming meetings with J.C., who was convicted of assaulting Mother and who had an active criminal no contact order against him when the case initiated, and for "escalating her concerns" to higher authorities than the Caseworker.

402.     S. Schmidt testified during the August 28, 2020 hearing that OCYF Defendants had no concerns regarding D.B. and/or D.B.'s biological father's failure to supervise D.B. In a display of overwhelming gender bias. S. Schmidt testified that, despite the majority of the searches occurring at T.B.'s home, the OCYF team was only concerned with Mother and investigating Mother, further discriminating against Mother.

403.     On December 14, 2020, Mother was informed by Ramsey, in front of Myhers, S. Schmidt and Cooper, that it was never the Defendants' plan for Mother to obtain custody of her children again. S. Schmidt confirmed Ramsey's statement, over Ramsey's advice to stop talking.

FF.  **POLICY AND PROCEDURES**

404.     OCYF Defendants, DHS Defendants and Allegheny County were made aware of and/or should have known about the insufficient screening/training and/or hiring of Caseworkers and OCYF supervisors in 2017 following the State of the Child report. Despite knowing of the shortcomings of the Caseworkers and supervisors, OCYF Defendants, DHS Defendants and Allegheny County failed to act to implement any policies or procedures that would mitigate insufficiencies and protect Plaintiffs' constitutional rights.

405.     Due to their failure to act, OCYF Caseworkers and OCYF supervisors with insufficient training were placed in positions to act outside of their scope of employment and deprive parents of their right to their children.

406.     On information and belief, OCYF Defendants developed and maintained unconstitutional policies and customs exhibiting willful disregard for the constitutional rights and other rights of parents and children, including, but not limited to, the following policies or customs, which proximately caused damages to Plaintiffs:

    a.   Inadequately and improperly investigating allegations of abuse or neglect;

    b.   Inadequately supervising and training its caseworkers, including but not limited to Defendants M. Schmidt, Snyder, Birdseye, and S. Schmidt;

    c.   Seeking dependency orders for children who do not meet the statutory requirement of being without parental control or supervision;

    d.   Imposing arbitrary, onerous, unlawful and irrelevant preconditions to reunification of parents with their children;

e.  Arbitrarily withholding mandated and available services that would alleviate dependency and/or placement and/or achieve reunification;

f.  Requiring mental health evaluations and services as a condition of reunification of parents and children;

g.  Seeking separation of parents from their children despite the fact that the statutory requirement that there be no feasible alternatives to separation is not met;

h.  Seeking retribution against parents and others who lawfully question and/or oppose the illegitimate actions and conduct of the Allegheny County Defendants;

i.  Acting with intention and/or reckless disregard of the Constitution and statutory rights of individuals with either or both intent to discriminate or through improper execution of its duties;

j.  Unlawfully interfering with the sanctity of marriage by requiring the separation of Mother and Father as a precondition of the return of the children;

k.  Obtaining personal confidential medical information through deceitful practices.

407.  Allegheny County, OCYF Defendants and DHS Defendants, as policy making officials, were aware of the deficiencies related to the hiring and training of OCYF employees due to the "State of the Child reports" generated annually.

408.  Despite having knowledge of the lack of training and sub-par hiring practices, Allegheny County, OCYF Defendants, and DHS Defendants failed to properly and/or adequately train and/or supervise Defendant employees of OCYF about the federal and state Constitutional and statutory restrictions on their authority to separate children from their parents.

409.  Upon information and belief, OCYF Defendant, DHS Defendants, and Allegheny County knew or should have known that employees and/or agents of OCYF had violated the constitutional and statutory rights of Plaintiffs and others, yet OCYF Defendant, DHS Defendants, and Allegheny County did

not require appropriate training or re-training of the Defendant employees under their supervision and control.

410.     OCYF Defendant, DHS Defendants, and Allegheny County had a policy of deliberate indifference to the rights of parents in the situation and as a result of the policy, failed to supervise, control, or direct the conduct of its social workers.

411.     OCYF Defendant, DHS Defendants, and Allegheny County are deliberately indifferent to the need to train and/or supervise its employees adequately, leading to the loss of familial association at a rate 50% higher than the national average.

412.     OCYF Defendant, DHS Defendants, and Allegheny County knew or should have known that the failure to provide appropriate training or re-training would result in future deprivations of Constitutional and statutory rights.

413.     It is the policy, custom and/or practice of OCYF Defendants to provide *ex parte* pretrial reports to the Court to improperly bias and mislead the Court. Further, upon information and belief, the pretrial reports were signed by S. Schmidt and/or Snyder and submitted to the Court with the intention that it be relied upon by the Court in rendering its decision.

414.      Upon information and belief, it was the duty of S. Schmidt and Snyder to accurately and fully report to the Court all evidence discovered during dependency investigations, including exculpatory evidence and conflicting evidence favorable to the parents and that any reasonable OCYF caseworker in similar circumstances would know it was unlawful to fail to adhere to such a standard.  OCYF caseworkers, including S. Schmidt and Snyder, breached their duty by including numerous lies, falsifying evidence, and suppressing exculpatory information in the County's pretrial report.  This includes, but is not limited to, the fact that H.P. recanted her allegations on numerous occasions, and that Father's charges were *nolle prossed*.  Defendants also failed to mention that the minor-Plaintiffs were enduring considerable stress due to the removal from Mother and Father.

415.     Despite the lack of any evidence that minor-Plaintiffs had suffered from any abuse or that Father and/or Mother represented any danger to the minor-Plaintiffs, the Court continued to detain minor-Plaintiffs.  OCYF Defendants demanded that Mother file for divorce from her husband if she wished to regain custody of her children. Upon information and belief, OCYF Defendants, DHS Defendants and Allegheny County have a well-established policy, custom, usage and practice of making similar unlawful and outrageous demands of parents. Undeterred by demonstrable evidence that minor-Plaintiffs were better off in the care of Mother and Father, OCYF Defendants, DHS Defendants and Allegheny County maliciously refused to return minor-Plaintiffs to Mother and Father and/or request immediate dismissal of the dependency case.

416.     As a result of OCYF Defendants, DHS Defendants and Allegheny County aforementioned conduct, Plaintiffs suffered and continue to suffer mental and physical pain and suffering including but not limited to: loss of enjoyment of life, stress, anxiety and depression, PTSD, headaches, stomach aches, sleeplessness, and loss of consortium.

417.     As a result of Defendants aforementioned conduct, Plaintiffs suffered, and continue to suffer, significant economic losses including but not limited to:  approximately $250,000.00 in legal fees related to the Allegheny County Court of Common Pleas proceedings that OCYF Defendants initiated and maintained based on false and misleading information, approximately $19,200.00 in rent for an apartment for Father due to the above described conduct of the Defendants, approximately $6,000.00 in community based activities with the children as required by OCYF Defendants, and approximately $17,000.00 on expert testimony and therapists' testimony to defend against OCYF Defendants witch hunt.

**COUNT I**

**Procedural Due Process Violation under the 14th Amendment**

*Plaintiffs v. OCYF Defendants, DHS Defendants, McCandless Defendants and Allegheny County*

418.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

419.     Plaintiffs are individuals and citizens of the United States, protected by 42 U.S.C. 1983.

420.     At all times relevant herein, the right to procedural due process, guaranteed under the Fourteenth Amendment to the United States Constitution were "clearly established" such that any reasonable social services agent in Defendants' position would know that it is unlawful to abridge the procedural due process rights guaranteed under the 14th Amendment of parents and children.

421.     Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourteenth Amendment, to include without limitation, the protection of Plaintiffs' right to procedural due process.

422.     Defendants, and each of them, were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired to violate Plaintiffs' constitutional rights by, but not limited to:

    a.   Seizing minor-Plaintiffs from the care, custody, and control of their parents and/or questioning, threatening, examining or searching a child in the absence of exigent circumstances without first obtaining a warrant or other court order to do so;

    b.   Failing to hold an adjudicatory hearing following minor-Plaintiffs' placement in shelter care within the statutorily required length of time;

    c.   Deferring ruling on S.P.'s dependency petition for six (6) months and keeping her in state custody before returning her to Mother and Father's care and custody; and

    d.   Failing to conduct permanency review hearings as required by statute

thereby violating Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.

423.     At no time ever did any of the Defendants have any specific, articulable evidence to support any reasonable basis to believe that minor-Plaintiffs were in immediate danger of sustaining serious bodily injury or death within the time it would have taken the Defendants to seek and obtain a custody warrant or court order.  Indeed, Plaintiffs are informed and believe and thereon allege that Defendants, and each of them purposefully or recklessly failed to seek a protective custody warrant or court order.

424.     At the time of the seizure, other more reasonable and less intrusive means existed to secure Plaintiffs' civil rights and security, short of the warrantless seizure and detention, yet these Defendants, and each of them, intentionally, or with a reckless, wanton, or malicious disregard for Plaintiffs' rights, failed to pursue or investigate such less intrusive alternative means of keeping the family together.

425.     With respect to the Doe Officers, through their extensive training as police officers, on information and belief, they were aware of the aforementioned constitutional rights of parents and children to live together without government interference.  On information and belief, they were equally aware through their training and experience that they had an affirmative obligation to intercede and intervene to protect the rights of citizens, like H.P., D.B., D.P., and A.P., when they witnessed the violation of constitutional rights.

426.     Doe Officers stood by and failed to intercede and intervene on H.P., D.B., D.P., and A.P.'s behalf.  They also provided agreement, concurrence, and armed support for Birdseye when H.P., D.B., D.P., and A.P. were seized without a warrant and in the absence of any exigency and interviewed. They further provided agreement, concurrence, and armed support for Birdseye when she falsified information to the Court to obtain an ECA.

427.     No reasonable officer in Doe Officers' position could have believed that their conduct, agreeing to and supporting the warrantless seizure and interrogation of Plaintiffs under the circumstances then presented was lawful.

428.     By their subsequent conduct, OCYF Defendants and DHS Defendants ratified the wrongful conduct of Defendants Birdseye, and M. Schmidt and all known and unknown employees of OCYF, intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

429.     Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, violating Plaintiffs' rights to be free from compelled speech, and violating Plaintiffs' rights to freedom of association. Said acts were taken deliberately, with callous or reckless indifference to the substantive rights of Plaintiffs or fueled by an evil motive or intent.

430.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

431.     Due to the malicious, wanton, callous, reckless, wrongful, and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

## COUNT II

### Violation of 1st Amendment Rights

*Mother and Father against OCYF Defendants, DHS Defendants, Allegheny County, McCandless Defendants, AHN Defendants, AFA Defendants, Inclusive*

432.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

433.     Plaintiffs are individuals and citizens of the United States, protected by 42 U.S.C. 1983.

434.     At all times relevant herein, the right to association, right to be free from compelled speech, and right to be free from retaliation, guaranteed under the First Amendment to the United States Constitution were "clearly established" such that any reasonable social services agent and/or police officer and/or medical person and/or governmental worker in Defendants' position would know that it is unlawful to abridge the First Amendment rights of parents and children brought within the jurisdiction of the juvenile dependency Court.

435.     Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the First Amendment, to include without limitation, the protection of Plaintiff-parents' right to be free from compelled speech and the right to freedom of association.

436.     Defendants, and each of them, were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired to violate Plaintiff-parents' constitutional rights by, but not limited to:

  a. Taking minor-Plaintiffs from Plaintiff parents in violation of First Amendment right of association, including but not limited to, the right to co-habitat with children and rear children;

  b. Demanding that Mother separate from and/or divorce Father in order to regain custody of minor-Plaintiffs;

  c. Restricting Mother and Father's ability to speak freely and openly with minor-Plaintiffs about certain topics;

d. Requiring Mother and Father to attend evaluations in which they were compelled to provide private and sensitive information, against their will, including answering questions about drug and alcohol use, mental health history, sexual orientation and sexual history; and

e. Enduring harassing and intimidating interrogations by OCYF Defendants, AFA Defendants, TRAC Defendants, and McCandless Defendants on multiple occasions

thereby violating Plaintiffs' rights under the First Amendment to the United States Constitution.

437. Under the First Amendment to the United States Constitution, Mother had the right to engage in free speech, particularly as to the matters of public importance, including misconduct of OCYF caseworkers.

438. Allegheny County, OCYF Defendants and DHS Defendants, as governmental agencies and state actors, respectively, are prohibited from retaliating against individuals for exercising their First Amendment rights or taking other action to prevent or discourage the exercise of such rights.

439. Mother engaged in protected activity and exercised her First Amendment rights by seeking to disclose information regarding matters of public importance, namely the unconstitutional and illegal activity of OCYF caseworkers.

440. OCYF Defendants retaliated against Mother by reporting to the Court that she was "minimally compliant" due to escalating her concerns to DHS Defendants. Further, OCYF Defendants set out to "right the wrong" done to J.C. after Mother complained to DHS Defendants about OCYF's conduct.

441. TRAC Defendants retaliated against Mother filing complaints with the State Licensing Board regarding their misconduct when they authored a report recommending the minor-Plaintiffs be removed from Mother and isolated from all of Mother's family. Such a recommendation was contrary to the best interests of the children and contrary to the opinions of all mental health providers involved in the case.

442. AFA Defendants retaliated against Mother and Father following Father's objection to O'Hara eliciting information from OCYF as to what to write in O'Hara's report. Following Father's objection, O'Hara issued recommendations for the first time in over 18 months directed at Mother and advised that Father be kept from minor-Plaintiffs. O'Hara's recommendation was not supported by any new clinical evidence and occurred solely after Father voiced concern and objected to O'Hara's improper and unethical behavior.

443. OCYF Defendants, Allegheny County and DHS Defendants' actions were motivated, in whole or in part, by Mother's protected activity.

444. By their subsequent conduct, OCYF Defendants and DHS Defendants ratified the wrongful conduct of Defendants Birdseye, S. Schmidt and all known and unknown employees of OCYF, intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

445. Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the First Amendment of the United States Constitution, by, but not limited to, violating Plaintiffs' rights to be free from compelled speech, and violating Plaintiffs' rights to freedom of association. Said acts were taken deliberately, with callous or reckless indifference to the substantive rights of Plaintiffs or fueled by an evil motive or intent.

446. Due to the malicious, wanton, callous, reckless, wrongful, and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

## COUNT III

### Violation of 4th Amendment Rights

*Mother and Father against OCYF Defendants, DHS Defendants, Allegheny County, McCandless Defendants, and AHN Defendants, Inclusive*

447.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

448.     At all times relevant herein, the right to be free from illegal search and seizure, guaranteed under the Fourth Amendment to the United States Constitution were "clearly established" such that any reasonable social services agent and/or police officer and/or government agent in Defendants' position would know that it is unlawful to abridge the Fourth Amendment rights of parents.

449.     Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourth Amendment, to include without limitation, the protection of Plaintiff-parents' right to be free unlawful search and seizure.

450.     Defendants, and each of them, were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired to violate Plaintiff-parents' constitutional rights by, but not limited to:

     a.  Improper searches of the family home by OCYF Defendants;

     b.  Unconstitutional searches of Mother through the testing of bodily fluids; and

     c.  Seizure of Plaintiff-parents by OCYF Defendants and McCandless Defendants on February 6, 2019

 thereby violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

451.     By their subsequent conduct, OCYF Defendants and DHS Defendants ratified the wrongful conduct of Defendants Birdseye, S. Schmidt and all known and unknown employees of OCYF, intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

452.     Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the Fourth Amendment

of the United States Constitution, by, but not limited to, violating Plaintiffs' rights to be free from unlawful search and seizure.  Said acts were taken deliberately, with callous or reckless indifference to the substantive rights of Plaintiffs or fueled by an evil motive or intent.

453.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

454.     Due to the malicious, wanton, callous, reckless, wrongful, and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

### Count IV

### Violation of 14th Amendment Rights

*Mother and Father against Defendants, Inclusive*

455.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

456.     At all times relevant herein, the rights guaranteed under the Fourteenth Amendment to the United States Constitution were "clearly established" such that any reasonable social services agent and/or police officer and/or government agent and/or person in Defendants' position would know that it is unlawful to abridge the Fourteenth Amendment rights of Plaintiffs.

457.     Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourteenth Amendment.

458.    Defendants, and each of them, were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired to violate Plaintiffs' constitutional rights by, but not limited to:

a.  Harassment and intimidation of Plaintiffs through threats of removal of minor-Plaintiffs, and/or placement in outside foster care;

b.  Removing, detaining, and continuing to detain minor-Plaintiffs after H.P. admitted to fabricating the allegations, the criminal charges against Father were withdrawn, psychological examinations of Father revealed no concerns regarding his relationship with the minor-Plaintiffs; and Mother and Father completed all "goals" set-forth by OCYF Defendants;

c.  Presenting perjured testimony and fabricating evidence to support OCYF Defendants and the County's false and malicious allegations against Plaintiff-parents that H.P. was being abused and/or Mother failed to protect minor-Plaintiffs, and in failing to disclose exculpatory evidence to the Court;

d.  Questioning and obtaining testimony from Plaintiff through the use of undue influence, coercion, and duress;

e.  Continuing to harass, annoy, and lie to Plaintiffs, and otherwise interfere with Plaintiffs, after any purported exigency or need ceased to exist;

f.  OCYF Defendants' practice of holding meetings outside of the presence of Mother, Father and their counsel to determine the desired outcome of the proceedings and subsequently acting in furtherance of their agreed upon, predetermined outcome, including that minor-Plaintiffs H.P., D.P., and/or A.P. would not return to Mother and Father;

g.  Failing to advise Mother and Father that they had the right to refuse to sign the safety plans, mental and physical examinations, and authorizations to obtain records;

h.  Improperly obtaining and/or disclosing confidential medical records and/or school records;

i.  The separation of Plaintiff-parents from their infant child S.P. without any factual or legal basis;

j.  The imposition of unlawful, onerous and irrelevant preconditions to the reunification of Plaintiff-parents and minor-Plaintiffs intended to, or reasonably likely to, destroy the sacred bond between parent and child;

k.  Defendants' willful and intentional failure to investigate and assess the factual basis underlying the allegations of dependency;

l.  Defendants' conduct in "righting a wrong" done to J.C. by the family Court in 2014 through the continued removal and separation of the minor-Plaintiffs was intentional, reckless, willful, wanton and malicious and shocks the conscious;

m.  Maliciously excluding Father from the family home without basis or cause after previously allowing Father to conduct his visits with minor-Plaintiffs if H.P. was not present in the home;

n.  Willfully and maliciously refusing to set up court-ordered visitation between Plaintiff-parents and minor-Plaintiffs;

o.  Refusing to make accommodations for Father to see A.P. and D.P., while making the same accommodations for J.C.;

p.  Maliciously requiring Plaintiff-parents to seek court intervention before complying with Court orders contrary to their pre-determined plan at the expense of Plaintiff-parents;

q. Refusing to provide documentation, namely the parents' case files, that would enable Plaintiff-parents to dispute the allegations and false information provided to the Court and other Defendants;

r. Vindictively scheduling joint teaming meetings between J.C. and Mother despite the existence of criminal convictions of J.C. for abuse against Mother, and prior assurance that Mother's request for separate meetings would be honored;

s. The Court's pre-determination of the dependency of the minor-Plaintiffs prior to the Court taking any testimony or the presentation of any evidence by Defendants and/or Plaintiffs;

t. Falsely and maliciously identifying Father as a perpetrator of abuse, despite OCYF Defendants possessing documents and records to the contrary;

u. Intimidating Father through the use of armed guards;

v. Providing false and misleading information to outside agencies in an effort to align them against Mother;

w. Falsifying reports and/or opinions at the request of OCYF;

x. Failing to properly investigate Plaintiff-parents' requests for a new caseworker despite evidence that S. Schmidt intentionally falsified documents and provided false testimony against Mother and Father; and

y. Disclosing confidential medical information without consent or court order

thereby violating Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.

459. Upon information and belief, there existed a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was deliberately fabricated by the government, such that a reasonable social services agent in Defendants' situation would know it is unlawful

to lie, fabricate evidence and/or suppress material exculpatory evidence in court reports or any other document filed with the juvenile court to influence decision making.

460.	Defendants, and each of them, had the affirmative and self-evident duty to be truthful, accurate, and complete in petitions, reports, and documents submitted to a sovereign Court with power to adjudicate substantial rights, including parental rights, and to refrain from using improper and deceptive means to obtain judicial adoption of recommendations seeking to disparage Plaintiffs' liberty interests.

461.	In addition, each of the abovementioned reports and "information" reports and other official documents submitted to the Juvenile Court contained knowingly falsified evidence, omitted known critical exculpatory evidence, and in some instances, contained outright fabricated evidence.  Each such report was knowingly submitted by OCYF Defendants with the intention that the Court rely thereupon, and in order for minor-Plaintiffs to continue to be detained from Plaintiff-parents' custody, which the Court did.

462.	Allegheny County, DHS Defendants, and OCYF Defendants violate parents constitutional rights by virtue of a custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, acquiesced in an/or has otherwise authorized its caseworkers to engage in the following:

a. Unwarranted investigations, and often unannounced coercive whole home inspections;

b. Interrogation of children in the household, including questions about their parents' activities and conduct;

c. Coercive demands to provide bodily fluid samples, including urine samples;

d. Intrusive psychological evaluations;

e. Falsification of court records and/or submissions and/or testimony;

f. Coercive demands to third parties to falsify and/or alter reports to reflect OCYF's desired outcome;

g. Dissemination of false and defamatory information regarding the parents in an effort to keep the children dependent;

h. Prying into and demanding to allow government social workers and/or investigators to have unfettered access to, confidential personal and other family members' medical records, including highly sensitive mental health information;

i. Violating parents' rights to make important medical decisions for their children and/or be present for or nearby their children when they are receiving medical attention; and

j. Requesting and/or receiving and/or disclosing confidential medical records without authorization, and/or court order violates Plaintiffs' 14th amendment rights.

463. Upon information and belief, Defendants AHN and OCYF, acting in concert with one another entered into an agreement or understanding to violate Mother's Fourteenth Amendment substantive due process right to privacy in her confidential personal medical records.

464. Defendant AHN had a policy specifically requiring its employees to report to OCYF positive urine drug test results under circumstances where it was not privileged or legally required to do so, even in the absence of a Childline report.

465. OCYF encouraged Defendant AHN to continue to violate Mother's rights by requesting and accepting records which it knew Defendant AHN was not privileged or legally required to disclose and, based exclusively on these fraudulently obtained records, initiating unwarranted, highly intrusive, humiliating, harassing and coercive child abuse investigation.

466. Upon information and belief, any reasonable OCYF caseworker in similar circumstances would know it was unlawful to fraudulently obtain Mother's medical records.

467. Defendant AHN entered into an agreement or understanding and/or otherwise acted in concert with OCYF Defendants to violate Mother's Fourteenth Amendment right to Equal Protection of the

Law. AHN Defendants and OCYF, each acted in concert with one another and in furtherance of this agreement or understanding.

468.     Defendant AHN had a policy or practice of collecting and drug testing the urine of new mothers but had no policy or practice of collecting and drug testing the urine of these women's male partners or other similarly situated men.

469.     Defendant AHN had a policy or practice of reporting to OCYF positive drug screen results of new mothers but had no similar policy or practice of reporting drug test results of these women's male partners or other similarly situated men.

470.     OCYF had a policy and practice of accepting and acting on confidential information it received from AHN, knowing that the information was being collected only from new mothers and was not being collected from similarly situated men. Any reasonable OCYF caseworker in similar circumstances would know it was unlawful to fail to adhere to such a standard.

471.     Both AHN and OCYF understood and intended that new mothers, but not similarly situated men, would be investigated for abusing or neglecting the children under their care based the results of a urine drug test.

472.     Both AHN and OCYF intended to subject new mothers, but not similarly situated men, to unwarranted highly invasive, burdensome, humiliating and/or unconstitutional child abuse or child neglect investigations based exclusively on a urine drug test without any basis to suspect or believe that their babies had been affected by substance abuse or were having withdrawal symptoms resulting from prenatal drug exposure.

473.     OCYF Defendants did not request or require J.C. to submit to a drug test, despite knowing that he consumed narcotic medication.

474.     OCYF Defendants had a policy, custom or practice to provide "mom-focused" services and placed onerous and burdensome requirements for mothers to regain custody of their children but had no similar policy or practice of requesting the same services of fathers.

475.     Upon information and belief, Defendant TRAC had a policy, custom or practice to discriminate against mothers, including making recommendations against Mother in favor of absent Fathers.

476.     Defendants conduct as above set forth was wholly unrelated to any legitimate governmental objective and was irrational and wholly arbitrary or otherwise constituted arbitrary discrimination through improper execution of its legal obligations effecting a denial of equal protection of the law guaranteed to the Plaintiffs under the 14th Amendment to the United States Constitution

477.     By their subsequent conduct, OCYF Defendants and DHS Defendants ratified the wrongful conduct of Defendants Birdseye, S. Schmidt and all known and unknown employees of OCYF, intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

478.     Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the Fourth Amendment of the United States Constitution, by, but not limited to, violating Plaintiffs' rights to be free from unlawful search and seizure.   Said acts were taken deliberately, with callous or reckless indifference to the substantive rights of Plaintiffs or fueled by an evil motive or intent.

479.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.   Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

480.     Due to the malicious, wanton, callous, reckless, wrongful, and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive

damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

## COUNT V

### Violation of 1st Amendment Rights

*Minor-Plaintiffs against OCYF Defendants, DHS Defendants, AFA Defendants, Allegheny County, McCandless Defendants, AHN Defendants, TRAC Defendants, Inclusive*

481.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

482.    Plaintiffs are individuals and citizens of the United States, protected by 42 U.S.C. 1983.

483.    At all times relevant herein, the right to association and right to be free from compelled speech, guaranteed under the First Amendment to the United States Constitution were "clearly established" such that any reasonable social services agent and/or police officer and/or medical person and/or governmental worker  in Defendants' position would know that it is unlawful to abridge the First Amendment rights of parents and children brought within the jurisdiction of the juvenile dependency Court.

484.    Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the First Amendment, to include without limitation, the protection of minor-Plaintiffs' right to be free from compelled speech and the right to freedom of association.

485.    Defendants, and each of them, were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired to violate minor-Plaintiffs' constitutional rights by, but not limited to:

a. Taking minor-Plaintiffs from Plaintiff parents in violation of First Amendment right of association, including but not limited to, the right to co-habitat with their parents;

b.  Depriving minor-Plaintiffs of a relationship with each other, specifically due to the removal of D.B.;

c.  Demanding that Plaintiff-parents separate and/or divorce, in order to regain custody of minor-Plaintiffs, and depriving minor-Plaintiffs of an intact family unit;

d.  Restricting minor-Plaintiff's ability to speak freely and openly with their parents without fear of repercussion from the government;

e.  Compelling minor-Plaintiffs to complete a "trauma narrative" in order to be released from treatment at PAAR, despite minor-Plaintiffs denying that said trauma occurred;

f.  Being subjected to interrogation by police after denying H.P. the right to have a parent or guardian present during the interrogation;

g.  Refusing to discharge minor-Plaintiffs from therapeutic care or allow them to leave sessions unless or until minor-Plaintiffs acquiesced to therapists' and/or OCYF's desires by stating that they wanted to have a relationship with J.C. or otherwise participate in therapeutic care;

h.  Authoring retaliatory reports against minor-Plaintiffs after Plaintiff-Parents filed complaints and/or objected to the alteration of reports at OCYF's request;

i.  Requiring minor-Plaintiffs to attend evaluations in which they were compelled to provide private and sensitive information, against their will, including answering highly invasive and personal questions; and

j.  Enduring harassing and intimidating interrogations by Allegheny County, OCYF Defendants and McCandless Defendants on multiple occasions

thereby violating Plaintiffs' rights under the First Amendment to the United States Constitution.

486.     By their subsequent conduct, OCYF Defendants and DHS Defendants ratified the wrongful conduct of Defendants Birdseye, S. Schmidt and all known and unknown employees of OCYF, intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

487.     Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the First Amendment of the United States Constitution, by, but not limited to, violating Plaintiffs' rights to be free from compelled speech, and violating Plaintiffs' rights to freedom of association.  Said acts were taken deliberately, with callous or reckless indifference to the substantive rights of Plaintiffs or fueled by an evil motive or intent.

488.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

489.     Due to the malicious, wanton, callous, reckless, wrongful, and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

## COUNT VI

### Violation of 4th Amendment Rights

*Minor-Plaintiffs against OCYF Defendants, DHS Defendants, Allegheny County, McCandless Defendants, Inclusive*

490.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

491.     At all times relevant herein, the right to be free from illegal search and seizure, guaranteed under the Fourth Amendment to the United States Constitution were "clearly established"

such that any reasonable social services agent and/or police officer and/or government agent in Defendants' position would know that it is unlawful to abridge the Fourth Amendment rights of parents.

492.    Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourth Amendment, to include without limitation, the protection of Plaintiff-parents' right to be free unlawful search and seizure.

493.    Defendants, and each of them, were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired to violate minor-Plaintiffs' constitutional rights by, but not limited to:

      a.  Improper seizure of minor-Plaintiffs on or about January 19, 2019;

      b.  Improper seizure of minor-Plaintiffs on or about February 6, 2019;

      c.  Improper seizure of minor-Plaintiff H.P. at the preliminary hearing on in May 2019;

      d.  Improper seizure of minor-Plaintiff S.P. on or about November 5, 2019; and

      e.  Multiple, highly invasive physical examinations of minor-Plaintiffs requiring minor-Plaintiffs to submit to full body examinations while unclothed and outside of the presence of their parents

thereby violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

494.    By their subsequent conduct, Allegheny County, OCYF Defendants, DHS Defendants and McCandless Defendants ratified the wrongful conduct of Defendants Birdseye, Schmidt and all known and unknown employees of OCYF, and police officers, intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

495.    Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the Fourth Amendment

of the United States Constitution, by, but not limited to, violating Plaintiffs' rights to be free from unlawful search and seizure. Said acts were taken deliberately, with callous or reckless indifference to the substantive rights of Plaintiffs or fueled by an evil motive or intent.

496. As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

497. Due to the malicious, wanton, callous, reckless, wrongful, and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

**Count VII**

**Violation of 14th Amendment Rights**

*Minor-Plaintiffs against Defendants, Inclusive*

498. Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

499. At all times relevant herein, the rights guaranteed under the Fourteenth Amendment to the United States Constitution were "clearly established" such that any reasonable social services agent and/or police officer and/or government agent and/or person in Defendants' position would know that it is unlawful to abridge the Fourteenth Amendment rights of Plaintiffs.

500. Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourteenth Amendment.

501.     Defendants, and each of them, were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired to violate Plaintiffs' constitutional rights by, but not limited to:

a. Harassment and intimidation of Plaintiffs through threats of removal of minor-Plaintiffs, and/or placement in outside foster care;

b. Removing, detaining, and continuing to detain minor-Plaintiffs after H.P. admitted to fabricating the allegations, the criminal charges against Father were withdrawn, psychological examinations of Father revealed no concerns regarding his relationship with the minor-Plaintiffs; and Mother and Father completed all "goals" set-forth by OCYF Defendants;

c. Presenting perjured testimony and fabricating evidence to support OCYF Defendants and the County's false and malicious allegations against Plaintiff-parents that H.P. was being abused and/or Mother failed to protect minor-Plaintiffs, and in failing to disclose exculpatory evidence to the Court;

d. Questioning and obtaining testimony from Plaintiff through the use of undue influence, coercion, and duress;

e. Continuing to harass, annoy, and lie to Plaintiffs, and otherwise interfere with Plaintiffs, after any purported exigency or need ceased to exist;

f. OCYF Defendants' practice of holding meetings outside of the presence of Mother, Father and their counsel to determine the desired outcome of the proceedings and subsequently acting in furtherance of their agreed upon, predetermined outcome, including that minor-Plaintiffs H.P., D.P., and/or A.P. would not return to Mother and Father; and

g. Forced submission to multiple psychological evaluations

thereby violating Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.

502.      Upon information and belief, there existed a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was deliberately fabricated by the government, such that a reasonable social services agent in Defendants' situation would know it is unlawful to lie, fabricate evidence and/or suppress material exculpatory evidence in court reports or any other document filed with the juvenile court to influence decision making.

503.      Defendants, and each of them, had the affirmative and self-evident duty to be truthful, accurate, and complete in petitions, reports, and documents submitted to a sovereign Court with power to adjudicate substantial rights, including parental rights, and to refrain from using improper and deceptive means to obtain judicial adoption of recommendations seeking to disparage Plaintiffs' liberty interests.

504.      In addition, each of the abovementioned reports and "information" reports and other official documents submitted to the Juvenile Court contained knowingly falsified evidence, omitted known critical exculpatory evidence, and in some instances, contained outright fabricated evidence. Each such report was knowingly submitted by OCYF Defendants with the intention that the Court rely thereupon, and in order for minor-Plaintiffs to continue to be detained from Plaintiff-parents' custody, which the Court did.

505.      Allegheny County, DHS Defendants, and OCYF Defendants violate minor-Plaintiffs' constitutional rights by virtue of a custom, pattern, practice, policy, and/or failure to appropriately train and/or discipline, acquiesced in an/or has otherwise authorized its caseworkers to engage in the following:

      a.   Unwarranted investigations;

      b.   Interrogation of children in the household, including questions about their parents' activities and conduct;

      c.   Intrusive psychological evaluations;

      d.   Falsification of court records and/or submissions and/or testimony;

e. Forced mental health treatment over minor-Plaintiffs' objections;

f. Dissemination of false and defamatory information regarding the parents in an effort to keep the children dependent; and

g. Prying into and demanding to allow government social workers and/or investigators to have unfettered access to, confidential personal and other family members' medical records, including highly sensitive mental health information.

506. Minor-Plaintiffs are informed and believe, and thereon allege, that the Constitutional right to familial association includes the right of minor-Plaintiffs to be parented by their parents, including the love and support of their parents. Minor-Plaintiffs are further informed and believe that the Constitution assures children that, in the absence of parental consent, physical examinations of their persons may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all circumstances. Moreover, minor-Plaintiffs are informed and believe that children have a right, arising from the liberty interest in family association, to have their parents with them or nearby while they are receiving medical attention.

507. At all times relevant herein, the rights mentioned in the foregoing paragraphs were clearly established, such that a reasonable caseworker in OCYF's position, a medical doctor with ACP, or a forensic interviewer with ACP who was working in voluntary collaboration with Defendants would know it is unlawful to strip a child naked, conduct invasive body cavity examinations, including of the sex organs, and search the body of the minor, internally and externally, without obtaining voluntary consent of Mother or Father, and without an authorizing warrant or court order. Indeed, such governmental agent or private person acting in voluntary collaboration with government agents, has an affirmative duty to refrain from such unconstitutional conduct and to protect minor-Plaintiffs' due process rights.

508.     In doing the things alleged hereinabove, OCYF Defendants, TRAC Defendants, and Does 1-50, inclusive, and each of them, were acting under color of state law, when they voluntarily collaborated, acted in concert and conspired to violate the above identified rights of minor-Plaintiffs, including violation of minor-Plaintiffs' rights found in the Due Process Clause under the Fourteenth Amendment of the United States Constitution by, but not limited to, subjecting minor-Plaintiffs to humiliating and invasive bodily examination without the consent, authority, or the presence of their parents.

509.     Moreover, the scope of the intrusion was not justified because no exigency existed to justify the intrusion.  Further, to the extent that the facts could reasonably suggest any exigency existed, the scope of intrusion was not narrowly circumscribed by the exigencies purporting to justify its initiation.

510.     Upon information and belief, Defendants AHN and OCYF, acting in concert with one another entered into an agreement or understanding to violate S.P.'s Fourteenth Amendment substantive due process right to privacy in her confidential personal medical records.

511.     Defendant OCYF encouraged Defendant AHN to continue to violate S.P.'s rights by accepting records which it knew Defendant AHN was not privileged or legally required to disclose and, based exclusively on these fraudulently obtained records, initiating unwarranted, highly intrusive, humiliating, harassing and coercive child abuse investigations.

512.      Upon information and belief, any reasonable OCYF caseworker in similar circumstances would know it was unlawful to fraudulently obtain S.P.'s medical records, absent parental consent or a court-order.

513.     Defendant AHN entered into an agreement or understanding and/or otherwise acted in concert with OCYF Defendants to violate S.P.'s Fourteenth Amendment right to Equal Protection of the Law. AHN Defendants and OCYF Defendants, each acted in concert with one another and in furtherance of this agreement or understanding.

514.     Defendants conduct as above set forth was wholly unrelated to any legitimate governmental objective and was irrational and wholly arbitrary or otherwise constituted arbitrary discrimination through improper execution of its legal obligations effecting a denial of equal protection of the law guaranteed to the minor-Plaintiffs under the 14th Amendment to the United States Constitution.

515.     By their subsequent conduct, OCYF Defendants and DHS Defendants ratified the wrongful conduct of Defendants Birdseye, S. Schmidt and all known and unknown employees of OCYF, intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

516.     Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of minor-Plaintiffs, including violation of minor-Plaintiffs' rights found in the Fourteenth Amendment of the United States Constitution, including falsification of evidence against Mother and Father, invasive medical procedures, and the disclosure of confidential medical information. Said acts were taken deliberately, with callous or reckless indifference to the substantive rights of Plaintiffs or fueled by an evil motive or intent.

517.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

518.     Due to the malicious, wanton, callous, reckless, wrongful, and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

**COUNT VIII**

**Violation of 6th Amendment right to counsel**

*H.P. against Allegheny County*

519.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

520.     OCYF Defendants threatened H.P. with criminal charges and then, despite its position as a "neutral" party, presented a Motion to the Court requesting that H.P. be denied private defense counsel of her choosing. The Court denied H.P. the right to private defense counsel, stating that dependent minors were not entitled to private counsel in [his] courtroom.

521.     Allegheny County, OCYF Defendants and DHS Defendants' policies, practices, and customs to deny dependent minors private criminal counsel following their threat of criminal charges, violated H.P.'s rights, under color of law, pursuant to the Sixth Amendment right to counsel, and directly and proximately damaged H.P., as herein alleged, entitling H.P. to recover damages for said constitutional violations pursuant to 42 U.S. C. section 1983.

522.     Plaintiff H.P. suffered substantial harm as a result of Defendants' conduct, including but not limited to, emotional and psychological pain and suffering and injury to her reputation.

523.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

524.     The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

**COUNT IX**

**Violation of 42 U.S.C. 1983 - Conspiracy to Deprive Constitutional Rights**

*Plaintiffs against all Defendants, except for NRJB Defendants and NASD Defendants, Inclusive*

525.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

526.     As described more fully within, each of the Defendants conspired, directly or indirectly, for the purposes of depriving Plaintiffs of their procedural and substantive due process rights as described more fully herein.

527.     Defendants acted under color of state law when they conspired to deprive Plaintiffs of their constitutionally guaranteed rights under the 1st, 4th, 6th, and 14th Amendments.

528.     In doing so, Defendants took actions in furtherance of this conspiracy, as discussed above, causing injury to Plaintiffs.

529.     The misconduct described in this Count was undertaken pursuant to the policy, practice, and custom of the Defendants in the manner described more fully in within contained paragraphs.

530.     By joining the conspiracy to violate Plaintiffs' civil rights, Defendants, and each of them, are responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy, including the aforementioned acts of Defendants.

531.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

532.      As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

533.     The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

**COUNT X**

**1985(3) Conspiracy to Deprive Constitutional Rights**

***Rebecca Peterson against all Defendants, Inclusive***

*Plaintiffs against all Defendants, except for NRJB Defendants and NASD Defendants, Inclusive*

534.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

535.     As described more fully within, each of the Defendants conspired, directly or indirectly, for the purposes of depriving Mother of her constitutional rights as discussed above. Such conspiracy was undertaken to deprive Mother of the equal protection of the law, or of equal privileges and immunities under the laws based solely upon Mother's gender.

536.     Defendants acted under color of state law when they conspired to deprive Plaintiffs of their constitutionally guaranteed rights under the 1st, 4th, 6th, and 14th Amendments.

537.     In doing so, Defendants took actions in furtherance of this conspiracy, as discussed above, causing injury to Plaintiffs.

538.     The misconduct described in this Count was undertaken pursuant to the policy, practice, and custom of the Defendants in the manner described more fully in within contained paragraphs.

539.     By joining the conspiracy to violate Plaintiffs' civil rights, Defendants, and each of them, are responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy, including the aforementioned acts of Defendants.

540.	As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

541.	 As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

542.	The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

## Count  XI

### Violation of 42 U.S.C. 1986

*Plaintiffs against all Defendants, except for NRJB Defendants and NASD Defendants, Inclusive*

543.	Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

544.	OCYF Defendants, DHS Defendants and Allegheny County maintain, and at all times relevant to this Complaint maintained, customs and practices which were the driving force behind their conspiracy to interfere with Plaintiffs' civil rights in violation of 42 U.S.C. sections 1983 and 1985, as discussed above.  Such customs and practices include removing children from parents, procuring false testimony, fabrication of evidence and refusal to disclose exculpatory evidence in preparing and presenting reports and documents to the Court in relation to dependency proceedings, all in violation of Plaintiffs' rights under the Due Process Clause of the 14th Amendment.

545.      OCYF Defendants, DHS Defendants and Allegheny County have, and at all times relevant to this complaint had, knowledge of the customs, practices, and policies that led to the conspiracy to interfere with the civil rights of Plaintiffs. Allegheny County, and DHS Defendants knew that OCYF Defendants, TRAC Defendants, and Does 1-50 were conspiring to commit the wrongs noted above and were going to commit them.

546.      OCYF Defendants, DHS Defendants and Allegheny County had the power to prevent the commission of these wrongs, through the implementation of policies, customs, procedures, and training programs that would educate and enlighten their employees as to the civil rights of the citizens of the United States and the State of Pennsylvania.

547.      Despite their knowledge, OCYF Defendants, DHS Defendants and Allegheny County refused or neglected to prevent OCYF Defendants, TRAC Defendants, and Does 1-50, inclusive, from committing these wrongs in violation of 42 U.S. C. sections 1983 and 1985.

548.      All Defendants, inclusive, had an affirmative duty under 42 U.S.C. section 1986 to prevent or aid in preventing the conspiracy outlined here within, and failed to do so.

549.      Plaintiffs did in fact suffer the deprivation of numerous rights granted to citizens of the United States, including those under the 14th Amendment protecting the right to familial integrity and/or relations.

550.      Plaintiffs' injuries were the direct and proximate result of the failure to act in preventing or aid in the prevention of the conspiracy furthered through the actions of OCYF Defendants, AFA Defendants, TRAC Defendants, and Does 1-50, inclusive, which they could have, through reasonable diligence, prevented.  As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

551.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

552.     The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

## COUNT XII

### *Monell*-claims

### *Plaintiffs v. Allegheny County*

553.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

554.     Defendants, and each of them, are considered "people" within the meaning of 42 U.S.C. 1983 and subject to *Monell* liability. Defendants, and each of them, acted under color of state law when committing the acts alleged herein, in violation of Plaintiffs' rights.

555.     Defendant Allegheny County had a duty to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter referred to as "policy" or "policies") which confirm and provide the protections guaranteed Plaintiffs under the United States Constitutions, including those under the First, Fourth, and Fourteenth Amendments to include without limitation, the protection of the right to familial relations; the right to privacy; the right not to be defamed or stigmatized; the right to be free from governmental deception, trickery, fabrication of evidence, and suppression of exculpatory evidence in juvenile dependency proceedings; right to be free from illegal searches and/or seizure; and the right to procedural due process.  Said defendants also had a duty to use reasonable care

to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within OCYF and DHS, as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

556.    Upon information and belief, Allegheny County, were, at all times relevant herein, possessed of final policymaking authority in that Allegheny Cunty delegated such power and responsibility to them. This authority included but was not limited to, the responsibility to set policies and priorities for DHS, OCYF and the supervision and management of staff performing all child welfare services.

557.    Based on the duties charged to the Court, DHS and OCYF, including the nature of its work relating to juvenile dependency proceedings, Allegheny County knew or should have known of the obvious need to establish customs, policies, and practices required to protect the aforementioned civil rights of parents and their children.

558.    Upon information and belief, Allegheny County was put on notice of the deficiencies of DHS, OCYF and/or its employees through the "State of the Child" Reports and/or the complaints Plaintiffs.

559.    Defendant Allegheny County, through OCYF, DHS and the Court system, followed policies, procedures, customs, and/or practices that were the moving force behind the violations of Plaintiffs' constitutional rights, including those under the First, Fourth and Fourteenth Amendments, by, but not limited to:

      a.   The policy of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent;

      b.   The policy of removing children from their family and their homes without first obtaining a warrant when no exigency exists;

c.  The policy of examining the children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian;

d.  The policy of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

e.  The policy of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental rights, including those as to familial relations;

f.  By acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments when performing actions related to child abuse and dependency type proceedings;

g.  The practice of setting forth allegations in Juvenile Dependency Petitions against parents regardless of whether or not specific articulable evidence exists at the time to support the claims set out in the petition under penalty of perjury;

h.  The policy, practice, or custom of making knowingly false allegation of child abuse, neglect or abandonment in Juvenile Dependency Petitions signed under penalty of perjury as a means of intimidating parents, by coercion, into accepting lesser charges, whether true or not and whether justified by extant evidence or not, thereby enabling the county to keep the family in the juvenile dependency system and record the case as a positive outcome for purposes of statistical analysis related to funding by the State and Federal government;

i. The custom, policy and/or practice of fraudulently charging parents with child abuse where none exists; and

j. A custom, policy or practice of failing to hold adjudicatory proceedings in dependency proceedings within the statutorily proscribed time period.

560. Allegheny County, including by and through its agents, employees, and its policymaking officials, OCYF and DHS and their agents, employees and policymaking officials, breached its duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control and review its agents and employees as to their compliance with Constitutional safeguards; and by deliberately permitting the DHS and OCYF defendants to engage in the unlawful and unconstitutional conduct as herein alleged with a total indifference to the rights of affected parents, including Plaintiffs herein.

561. Allegheny County knew or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agencies' policies, practices, customs, and usages would, and did, cause Plaintiffs to be injured and damaged by the Court, DHS, and OCYF's wrongful policies, or deliberate thereof or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in contravention of public policy and their legal duties and obligations to Plaintiffs; and that such policies were the moving force behind the violation of Plaintiffs' constitutional rights as alleged herein above. Namely, Plaintiffs' civil rights were violated, as discussed above, when DHS Defendants and OCYF defendants, while acting under color of state law and in conformance with official OCYF policies, conspired and/or acted to seize Plaintiffs' children without warrant; then lied about Plaintiffs in various court reports submitted to the Juvenile and Appellate Courts.

562. As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will

continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

563.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

564.     The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

## COUNT XIII

### *Monell*-claims

*Plaintiffs v. Defendant NASD*

565.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

566.     Defendants, and each of them, are considered "people" within the meaning of 42 U.S.C. 1983 and subject to *Monell* liability. Defendants, and each of them, acted under color of state law when committing the acts alleged herein, in violation of Plaintiffs' rights.

567.     Defendant NASD had a duty to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter referred to as "policy" or "policies") which confirm and provide the protections guaranteed Plaintiffs under the United States Constitutions, including those under the First, Fourth, and Fourteenth Amendments to include without limitation, the protection of the right to familial relations; the right to privacy; the right to be free from compelled speech; and the right to be free from illegal searches and/or seizure. Said defendants also had a duty to use reasonable

care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

568.     Upon information and belief, it is the policy, practice, and/or custom of NASD to permit OCYF workers and/or other third parties to interview students without parental consent or notice and over minor-children's objections.  Such policy, procedure, and/or custom violates minor-Plaintiffs' rights against compelled speech and illegal seizure. NASD failed to train its employees that students should not be compelled to speak with third parties with whom they express a desire not to and /or outside of their parent's presence once parents have objected to the interrogation. The NASD policy, procedure and/or custom is so widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials as all school personnel subject students to said seizures and compelled speech.

569.     Upon information and belief, Crimone, Mathieson, Jenkins, at all times relevant herein, possessed of final policymaking authority in that NASD delegated such power and responsibility to them. This authority included but was not limited to, the responsibility to set policies and priorities for Carson Middle School and Hosack Elementary School and the supervision and management of staff within the buildings.

570.     Based on the duties charged to NASD, including the nature of its work relating to children, NASD knew or should have known of the obvious need to establish customs, policies, and practices required to protect the aforementioned civil rights of parents and their children.

571.     Upon information and belief, the practice of allowing third parties access to minor-children, without the consent or knowledge of parents, is so persistent and widespread and constitutes a custom of which constructive knowledge can be implied on the part of policy-making officials.

572.	Defendant NASD, through its employees, followed policies, procedures, customs, and/or practices that were the moving force behind the violations of Plaintiffs' constitutional rights, including those under the First, Fourth and Fourteenth Amendments, by, but not limited to:

    a.	The policy of allowing third party organizations, including but not limited OCYF and TRAC, to interview, interrogate, or otherwise have access to, minor children, outside of the existence of exigent circumstances, and without the knowledge and/or consent of parents;

    b.	The custom, policy and/or practice of participating in the illegal seizure of minor children; and

    c.	The custom, policy and/or practice of violating minor-children's 1st Amendment right against compelled speech.

573.	NASD, including by and through its agents, employees, and its policymaking officials, breached its duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control and review its agents and employees as to their compliance with Constitutional safeguards; and by deliberately permitting employees to engage in the unlawful and unconstitutional conduct as herein alleged with a total indifference to the rights of affected parents and children, including Plaintiffs herein.

574.	NASD knew or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agency's policies, practices, customs, and usages would, and did, cause Plaintiffs to be injured and damaged by NASD's wrongful policies, or deliberate thereof or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in contravention of public policy and their legal duties and obligations to Plaintiffs; and that such policies were the moving force behind the violation of Plaintiffs'

constitutional rights as alleged herein above. Namely, Plaintiffs' civil rights were violated, as discussed above, when NASD defendants, while acting under color of state law and in conformance with official NASD policies, conspired and/or acted to seize Plaintiffs' children without warrant, compelled minor-Plaintiffs to speak with third parties, and interfered with Plaintiff-parents' rights to parent their children.

575.    As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

576.    The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

### COUNT XIV

### *Monell*-claims

*Plaintiffs v. McCandless Township and NRJPB*

577.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

578.    Defendants NRJPB and McCandless Township, through their respective entities, the Northern Regional Police Department and McCandless Police Department, had a duty to Plaintiffs, at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter referred to as "policy" or "policies") which confirm and provide the protections guaranteed Plaintiffs under the United States Constitution, including those under the First, Fourth, and Fourteenth Amendments, to include without limitation, the protection of the right to familial  relations; the right to privacy; the right not to be defamed, harassed or stigmatized; the right to be free from governmental deception, trickery,

fabrication of evidence, and suppression of exculpatory evidence in juvenile dependency proceedings; and the right to procedural due process. Said defendants also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within its police departments, as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

579.    Based on the duties charged to NRJPB and McCandless Township, including the nature of its work relating to juvenile dependency proceedings, NRJPB and McCandless Township knew or should have known of the obvious need to establish customs, policies and practices required to protect the aforementioned civil rights of parents and their children.

580.    McCandless Township enacted policies, procedures and/or customs through their policy making authority. Such policies, procedures and/or customs were followed when minor-Plaintiffs were questioned outside of the presence of their guardians and over said guardian's objections.

581.    McCandless Township enacted policies, procedures and/or customs through their policy making authority. Such policies, procedures and/or customs were followed when minor-Plaintiffs were seized without a warrant and/or exigent circumstances.

582.    Defendants NRJPB and McCandless Township, including through its police departments, established and/or followed policies, procedures, customs, and/or practices which policies were the moving force behind the violations of Plaintiffs' constitutional rights, including those under the Fourth and Fourteenth Amendments, by, but not limited to:

    a.    The policy of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent;

a. The policy of removing children from their family and their homes without first obtaining a warrant when no exigency exists;

b. The policy of examining the children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian;

c. The policy of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

d. The policy of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental rights, including those as to familial relations;

e. By acting with deliberate indifference in implementing a policy of inadequate training an/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments when performing actions related to child abuse and dependency type proceedings;

f. A policy, procedure and/or custom of discussing confidential information with unaffiliated third parties; and

g. A policy, procedure and/or custom of allowing police officers to stalk, and/or harass, and/or defame individuals under investigation and/or otherwise involved with police activity.

583. NRJPB and McCandless Township, by and through their police departments and their policymaking officials, breached its duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control and review its agents and employees as to

their compliance with Constitutional safeguards; and by deliberately permitting the police departments to engage in the unlawful and unconstitutional conduct as herein alleged with a total indifference to the rights of affected parents, including Plaintiffs herein.

584. NRJPB and McCandless Township knew or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agencies' policies, practices, customs, and usages would, and did, cause Plaintiffs to be injured and damaged by NRJPB and McCandless Township's wrongful policies, or deliberate lack thereof or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in contravention of public policy and their legal duties and obligations to Plaintiffs; and that such policies were the moving force behind the violation of Plaintiffs' constitutional rights as alleged herein above. Namely, Plaintiffs' civil rights were violated, as discussed above, when Police defendants, while acting under color of state law and in conformance with official NRJPB and McCandless Township and McCandless Township policies, conspired and/or acted to seize Plaintiffs' children without warrant and violated Plaintiffs' right to privacy and to be free from police harassment.

585. These actions, and/or inactions, of NRJPB and McCandless Township are a moving force behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein.

586. As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

587. The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

## COUNT XV

### Violation of the Pennsylvania Constitution, Article I, Section 1

*Plaintiffs v. Defendants*

588.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

589.     Upon information and belief, Defendants, by the use of threats, intimidation, deception, conspiracy, fraud, and coercion (or attempts to threaten, intimidate, deceive, defraud, and coerce), interfered with Plaintiffs' exercise and enjoyment of the rights secured by the United States Constitution and other Federal laws, the Constitution and laws of the State of Pennsylvania.

590.     As to the OCYF Defendants, such conduct includes, but is not limited to, the wrongful seizure of minor-Plaintiffs, the continued detention of minor-Plaintiffs after any alleged basis for detention had been negated, the procuring of false testimony, fabrication of evidence, refusal to disclose exculpatory evidence in preparing and presenting reports and documents to the Court in relation to dependency proceedings, and the denial of reasonable accommodations, all in violation of the right to familial associations and privacy arising under the Fourteenth Amendment.

591.     As to the McCandless and NRJPB, such conduct includes, but is not limited to the wrongful seizure of minor-Plaintiffs and the harassment of H.P.

592.     As to all other Defendants, such conduct includes but is not limited to, the continued detention of minor-Plaintiffs after any alleged basis for detention had been negated, the procuring of false testimony, fabrication of evidence, refusal to disclose exculpatory evidence in preparing and presenting reports and documents to the Court in relation to dependency proceedings, conspiracy, dissemination of false information, slander and the denial of reasonable accommodations, all in violation of the right to familial associations and privacy arising under the Fourteenth Amendment.

593.     Upon information and belief, Government searches and seizures are inevitably acts of "political violence" that causes fear, degradation, humiliation, and indignity along with its obvious physical impacts including confinement.

594.     As a result of Defendants' acts as described above, Plaintiffs were deprived of rights and liberties secured to them by the Pennsylvania Constitution.  Specifically, Plaintiffs were deprived of the right to familial integrity and association protected by Article 1, Section 1 of the Pennsylvania Constitution.

595.     As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.  Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

596.     The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

**Count XVI**

**Violation of the Pennsylvania Constitution, Article I, Section 8**

*Plaintiffs v. Defendants*

597.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

598.     As a result of Defendants' acts as described above, Plaintiffs were deprived of rights and liberties secured to them by the Pennsylvania Constitution.  Specifically, Plaintiffs were deprived of their right to privacy under Article 1, Section 8 of the Pennsylvania Constitution.

599.    Further, minor Plaintiffs were deprived of the right to be free from unreasonable searches and seizures protected by Article 1, Section 8 of the Pennsylvania Constitution.

600.    Plaintiffs have suffered substantial harm as a result of Defendants' conduct, including but not limited to, emotional and psychological pain and suffering and injury to their reputations.

601.    As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

602.    The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

## Count XVII

### Violation of the Pennsylvania Constitution, Article I, Section 26

*Plaintiffs v. Defendants*

603.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

604.    Defendant OCYF and its employee Defendants' above-described conduct in withholding and refusing to provide available and mandated services that would have prevented dependency and/or placement and/or effected reunification between H.P. and Father amount to unlawful discrimination in violation of the equal protection component of the Constitution of the Commonwealth of Pennsylvania.

605.    As a result of the inaction of the Defendants, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. Plaintiffs have also incurred, and will

continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

606.     The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

## COUNT XVIII

### False Imprisonment

*Plaintiffs v. Allegheny County, OCYF Defendants, DHS Defendants, NASD Defendants, TRAC Defendants and McCandless Defendants*

607.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

608.     Minor-Plaintiffs H.P., D.B., D.P., and A.P., were unlawfully detained by NASD Defendants, DHS Defendants, Allegheny County and OCYF Defendants on January 19, 2019.

609.     Minor-Plaintiffs H.P., D.B., D.P., A.P., F.P., and G.P. were unlawfully detained by Allegheny County, OCYF Defendants and DHS Defendants on February 6, 2019 and thereafter.

610.     Further, Mother and Father were intentionally and unlawfully detained by McCandless Defendants on February 6, 2019.

611.     Minor Plaintiff S.P. was unlawfully detained by Allegheny County, OCYF Defendants and DHS Defendants on or about June 25, 2019.

612.     Minor-Plaintiff S.P. was unlawfully detained by Allegheny County, OCYF Defendants and DHS Defendants on November 5, 2019, after she was returned to Mother's custody.

613.     Minor-Plaintiffs D.P. and A.P. were unlawfully detained on numerous occasions by TRAC Defendants.

614.     Defendants detained minor-Plaintiffs intentionally.

615.     Said detainment was nonconsensual, arose from a warrantless search and seizure, happened in the absence of exigent circumstances, and without discharging duties imposed by state laws and statutes.

616.     The above-mentioned detainment was not authorized by law and took place for an appreciable length of time on two separate occasions.

617.     Plaintiffs suffered damages as a proximate case of their unlawful and intentional detention.

618.     As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

619.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

620.     The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

**Count XIX**

**Intentional Infliction of Emotional Distress**

*Plaintiffs v. Defendants*

621.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

622.     Plaintiffs are informed and thereon believe that Defendants, and each of them, engaged in the above-mentioned extreme, outrageous, unlawful and unprivileged conduct, including, but not limited to, removing and detaining minor-Plaintiffs from the love and care of their Mother and Father without court order or exigent circumstances; continuing to detain minor-Plaintiffs for an unreasonable period after any alleged basis for detention had been negated; presenting perjured testimony and fabricating evidence to support the County and OCYF's false and malicious allegations that minor-Plaintiffs were being abused and/or neglected by their parents and failing to disclose exculpatory evidence in furtherance of their goal to right a perceived wrong against J.C.; questioning and obtaining testimony from Plaintiffs through the use of undue influence, coercion, and duress; and continuing to harass, annoy and lie to Plaintiffs, including requesting that minor-Plaintiffs be removed from Mother and Father's custody despite acknowledging that it was against the best interest of the children and that such a request was done solely to spur the Court in to action and not because OCYF Defendants wanted the minor-Plaintiffs removed, and otherwise interfere with Plaintiffs' lives, after any purported exigency or need ceased to exist, as to the Police Defendants, the use of excessive force, unlawful seizure of minor-Plaintiff's and false imprisonment; as to TRAC Defendants for recommending treatment for Mother without providing any therapeutic services and/or for recommending minor-Plaintiffs be placed in foster care to force a relationship between A.P. and D.P. with J.C.; and as to OCYF Defendants for trivializing the extent of the emotional trauma endured by minor-Plaintiffs.

623.     These acts, and all of them, exceeded the bounds of common decency usually tolerated by a civilized society.

624.     Each of the abovementioned Defendants, participated in, conspired with, approved of, and/or aided and abetted the conduct of the remaining culpable parties mentioned herein.

111

625. Through information and belief, Plaintiffs aver that Defendants, and each of them, intended to cause harm to Plaintiffs, conspired to cause harm, or acted with reckless disregard for the possibility that Plaintiffs would suffer extreme emotional distress as a result of the outrageous conduct listed above. Further, because Allegheny County assumed wardship of minor-Plaintiffs, it owed the children and their Mother and Father, as part of minor Plaintiffs' protected liberty interest and Mother and Father's familial liberty interest, reasonable safety and adequate care of minor Plaintiffs. Allegheny County's OCYF workers and/or agents abused this special relationship and/or position which gave them power to damage the Plaintiffs' interest, in egregious fashion; they knew of Plaintiffs' susceptibility to injuries through mental distress in order to inflict trauma; and/or they acted intentionally or unreasonably with the recognition that the acts were likely to result in illness through mental distress. Said conduct was done with deliberate indifference to the liberty interests of Plaintiffs, such that said public employees' actions assault and shock the public conscience.

626. As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

627. Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

628. The wrongful and despicable conduct of Defendants, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights

of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

<strong><u>Count XX</u></strong>

<strong>Negligent Infliction of Emotional Distress</strong>

<em>Plaintiffs v. Defendants</em>

629.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

630.     By virtue of the relationship between minor-Plaintiffs and Allegheny County, including as between minor-Plaintiffs and the individual caseworkers, a fiduciary duty existed relating to the provision of reasonable care and safe environments to minor-Plaintiffs. Further, because Allegheny County assumed wardship of the minor-Plaintiffs, it owed their Mother and Father, as part of Plaintiffs' familial liberty interest, reasonable safety, and adequate care of minor-Plaintiffs. A pre-existing relationship between Allegheny County and Plaintiffs therefore existed at all times relevant hereto.

631.     Allegheny County and its agents and employees, breached their respective duties of care by, but not limited to, continuing to detain minor-Plaintiffs for an unreasonable period after any alleged basis for detention had been negated; as to the Police Defendants, the use of excessive force; presenting perjured testimony and fabricating evidence to support the County and OCYF's false and malicious allegations that minor-Plaintiffs were being abused and/or neglected by their parents and failing to disclose exculpatory evidence in furtherance of their goal to right a perceived wrong against J.C., and obtaining testimony from Plaintiffs through the use of undue influence, coercion, and duress; and continuing to harass, annoy and lie to Plaintiffs, including requesting that minor-Plaintiffs be removed from Mother and Father's custody despite acknowledging that it was against the best interest of the children and that such a request was done solely to spur the Court in to action and not because OCYF Defendants wanted the minor-Plaintiffs removed and otherwise interfere with Plaintiffs' lives, after any purported exigency or

need ceased to exist, and as to OCYF Defendants for trivializing the extent of the emotional trauma endured by minor-Plaintiffs.

632.    Defendants negligently engaged in the acts as alleged above, which proximately resulted in injury and emotional distress to Plaintiffs.

633.    As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

634.    Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

## COUNT XXI

### Assault

*Minor-Plaintiffs v. Allegheny County, OCYF Defendants, DHS Defendants, TRAC Defendants, ACP Defendants, NASD Defendants, inclusive*

635.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

636.    As discussed previously, OCYF Defendants, and each of them, conspired to violate minor-Plaintiffs' civil rights, by, but not limited to seizing and abducting minor-Plaintiffs from the care and custody of Mother and Father, without warrant, parental consent, or exigent circumstances.  As part of the continuum of events comprising said violations of civil rights, S. Schmidt and Birdseye intentionally, willfully, wantonly, and maliciously threatened to seize minor-Plaintiffs' persons and physically sever them

from the care custody of their Mother and Father, without a warrant, without parental consent, and in the absence of exigent circumstances. Minor-Plaintiffs did not consent to such conduct.

637. As a direct and proximate result of the threatening conduct of S. Schmidt and Birdseye, as mentioned above, coupled with their present ability to carry out the threat, minor-Plaintiffs felt imminent apprehension of such contact, and therefore suffered severe emotional distress and other serious injuries to their persons, in an amount to be shown according to proof.

638. TRAC Defendants caused A.P. and D.P. to fear imminent bodily harm when they intentionally and/or recklessly grabbed A.P. and D.P., forcing them to treatment rooms, and physically preventing them from leaving therapeutic sessions.

639. Prior to the highly intrusive physical examinations of minor-Plaintiffs by ACP Defendants, ACP Defendants instructed minor-Plaintiffs to fully disrobe and described the imminent physical examination that was to occur on minor-Plaintiffs' persons, causing significant fear and apprehension of the imminent physical contact.

640. Minor-Plaintiff feared the imminent, unwanted and non-consensual contact with her person when NASD Defendants improperly and illegally grabbed minor-Plaintiff H.P. to force her back to the office after she fled caseworker S. Schmidt.

641. By joining the conspiracy to violate minor-Plaintiffs' civil rights, Defendants, and each of them, are responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy, including the aforementioned-acts of OCYF Defendants.

642. As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

643.        Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**COUNT XXII**

**Battery**

*Minor-Plaintiffs v. OCYF Defendants, DHS Defendants, Allegheny County, TRAC Defendants, ACP Defendants, NASD Defendants*

644.        Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

645.        As discussed previously, OCYF Defendants, and each of them, conspired to violate minor-Plaintiffs' civil rights, by, but not limited to seizing and abducting minor-Plaintiffs from the care and custody of Mother and Father, without warrant, parental consent, or exigent circumstances.  As part of the continuum of events comprising said violations of civil rights, OCYF Defendants and/or their agents, intentionally and/or recklessly grabbed A.P. and D.P.  and forced them into her vehicle. Neither A.P., D.P. nor their Mother, consented to the said harmful or offensive touching.

646.        As discussed previously, TRAC Defendants, and each of them, conspired to violate minor-Plaintiffs' civil rights, A.P. and D.P.  by, but not limited to committing perjury, fabricating evidence and suppressing exculpatory evidence.  As part of the continuum of events comprising said violations of civil rights, TRAC Defendants intentionally and/or recklessly grabbed A.P. and D.P., forcing them to treatment rooms, and physically preventing them from leaving therapeutic sessions. Neither A.P., D.P.  nor their Mother, consented to the said harmful or offensive touching.

647.        OCYF Defendants and TRAC Defendants did the aforementioned acts with the intent to cause a harmful or offensive contact to the body of A.P. and H.P.

648.     The unwanted and non-consensual, highly intrusive physical examinations of minor-Plaintiffs by ACP Defendants constituted a battery upon their persons.

649.     NASD Defendants improperly and illegally grabbed minor-Plaintiff H.P. to force her back to the office after she fled caseworker S. Schmidt.  Such contact constituted a non-consensual, unwanted, harmful and/or offensive touching.

650.     As a direct and proximate result of the conduct of these Defendants, as mentioned above, suffered severe emotional distress and other injuries to their persons, in an amount to be shown according to proof.

651.     By joining the conspiracy to violate minor-Plaintiffs' civil rights, Defendants, and each of them, are responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy, including the aforementioned acts of OCYF Defendants and/or TRAC Defendants.

652.     Minor-Plaintiffs are informed and believe that the aforesaid acts were carried out with the base and vile motivation of seizing and abducting minor-Plaintiffs in furtherance of their malicious agenda to separate minor-children from their parents.

653.     As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

654.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**COUNT XXIII**

**Defamation**

*Plaintiff-parents v. OCYF Defendants*

655.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

656.     OCYF Defendants published false statements to numerous third parties about Father and Mother. Said statements were false at the time OCYF Defendants made them.

657.     OCYF Defendants published the statements knowing they were false at the time OCYF Defendants made them.

658.     The aforementioned false statements were made to the third parties without privilege and with knowledge of their falsity.

659.     The aforementioned false statements were made to OCYF Defendants without privilege, and with knowledge of their falsity.

660.     The false statements were injurious to the reputations of Mother and Father in the community, in that they tended to subject Mother and Father to hatred, ridicule or contempt.  Moreover, the statements implied that Mother improperly interfered in the criminal investigation of Father, which she did not.  Further, the statements implied that Father was guilty of abuse, when in fact he was not.

661.     As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

662.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are

entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**Count XXIV**

**Abuse of Power**

*Plaintiffs v. Defendants*

663.        Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

664.        Defendants used civil legal processes for purposes for which they were not designed, resulting in the seizure of the minor Plaintiffs and the prolonged separation of the minor-Plaintiffs from Plaintiff-parents.

665.        As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

666.        Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**Count XXV**

**Wrongful use of Civil Proceedings**

*Plaintiffs v. OCYF Defendants, DHS Defendants, and Allegheny County*

667.        Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

668.        Defendants took part in the procurement, initiation, and continuation of civil proceedings against Plaintiff-parents.  Specifically, Defendants sought an order of dependency with respect to minor Plaintiff S.P.

669.        Defendants acted without probable cause and primarily for a purpose other than that of securing the proper discovery or adjudication of the claim in which the proceedings were based.

670.        The proceedings have terminated in favor of Plaintiff-parents.

671.        As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

672.        Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**Count XXVI**

**Invasion of Privacy**

*Plaintiffs v. Defendants*

673.        Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

674.        Plaintiffs have a protected liberty interest in the privacy and integrity of their family unit, free from unwarranted governmental intrusion.

675.        Defendants intruded upon the privacy of Plaintiffs' family by, but not limited to, removing minor-Plaintiffs from the family home without judicial authorization, without parental consent, and in the

absence of exigent circumstances; failing to discharge their duty to consider whether minor-Plaintiffs could remain safely in their residence with Mother, prior to removal; and continuing to detain minor-Plaintiffs after any purported reason for doing so had been extinguished or discovered as without basis. Each and every act mentioned above was carried out intentionally, and with full knowledge of the probable consequences thereof.

676.     Said intrusions upon the family home and privacy interests of Plaintiffs would be highly offensive to any reasonable person and was, in fact, highly offensive to Plaintiffs.

677.     As the direct and proximate result of the Defendants' dereliction of duty, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial.

678.     As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

679.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**Count XXVII**

**Negligence**

*Plaintiffs v. Defendants*

680.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

681.    At all times relevant, the Defendants had a duty of care to the Plaintiffs.

682.    The Defendants breached this duty of care of the Plaintiffs.

683.    The negligence of Defendants includes, but is not limited to:

a.  Failure to exhibit the proper care and control of sensitive and confidential documents resulting in the disclosure of the D.P. Childline unaffiliated parties;

b.  Conspiring to "right the [alleged] wrong" against J.C. to the detriment of minor-Plaintiffs;

c.  Forcing Plaintiffs to participate in mental health treatments and /or evaluations against their will;

d.  Failure to obtain full, complete and unbiased information prior to authoring reports making recommendations as to Plaintiffs;

e.  Failure to obtain voluntary and willing consent prior to performing invasive medical procedures;

f.  Disclosing confidential medical information in the absence of a consent and/or court order;

g.  Interrogating a minor-child without the consent and/or presence of their guardian and over objections of their guardian;

h.  Altering documents and/or reports at the request of OCYF Defendants;

i.  Disseminating false and defamatory information without regard to its truth;

j.  Failing to consider that the minor-Plaintiffs could remain with Mother with the provision of reasonable services;

k.  Failing to properly investigate the allegations of H.P.;

l.  Improperly threatening Mother if she remained with Father;

m.  Coercing Mother to testify against Father in exchange for the return of her children;

n.  Failing to terminate the investigation immediately upon learning that it was unfounded;

o.  Failing to return the children to Mother and Father upon determining that the allegations by H.P. were unfounded;

p.  Disseminating false information about Mother and Father to third party agencies in an effort to skew the agencies view of Mother and Father;

q.  Making recommendations contrary to the health and well-being of minor-Plaintiff;

r.  Attempting to place minor-Plaintiffs with J.C. despite his history of violence and contrary to the recommendations of O'Hara.

s.  Disseminating confidential medical information without authorization or court order; and

t.  Making recommendations outside of their scope of treatment.

684.     As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

685.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**Count XXVIII**

**Civil Conspiracy**

*Plaintiffs v. Defendants*

686.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

687.     Defendants acted in concert with each other and other persons, maliciously, without just cause or excuse, and with the willful intent to injure the Plaintiffs, conspired to remove and keep the children from the Plaintiffs' home without factual basis and to deprive the Plaintiffs of their civil rights.

688.     In committing the acts set forth above, the Defendants were without legitimate cause or justification and were animated by malice towards the Plaintiffs with the willful intent to injure the Plaintiffs.

689.     As a direct and proximate result of Defendants intentional and/or negligent infliction of emotional distress, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

690.     As a direct and proximate result of Defendants conduct, Plaintiffs have been diagnosed with attachment disorders, PTSD, anxiety and depression.

691.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**Count XXIX**

**Trespass**

*Plaintiffs v. Allegheny County, OCYF Defendants, and DHS Defendants*

692. Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

693. Defendant S. Schmidt, at the direction of OCYF Defendants and DHS Defendants, knowingly entered the Plaintiffs' property uninvited.

694. Specifically, Defendant S. Schmidt entered Plaintiffs' landscaping beds and yard to look through Plaintiffs' windows in an effort to determine if anyone was at home.

695. Defendant S. Schmidt also knowingly entered the Plaintiffs' previous property, uninvited, and walked their property following a fire at Plaintiffs' home.

696. As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

697. Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**COUNT XXX**

**Breach of Physician-Patient Confidentiality**

*Mother and S.P. v. AHN*

698. Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

699.     AHN owed a duty to Mother, upon admission of Mother as a patient at the AHN facility, to keep all communications, diagnoses and treatment information completely confidential, as required under Federal and Pennsylvania law.

700.     AHN breached this duty to Mother by disclosing to OCYF the results of her urine drug test.

701.     AHN owed a duty to S.P., upon the birth of S.P. and admission as a patient at the AHN facility, to keep all communications, diagnoses and treatment information completely confidential, as required under Federal and Pennsylvania law.

702.     AHN breached this duty to S.P. by disclosing to OCYF S.P.'s confidential medical information.

703.     The disclosure of this information by AHN falsely portrayed Mother as an abuser of illegal drugs, and thus had a tendency to tarnish Mother's character.

704.     As a direct and proximate result of AHN's actions, Mother and S.P. suffered harm, including but not limited to, emotional and psychological pain and suffering, separation, and injury to Mother's reputation.

705.     AHN's conduct violated Mother and S.P.'s rights under Pennsylvania law to physician-patient confidentiality.

706.     AHN's conduct was outrageous, willful and/or recklessly indifferent to Mother and S.P.'s rights.

707.     As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

708.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**Count XXXI**

**Loss of Consortium**

*Plaintiff-parents v. Defendants*

709.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

710.     At the time of the events complained of above, Mother and Father were married and continued to be married.

711.     As a result of the wrongful and negligent acts of the Defendants as set forth, above, Mother and Father were cased to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and fellowship with their spouse, to the detriment of their marital relationship.

712.     As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

713.     Plaintiffs are informed and believe and thereon allege that Defendants acted knowingly and willfully, with malice and oppression and with the intent to harm Plaintiffs.  Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

**PUNITIVE DAMAGES**

714.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every one of the

foregoing paragraphs.

715.     Defendants actions, as described above, were willful, wanton, malicious and outrageous.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment in their favor and the following relief against Defendants:

a.  Award Plaintiffs compensatory damages;
b.  Award Plaintiffs' punitive damages against the individual Defendants;
c.  Award Plaintiffs reasonable attorney's fees, costs and expenses; and
d.  Award Plaintiffs such further relief as this Court deems just and appropriate.


Dated: February 1, 2021                                        Respectfully submitted,



*/s/ Jason J. Blake*

Jason J. Blake, Esq.

Pa I.D. No. 83984


*/s/ Sarah E. Cobbs*

Sarah E. Cobbs, Esq.

Pa. I.D. No. 318194


2190 Ben Franklin Drive

Pittsburgh, PA 15237

(412) 997-0234