IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT PETERSON, *individually and on behalf of his minor children*, F.P., G.P., and S.P., AND REBECCA PETERSON, *individually and on behalf of her minor children* H.P., D.P., A.P., F.P., G.P., S.P., and D.B.,

        Plaintiffs,

   v.

ALLEGHENY COUNTY, et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

2:21-CV-00078-CCW

## <u>OPINION</u>

Before the Court are eight separate Motions to Dismiss filed by various defendants or groups of defendants. Having reviewed and considered the Amended Complaint, the Motions to Dismiss, and related briefing, the Court will dismiss the Amended Complaint. Some of Plaintiffs' claims, and some defendants, will be dismissed with prejudice. To the extent any claim or defendant is dismissed without prejudice, however, Plaintiffs will be given leave to file a Second Amended Complaint to attempt to cure their Amended Complaint's deficiencies.

## I.  Background

### A.  The Parties

Plaintiffs in this case are a family: Robert Peterson ("Father"), Rebecca Peterson ("Mother") (collectively "Plaintiff Parents"), and seven minor children, H.P., D.P., A.P., F.P., G.P., S.P., and D.B.[1] (collectively "Minor Plaintiffs"). Mother and Father have been married since

---

[1] Mother and Father are proceeding with a fictitious last name, and the Minor Plaintiffs are proceeding using only initials, to protect the identities of the Minor Plaintiffs.

2015.  *See* ECF No. 10 ¶¶ 1–3.  The Minor Plaintiffs are all Mother's biological children.  *See id.* ¶¶ 4–10.  Minor Plaintiffs F.P., G.P., and S.P. are also Father's biological children.  *See id.* ¶¶ 7–9.  Minor Plaintiffs H.P., D.P., A.P., and D.B. are Father's stepchildren.  *See id.* ¶¶ 4–6, 10.

In their Amended Complaint, Plaintiffs assert claims against 25 separate named Defendants and numerous, unnamed "Doe" defendants.  The Defendants—along with designations Plaintiffs use when grouping them—are as follows:[2]

| Defendant | Title/Position | Group |
|---|---|---|
| Allegheny County | --- | --- |
| Desiree Birdseye ("Ms. Birdseye") | Allegheny County Office of Children, Youth, and Families ("OCYF") Caseworker | The "OCYF Defendants" |
| April Hayden ("Ms. Hayden") | OCYF Caseworker[3] | |
| Melissa Schmidt ("Ms. M. Schmidt") | OCYF Intake Supervisor | |
| Stephanie Schmidt ("Ms. S. Schmidt") | OCYF Caseworker | |
| Erin Snyder ("Ms. Snyder") | OCYF Caseworker Supervisor | |
| Margie Remele ("Ms. Remele") | OCYF Regional Director | |
| Denise Lee ("Ms. Lee") | OCYF Clinical Manager | |
| Ann Schlegel ("Ms. Schlegel") | OCYF Assistant Deputy Director | |
| Jacki Hoover ("Ms. Hoover") | OCYF Deputy Director | |
| Marc Cherna ("Mr. Cherna") | Director, Allegheny County Department of Human Services ("DHS")[4] | The "DHS Defendants"[5] |
| John Zubryd ("Mr. Zubryd") | Regional Program Director, Commonwealth of Pennsylvania Department of Human Services[6] | --- |

---

[2] *See id.* ¶¶ 11–49.

[3] Although named in the Amended Complaint as a Defendant, *see id.* ¶ 18, Ms. Hayden is not identified in the caption of this case, nor was she ever served.  As such, Ms. Hayden is not a party to this case.

[4] According to the Amended Complaint, OCYF is a department within Allegheny County DHS.  *See id.* ¶ 13.

[5] Because Allegheny County, the OCYF Defendants, and the DHS Defendants together moved for dismissal, *see* ECF No. 68, the Court will collectively refer to them throughout this opinion as the "County Defendants."

[6] The Amended Complaint identifies Mr. Zubryd as an employee of Allegheny County DHS.  *See* ECF No. 10 ¶ 14.  However, after the Amended Complaint was filed, Plaintiffs and Mr. Zubryd entered into a Stipulation, which establishes that "Defendant Zubryd, although identified in the Amended Complaint as an employee of the Allegheny

| | | |
|---|---|---|
| Three Rivers Adoption Counsel ("TRAC") | --- | The "TRAC Defendants" |
| Lynetta Ward ("Ms. Ward") | Therapist, TRAC | |
| Kelly Ryan-Schmidt ("Ms. Ryan-Schmidt") | Therapist, TRAC | |
| Allegheny Health Network ("AHN") | --- | --- |
| McCandless Township | --- | Dismissed per ECF No. 78[7] |
| Eric Egli | Detective, McCandless Twp. Police Department | |
| North Allegheny School District ("NASD") | | The "NASD Defendants" |
| Amanda Mathieson ("Ms. Mathieson") | Principal, Hosack Elementary School, NASD | |
| Erin Crimone ("Ms. Crimone") | Assistant Principal, Carson Middle School, NASD | |
| Katherine Jenkins ("Ms. Jenkins") | Principal, Carson Middle School, NASD | |
| Northern Regional Joint Police Board ("NRJPB")[8] | --- | The "NRJPB Defendants" |
| Matthew Durzo ("Det. Durzo") | Detective, Northern Regional Police Department | |
| Allegheny Forensic Associates ("AFA") | --- | The "AFA Defendants" |
| Dr. Terry O'Hara ("Dr. O'Hara") | Forensic Psychologist, AFA | |
| Doe Police Officers 1-50 | --- | --- |
| John Does 1-50 | --- | --- |
| "Others as yet unknown" | --- | --- |

County Department of Human Services…is in fact an employee of the Commonwealth, and therefore not a part of the identified collective of DHS Defendants… That said, to the extent the Amended Complaint makes legal claims against the DHS Defendants, those claims are understood to be made against Defendant Zubryd also." ECF No. 40 (internal citations omitted).

[7] On May 13, 2021, after the 90-day period for service of the Amended Complaint had expired, *see* Fed. R. Civ. P. 4(m), the Court ordered the Petersons to show cause why Defendants Allegheny Forensic Associates, McCandless Township, and Eric Egli should not be dismissed because they had not yet been served. *See* ECF No. 74. The Petersons then filed an executed waiver of service for Allegheny Forensic Associates. *See* ECF No. 77. No proof of service (or other response to the Court's Order to Show Cause) was filed with respect to McCandless Township or Mr. Egli. Accordingly, on May 25, 2021, the Court dismissed McCandless Township and Mr. Egli without prejudice. *See* ECF No. 78.

[8] The NRJPB is a local government agency responsible for providing law enforcement services, through the Northern Regional Police Department, to four municipalities within Allegheny County: Pine Township, Richland Township, Marshall Township, and Bradford Woods Borough. *See* ECF No. 10 ¶ 37. Plaintiffs do not reside in any jurisdiction for which the NRJPB is responsible. *See id.* ¶ 70 (noting that Plaintiffs reside in McCandless Township, Allegheny County).

**B.      Summary of Factual Allegations**

Plaintiffs' 128-page, 715-paragraph Amended Complaint presents a long and, at times, convoluted narrative of the family's experiences with OCYF and others following two separate reports of suspected child sexual abuse related to Minor Plaintiffs D.P. and H.P. (the "ChildLine Reports").   In broad strokes, Plaintiffs' Amended Complaint claims that OCYF personnel— allegedly acting in concert with various school officials, social workers, law enforcement personnel, therapists, and mental health professionals—violated Plaintiffs' federal and state constitutional rights and state law in investigating the ChildLine Reports and pursuing dependency proceedings in state court (the "Family Court") related to the second ChildLine Report.   The Court will outline certain events described in the Amended Complaint here, and then address additional relevant factual allegations when discussing a particular defendant's (or group of defendants') Motion to Dismiss. *See e.g.*, ECF No. 10.

**1.      ChildLine Report Relating to Minor Plaintiff D.P.**

The first ChildLine Report—related to D.P.—was made on January 15, 2019 (the "D.P. Report"). Id. ¶ 54.  Ms. Birdseye, an OCYF Caseworker, investigated the report.  The investigation related to the D.P. Report was closed as "unfounded" that same day. *See generally, id.* ¶¶ 56–69. Plaintiffs level various complaints about how this investigation was conducted, including, for example, that Ms. Birdseye interviewed the Minor Plaintiffs at school without first notifying Plaintiff Parents;  that the schools disclosed the Minor Plaintiffs' school records to Ms. Birdseye without first obtaining Plaintiff Parents' consent or a warrant;  and that Ms. Birdseye threatened to remove the Minor Plaintiffs from the family home unless Plaintiff Parents cooperated in the investigation. *Id.*

Plaintiffs allege that around the time (or shortly after) Ms. Birdseye was conducting her investigation, the D.P. Report was erroneously transmitted to the Northern Regional Police Department and Det. Durzo.[9]  *See generally, id.* ¶¶ 70–80.  Plaintiffs claim that Det. Durzo then disclosed the report to his daughter, who is a classmate of Minor Plaintiff H.P., and instructed her to avoid contact with H.P.  *Id.* ¶ 73.  Plaintiffs further allege that Det. Durzo "appeared at H.P.'s school in order to monitor the contact between H.P. and G.D." and that H.P. "felt harassed and stalked by Durzo's appearances at the school."  *Id.* ¶¶ 75–76.  Plaintiffs claim that Mother complained to Ms. Birdseye and Mr. Zubryd (a Commonwealth of Pennsylvania Department of Human Services employee) about the allegedly negligent disclosure of the D.P. Report;  both allegedly apologized but informed Mother that they "couldn't control what [Det.] Durzo did with the negligently and improperly disseminated information."  *Id.* ¶¶ 78–79.

### 2.    Childline Report and Subsequent Events Relating to Minor Plaintiff H.P.

The second ChildLine Report—related to H.P.—was made on February 6, 2019 (the "H.P. Report").  *Id.* ¶ 81. According to the Amended Complaint, H.P. disclosed to her school guidance counselor that she had been abused by Father, but "that the abuse had not occurred in over two (2) years."  *Id.*  H.P. reportedly said that she did not feel unsafe at home, and "[n]o immediate safety concerns were reported to OCYF."  *Id.* ¶ 82.

OCYF's investigation of the H.P. Report was again led by Ms. Birdseye (at least initially).  Ms. Birdseye went to the family home on the evening of February 6, 2019, and interviewed Plaintiffs.  *Id.* ¶ 83.  During these conversations, "Mother and Father related an incident in 2017

---

[9] As noted above, the NRPD serves the following municipalities: Pine Township, Richland Township, Marshall Township, and Bradford Woods Borough.  *See* ECF No. 10 ¶ 37.  Plaintiffs reside within the jurisdiction of the McCandless Township Police Department.  *See id.* ¶ 70   As such NRPD was never formally involved in the investigation of the D.P. Report.

wherein H.P. was caught sending an explicit email to an unknown recipient. Mother and Father further disclosed that H.P. recently expressed dissatisfaction with Mother's recent pregnancy announcement and was upset at the thought of sharing Mother with another person." *Id.* ¶ 85. In addition, H.P. "told another dramatically enhanced version of her allegations." *Id.* ¶ 86.

Following these discussions, Ms. Birdseye left the home to consult with her supervisor, Ms. M. Schmidt via telephone. *Id.* ¶ 91. Plaintiffs allege that, when she returned, Ms. Birdseye, with the assistance of two McCandless Township Police Officers, took custody of the Minor Plaintiffs by refusing Mother and Father contact with the children. *Id.* ¶ 92–93. At some point, a Family Court judge issued an "Emergency Custody Authorization" for OCYF to take custody of the Minor Plaintiffs. *Id.* ¶ 100. Plaintiffs allege that, at least in part, that the Emergency Custody Authorization was based on misrepresentations made by Ms. Birdseye and/or Ms. M. Schmidt to the Family Court judge to the effect "that Mother did not believe H.P." *Id.* ¶¶ 94–100.

Further Family Court proceedings (and related events) followed. While the details of the subsequent incidents—which span almost two years and involve numerous defendants and third parties—resist concise summation, it is sufficient here to say that Plaintiffs allege OCYF and other defendants have used the Family Court proceedings as a means to carry out a campaign of bullying, harassment, and intimidation, allegedly in violation of state law and Plaintiffs' federal and state constitutional rights, and with the particular aim of depriving Mother and Father of custody of the Minor Plaintiffs.

For example, Plaintiffs allege that the therapists and psychologists involved with their case—the TRAC Defendants and the AFA Defendants—manufactured reports at OCYF's behest to present Plaintiff Parents as being noncompliant and refusing to complete certain conditions—such as particular therapy requirements or psychological evaluations, *see, e.g.*, *id.* ¶ 185 ("OCYF

Defendants and/or DHS Defendants decided to place numerous irrelevant obstacles in Plaintiff-parents' path in an effort to effectuate their plan that they, as a group, created outside of the presence of Plaintiff-parents and/or Plaintiff-parents' counsel, namely to place H.P., D.P., and A.P. outside of Mother's care and custody"); *id.* ¶ 256 ("On March 13, 2020, immediately prior to a Permanency Review Hearing, OCYF produced a 25-page written report from TRAC. Despite only meeting Mother on one occasion while Mother was filing a complaint against Ward, and having never spoken or met with Father, Ryan-Schmidt issued a retaliatory report making numerous treatment recommendations regarding Mother and Father.")—required before the Family Court proceedings could be concluded.  Furthermore, Plaintiffs allege that OCYF personnel—with AHN's help—unlawfully removed newborn S.P. from Mother's care shortly after her birth in June 2019, just a few months after the H.P. Report. *Id.* ¶¶ 200–31.  Plaintiffs further claim that OCYF personnel have been motivated by a desire to reunite J.C.—Mother's ex-husband and abuser—with H.P., D.P., and A.P., who are J.C.'s biological children, leading OCYF to impose less onerous conditions on J.C. than on Mother. *Id.* 243–62. OCYF personnel also allegedly required Mother to attend certain meetings with J.C.—despite "J.C.'s previous criminal conviction for domestic violence against Mother, a previous protection from abuse order and an existing five-year criminal No Contact order issued against J.C. by the trial court that adjudicated his case." *Id.* ¶ 142.

Finally, Plaintiffs allege that they complained about the allegedly unlawful conduct of their caseworkers—Ms. Birdseye, Ms. S. Schmidt, and their supervisors Ms. Snyder and Ms. M. Schmidt—to higher-ranking officials in OCYF and Allegheny County DHS—Mr. Cherna, Ms. Remele, Ms. Schlegel, Ms. Hoover, and Ms. Lee—and also sought relief from Mr. Zubryd, a Commonwealth of Pennsylvania DHS employee. *See generally, id.* ¶¶ 172–82, 198, 322–26.  In general, however, Plaintiffs maintain that these complaints were not addressed. *Id.*

7

### C.  The Family Court Proceedings

Details regarding the Family Court proceedings themselves are also relevant to the Court's analysis of the pending Motions to Dismiss.  Indeed, in addition to the D.P. and H.P. Reports, the Amended Complaint refers, at numerous points, to proceedings held before the Family Court and various orders issued by the Family Court.  In support of their Motion to Dismiss, the County Defendants submitted a collection of documents from the Family Court proceedings, including written orders and opinions of the Family Court judge and a written opinion from the Superior Court of Pennsylvania.  *See* ECF No. 68-3 to ECF No. 68-14.  Because these documents are "indisputably authentic" and are relied on by Plaintiffs' throughout the Amended Complaint, *see, e.g.,* ECF No. 10 ¶¶ 54–69 (discussing and describing D.P. Report and related investigation); ¶¶ 107–115 (describing the February 8, 2019 shelter care hearing, including instructions given by the Family Court to OCYF);  ¶¶ 147–150 (describing April 11, 2019 dependency hearing), the Court may consider them in resolving the pending Motions.  *See Davis v. Wells Fargo,* 824 F.3d 333, 341 (3d Cir. 2016) ("'In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.'") (quoting *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010)); *Simpson v. Sessions*, No. 16-1334, 2017 U.S. Dist. LEXIS 71109, at *5–6 (E.D. Pa. May 9, 2017) (noting that "'judicial opinions and docket sheets are public records, of which this court may take judicial notice in deciding a motion to dismiss.'") (quoting *Zedonis v. Lynch*, 233 F. Supp. 3d 417, 422 (M.D. Pa. 2017)).

In summary, the records submitted by the County Defendants consist of the following:

- The D.P. Report.  *See* ECF No. 68-3.  According to the D.P. Report, a child on D.P.'s school bus reported hearing D.P. say that "'when he gets in trouble at home, he has to put his mouth on his daddy's private parts'" and that "'sex means that you put your mouth on

someone's butt hole.'"  The D.P. Report records the "alleged perpetrator" as "Stepfather or Father – Unknown."

- The H.P. Report.  *See* ECF No. 68-4.  According to the H.P. Report, H.P. disclosed to her school counselor that Father sexually abused her "a hundred or hundreds of times" over a period of about four years, when H.P. was six to ten years of old.  The H.P. Report further notes that, on an undated prior occasion, when H.P. "had gotten in trouble for something," she disclosed the alleged abuse to Mother.  Mother then reportedly told H.P. that because H.P. was in trouble for something else "she is trying to make a bigger deal about this"; however, the H.P. Report also notes that H.P. was not left alone with Father after she disclosed the alleged abuse to Mother.  Finally, the H.P. Report records that H.P.'s concern for her younger siblings was her stated reason for coming forward with allegations against Father.

-  "Confirmation of Verbal Order for Emergency Protective Custody."  *See* ECF No. 68-5.  Family Court orders,[10] dated February 8, 2019, confirming that the Family Court issued a verbal order on February 6, 2019, for OCYF to take emergency protective custody of the Minor Plaintiffs.

- "Shelter Care Order."  ECF No. 68-6.  Family Court orders, dated February 8, 2019, finding that it would be against the welfare of the Minor Plaintiffs to remain in the family home; transferring legal custody to OCYF;  and transferring physical custody to Maternal Grandmother.  The Family Court ordered that "visits/contact (incl. phone calls social media etc. [sic]) for all parents are suspended pending the results of the forensic evaluations set of [sic] 2/14/19.  [O]CYF is permitted to authorized visits/contact after the visits consistent with the results."  The Family Court further ordered that Minor Plaintiffs and Maternal Grandmother would reside in Plaintiffs' house, with Mother and Father excluded from the home "pending further order of court."

- "Order of Adjudication and Disposition."  *See* ECF No. 68-7.  Family Court orders, dated May 23, 2019, for Minor Plaintiffs H.P., D.P., A.P., F.P., and G.P.  The Family Court found, "by clear and convincing evidence," that each was a "Dependent Child."  The Family Court ordered that legal custody would remain with OCYF and physical custody would remain with Maternal Grandmother.  The Family Court ordered that A.P. and D.P. "have reunification therapy and individual therapy," while H.P, F.P., and G.P. were ordered to "have individual therapy" only.  Pursuant to the orders, Mother was to have "liberal unsupervised visits, overnights after service and therapist agrees."  Father was ordered to have "no contact with child not his" in the orders related to D.P., A.P., F.P., and G.P., while the order related to H.P. directed that Father have no contact with H.P.

---

[10] The Court notes that, although their cases proceeded together, a separate case was opened in the Family Court for each Minor Plaintiff, and a separate order was issued by the Family Court for each Minor Plaintiff at each stage of the proceedings.  As such, for example, the "Confirmation of Verbal Order for Emergency Protective Custody," ECF No. 68-5, is a collection of six separate orders—one each for H.P., D.P., A.P., F.P., G.P., and T.B.—confirming the Family Court's verbal order of February 6, 2019.

- "Custody Order Following Closure/Withdrawal/Dismissal of Juvenile Section Child Protection Matter." *See* ECF No. 68-8. Family Court order, dated May 28, 2019, dismissing the dependency case related to D.B. and awarding primary physical custody of D.B. to his father, T.B.; legal custody of D.B. to be shared between T.B. and Mother; and Mother to have "liberal unsupervised contact."

- "Order for Emergency Protective Custody." *See* ECF No. 68-9 at 1. Family Court order, dated June 25, 2019, related to S.P. The Family Court found that, after review of OCYF's emergency petition, "[c]ontinuation of the child in his/her home would by contrary to the welfare of the child and therefore not in the best interest of the child" and therefore authorized OCYF Caseworker S. Schmidt "or any duly authorized law enforcement officer" to take custody of S.P. "if the child is in imminent danger from his/her surroundings."

- "Shelter Care Order." *See* ECF No. 68-9 at 2–3. Family Court order, dated June 28, 2019, related to S.P. The Family Court found "that to allow this child to remain in the home would be contrary to the child's welfare," and transferred legal custody to OCYF and physical custody to Maternal Grandmother. Mother was to be permitted supervised overnight visits "while [H.P.] is not in the home pending review of the case by Judge Woodruff." Father was to be permitted twice weekly visits, scheduled through OCYF.

- "Permanency Review Order." *See* ECF No. 68-10. Family Court orders, dated December 9, 2020, related to A.P., D.P., G.P., F.P., and H.P. The Family Court ordered the return of the physical custody of A.P, D.P., G.P., and F.P. to Mother, imposed other requirements— such as directing that (1) A.P. and D.P continue with individual therapy and directing Mother to "sign all releases to [O]CYF for child to allow [O]CYF to obtain info as to all therapy, etc."—and also permitted A.P., D.P., G.P., and F.P. to have overnight visits with Father, with conditions. With regard to H.P., the Family Court ordered that she remain in the physical custody of Maternal Grandmother, and imposed other conditions like requiring H.P. and Mother to both continue with individual therapy and directing that H.P. have "an in person interactional" with J.C. and also one with Father (but otherwise Father to have no contact with H.P.).

- "Permanency Review Order (Non-Placement)." *See* ECF No. 68-11 at 1–4. Family Court orders, dated March 31, 2021, related to A.P. and D.P. The orders maintain many of the conditions listed in the December 9, 2020 orders—such as directing that A.P. and D.P. continue with individual therapy—but also direct that Father be permitted to return to the family home.

- "Order for Termination of Court Supervision." *See* ECF No. 68-11 at 5–7. Family Court orders, dated March 31, 2021, related to G.P. and F.P. The orders terminate the Family Court's supervision of G.P. and F.P. The Family Court found that G.P. and F.P. were no longer dependent, and ordered their dependency cases closed.

- "Permanency Review Order." *See* ECF No. 68-11 at 8–9. Family Court order, dated March 31, 2021, related to H.P. The Family Court ordered that H.P. remain in the physical

custody of Maternal Grandmother, and further directed that H.P. and Mother continue with individual therapy, that H.P. have "an in person interactional" with J.C. and one with Father (but Father to otherwise have no contact with H.P.), that Mother have liberal unsupervised visits with H.P., and that Mother sign releases to allow OCYF "to obtain info as to all therapy, etc." as to H.P.

- "Appeal from the Order Dated May 28, 2019." *See* ECF No. 68-12. This exhibit is a copy of the Pennsylvania Superior Court's disposition of Mother's and Father's appeal from the Family Court's May 23, 2019, orders adjudicating H.P., A.P., F.P., G.P., and D.P. dependent. The Superior Court affirmed the Family Court's order in full. Mother and Father challenged a number of the Family Court's evidentiary rulings, the Family Court's decisions regarding appointment of a Guardian ad Litem, and, ultimately, the Family Court's finding of dependency. Two portions of the Superior Court's opinion are especially relevant here.

  First, in summarizing the underlying facts, the Superior Court notes some additional details regarding the 2017 incident involving H.P. Specifically, the court notes that Mother testified that she had caught H.P. typing a sexually explicit e-mail on an old phone, apparently taken from Father's nightstand, and on which Mother discovered nude photos of H.P. Mother testified that H.P. initially told her she was sending the e-mail to a boy at school, but a few weeks later told Mother that Father had told her to send the e-mail and given her the e-mail address. Mother further testified that, after these disclosures, she (1) discussed the matter with Father and (2) took steps to ensure that H.P. and Father would not be alone together. Finally, the Superior Court opinion notes that "Mother also testified that she did not believe [H.P.]'s allegations against Father were truthful and that [H.P.] had a history of lying." *Id.* at 6.

  Second, in affirming the Family Court's dependency orders, the Superior Court found that, while "there was no substantive evidence of abuse suffered by the Children," the Family Court's orders were appropriate nonetheless because "[t]he finding was based on a pattern of failing to protect and seek treatment for the Children when confronted with disturbing allegations and age-inappropriate behavior. The record reveals clear and convincing evidence that no parent was immediately available to support the Children's mental and emotional health in this way." *Id.* at 24–25.

- "May 23, 2019, Pa.R.A.P. 1925(a) Opinion." *See* ECF No. 68-13. In response to Mother and Father's appeal of the May 23, 2019, dependency orders, and pursuant to Pennsylvania law,[11] the Family Court issued an opinion on August 16, 2019. This Family Court opinion covers much the same ground as the Superior Court Opinion that ultimately disposed of Mother and Father's appeal.

---

[11] Pennsylvania Rule of Appellate Procedure 1925(a) requires that a trial-court level judge who receives a notice of appeal must, if the reasons for the order appealed from do not already appear on the record, issue an opinion setting forth the reasons supporting the order.

- "November 5, 2020, Pa.R.A.P. 1925(a) Opinion." *See* ECF No. 68-14.  Mother and Father next appealed the Family Court's August 28, 2020, Permanency Review Order.[12]  The Family Court recounts in its November 5, 2020,[13] opinion that Mother and Father raised many of the same issues as they had in their 2019 appeal, again challenged evidentiary rulings of the Family Court, and argued that the court erred in its adjudication of continued dependency.  In summarizing the procedural history leading up to the November 2020 appeal, the Family Court notes that both Mother and Father "filed several motions during the life of the dependency case regarding desire to *not* participat[e] in court order[ed] objectives, relocation of the children, and compelling records and discovery."  *Id.* at 4. Finally, in concluding that its orders should affirmed, the Family Court states that "[t]he Appellants in this case want to challenge the dependency of the children, but have made minimal progress on their goals, and have refused to sign releases for this Court to obtain necessary information from the children[s'] therapists.  The issues that brought this family into court still exist.  Until all parents fully participate, this Court cannot properly reunify this family." *Id.* at 11.

### D.    The Claims

The Amended Complaint contains 31 separate counts, consisting of a mix of claims for alleged violations of rights secured by the U.S. Constitution, the Pennsylvania Constitution, and violations of Pennsylvania state common law.  Plaintiffs' claims, along with the relevant Plaintiff(s) and Defendant(s) for each, are as follows:

| Count | Claim | Plaintiff(s) | Defendant(s) |
|---|---|---|---|
| I | 14th Amendment (Procedural Due Process) | All | OCYF Defendants;  DHS Defendants; Allegheny County |
| II | 1st Amendment (Association, Compelled Speech, Retaliation) | Mother & Father | OCYF Defendants;  DHS Defendants; Allegheny County;  AHN Defendants; AFA Defendants |
| III | 4th Amendment (Search and Seizure) | Mother & Father | OCYF Defendants;  DHS Defendants; Allegheny County;  AHN Defendants |
| IV | 14th Amendment (Substantive Due Process, Equal Protection) | Mother & Father | All Defendants |
| V | 1st Amendment (Association, Compelled Speech) | All Minor Plaintiffs | OCYF Defendants;  DHS Defendants; AFA Defendants;  Allegheny County; AHN Defendants; TRAC Defendants |

---

[12] The Court notes that this Family Court order does not appear to have been included with the County Defendants' submissions.

[13] The Court notes that the November 5, 2020, Pa. R.A.P. 1925(a) Opinion was dated by the Family Court for November 5, but bears a filing stamp of November 16, 2020.  Because any difference in the date of the opinion is not material to the Court's analysis of the Motions to Dismiss, we will use the Family Court's date.

| VI | 4th Amendment (Search and Seizure) | All Minor Plaintiffs | OCYF Defendants;  DHS Defendants;  Allegheny County |
|---|---|---|---|
| VII | 14th Amendment (Substantive Due Process) | All Minor Plaintiffs | All Defendants |
| VIII | 6th Amendment (Right to Counsel) | H.P. | Allegheny County |
| IX | 42 U.S.C. § 1983 – Conspiracy | All | All Defendants (except NRJPB Defendants;  NASD Defendants) |
| X | 42 U.S.C. § 1985(3) – Conspiracy | Mother | All Defendants |
| XI | 42 U.S.C. § 1986 | All | All (except NRJPB Defendants;  NASD Defendants) |
| XII | 42 U.S.C. § 1983 – *Monell* | All | Allegheny County |
| XIII | 42 U.S.C. § 1983 – *Monell* | All | NASD Defendants |
| XIV | 42 U.S.C. § 1983 – *Monell* | All | NRJPB |
| XV | Pennsylvania Constitution, Article I, Section 1 | All | All Defendants |
| XVI | Pennsylvania Constitution, Article I, Section 8 | All | All Defendants |
| XVII | Pennsylvania Constitution, Article I, Section 26 | All | All Defendants |
| XVIII | False Imprisonment | All | Allegheny County;  OCYF Defendants;  DHS Defendants;  NASD Defendants;  TRAC Defendants |
| XIX | Intentional Infliction of Emotional Distress | All | All Defendants |
| XX | Negligent Infliction of Emotional Distress | All | All Defendants |
| XXI | Assault | All Minor Plaintiffs | Allegheny County;  OCYF Defendants;  DHS Defendants;  TRAC Defendants;  NASD Defendants |
| XXII | Battery | All Minor Plaintiffs | OCYF Defendants;  DHS Defendants;  Allegheny County;  TRAC Defendants;  NASD Defendants |
| XXIII | Defamation | Mother and Father | OCYF Defendants |
| XXIV | Abuse of Power | All | All Defendants |
| XXV | Wrongful Use of Civil Proceedings | All | OCYF Defendants;  DHS Defendants;  Allegheny County |
| XXVI | Invasion of Privacy | All | All Defendants |
| XXVII | Negligence | All | All Defendants |
| XXVIII | Civil Conspiracy | All | All Defendants |
| XXIX | Trespass | All | Allegheny County;  OCYF Defendants;  DHS Defendants |
| XXX | Breach of Physician-Patient Confidentiality | Mother and S.P. | AHN |

| XXXI | Loss of Consortium | Mother and Father | All Defendants |
|------|--------------------|--------------------|----------------|

The Court has original jurisdiction over Plaintiffs' federal claims.  *See* 28 U.S.C. § 1331. And, because Plaintiffs' state and federal claims are so closely related as to be part of the same "case or controversy," the Court may exercise supplemental jurisdiction over Plaintiffs' state law claims.  *See* 28 U.S.C. § 1367(a).

The Court further notes that some of Plaintiffs' federal claims are pled pursuant to 42 U.S.C. § 1983, while others are not.  *Compare* ECF No. 10 ¶ 419 (invoking § 1983 for purposes of Count I) *with* ¶¶ 455–80 (Count IV).  That said, because § 1983 is the vehicle through which claims for damages may be brought against state officials for violations of federal law, *see Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (noting that "42 U.S.C. § 1983, 'is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred.'") (quoting *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979), and because Plaintiffs expressly seek only damages for the alleged violations of their constitutionally-guaranteed rights, the Court here construes Plaintiffs' claims in Counts I–VIII as seeking relief through 42 U.S.C.§ 1983.

## E.    Procedural History

Plaintiffs initiated this case by filing a Complaint on January 18, 2021.  *See* ECF No. 1. They then filed their Amended Complaint, which is the operative pleading, on February 2, 2021. *See* ECF No. 10.  Although Plaintiffs claim that Defendants have unlawfully interfered with their family unit, Plaintiffs are not seeking any declaratory or injunctive relief in this case;  rather, they seek only money damages (including punitive damages and attorneys' fees) as compensation for Defendants' alleged unlawful acts.  *See id.* at 128 (seeking compensatory damages;  punitive damages;  and attorneys' fees, costs, and expenses).

Defendants, individually or in groups, have all moved to dismiss the Amended Complaint. *See* ECF No. 42 (Mr. Zubryd);  ECF No. 45 (Dr. O'Hara);  ECF No. 50 (AHN);  ECF No. 52 (NASD Defendants);  ECF No. 54 (NRJPB Defendants);  ECF No. 68 (County Defendants);  ECF No. 72 (TRAC Defendants); and ECF No. 90 (AFA).   With the exception of the AFA Defendants—who filed their Motion to Dismiss after briefing of the other Motions was complete due to a delay in Plaintiffs serving them, *see* ECF No. 77—the Court allowed Plaintiffs to file a single response in opposition to Defendants' Motions to Dismiss (the "Omnibus Response").  *See* ECF No. 79.  The briefing on all of the Motions to Dismiss is complete, and the Motions are ripe for disposition.

## II.   Standard of Review

The majority of Defendants' arguments in favor of dismissal are framed in the context of Federal Rule of Civil Procedure 12(b)(6)—*i.e.*, that the Amended Complaint fails to state a claim (or claims) upon which relief can be granted.  As such, the familiar standard governing motions to dismiss under Rule 12(b)(6), as set forth below, applies.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim.  In reviewing a motion to dismiss, the court accepts as true a complaint's factual allegations and views them in the light most favorable to the plaintiff.  *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008).  Although a complaint need not contain detailed factual allegations to survive a motion to dismiss, it cannot rest on mere labels and conclusions.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That is, "a formulaic recitation of the elements of a cause of action will not do." *Id*.  Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and be "sufficient … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than the sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556).

The United States Court of Appeals for the Third Circuit has established a three-step process for district courts to follow in analyzing a Rule 12(b)(6) motion:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). That said, under Rule 8's notice pleading standard, even after the Supreme Court's decisions in *Twombly* and *Iqbal*, a plaintiff need only "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connolly v. Lane Constr. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016) (finding that "at least for purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss").

On the other hand, "[t]o prevail on a Rule 12(b)(6) motion to dismiss based on an affirmative defense…a defendant must show that 'the defense is "apparent on the face of the complaint" and documents relied on in the complaint.'" *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (quoting *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 923 n.2 (3d Cir. 2015)).

Next, while a "pro se pleading must be 'liberally construed,'" *Berkery v. Equifax Info. Servs.*, 429 F.Supp.3d 24, 29 (E.D. Pa. 2019) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), it "must still 'contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Baker v. Younkin*, 529 F. App'x. 114, 115 (3d Cir. 2013) (quoting *Iqbal*,

556 U.S. at 678)).  Here, although Mother and Father are proceeding here *pro se*, both are, in fact,

attorneys.  *See* ECF No. 79 at 53–54.  Accordingly, the Court "declines to afford [Plaintiffs] the

substantial degree of latitude it would otherwise extend to non-licensed pro se litigants."  *Kovarik*

*v. S. Annville Twp*., No. 1:17-cv-00097, 2018 U.S. Dist. LEXIS 47528, at *19 (M.D. Pa. Mar. 22,

2018) (collecting cases).

Finally, when deciding a Rule 12(b)(6) motion and as noted above, the Court "must

consider only the complaint, exhibits attached to the complaint, matters of public record, as well

as undisputedly authentic documents if the complainant's claims are based upon these documents."

*Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citations omitted).  Thus, for the purpose of

deciding the present Motions, while the Court accepts as true the facts alleged in Plaintiffs'

Amended Complaint and views those facts in the light most favorable to the Plaintiffs, *see Burch*,

662 F.3d at 220, the Court will also consider the state court records submitted by the County

Defendants in connection with their Motion to Dismiss.  Those documents—which consist of the

two Childline Reports, various Family Court orders, and written opinions from the Family Court

and the Pennsylvania Superior Court—are undisputedly authentic public records that directly

relate to the basis for many of Plaintiffs' allegations, and "allow[] us to interpret the complaint."

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 428 n.8 (3d

Cir. 1999) (citations omitted);  *see also City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256,

259 (3d Cir. 1998) ("Our recounting of the averments of the complaint, therefore, is informed by

the context provided by these documents and other public records of which we can take judicial

notice").

## III.   Discussion of Issues Relevant to All Defendants

Certain arguments raised in the Motions to Dismiss apply to all Defendants, and the Court

will address those global issues first, before turning to issues as they relate to a particular sub-set

of Defendants.  The global issues before the Court are:  (1) whether the Court lacks jurisdiction

over this case pursuant to the *Rooker-Feldman* doctrine;  (2) whether the Court should abstain

from exercising jurisdiction under *Younger v. Harris*;  (3) whether Mother and Father are able to

litigate on behalf of the Minor Plaintiffs under Federal Rule of Civil Procedure 17(c);  (4) whether

Plaintiffs' claims in Counts XV–XVII (alleged violations of the Pennsylvania Constitution) and

Count XXIV (abuse of power) are legally cognizable;  (5) whether Plaintiffs' claims based on the

January 15, 2019 Childline Report are barred as a matter of law by the statute of limitations;  and

(6) whether Plaintiffs have adequately plead civil rights conspiracy claims under 42 U.S.C.

§§ 1983, 1985(3), and 1986.  The Court will address each global argument in turn.

## A.    The *Rooker-Feldman* Doctrine Does Not Bar Federal Jurisdiction in This Case

The County Defendants argue that the Court lacks jurisdiction over Plaintiffs' claims under

the *Rooker-Feldman* doctrine.  *See* ECF No. 65 at 10–12.  They contend that Plaintiffs claims here

are "inextricably intertwined" with the underlying Family Court proceedings and that "this Court

cannot find that the Allegheny County Defendants' actions [were] unconstitutional without

undermining the Family Court decisions."  *Id.* at 12.  The County Defendants point out that the

Family Court "adjudicated five of the Minor Plaintiffs dependent;  gave legal and physical custody

of one Minor Plaintiff (D.B.) to his biological father;  determined custody;  established visitation;

removed [F]ather and [M]other from the family residence;  and, among many other things, set

requirements of counseling and supervision for all Plaintiffs."  *Id.* at 11.  And, importantly, the

County Defendants note that "[t]he Family Court adjudicated the Minor Children dependent, thus

finding the Minor Plaintiffs were without proper parental care or control at the time.  This decision

was appealed to the Superior Court and was affirmed.  It is now a final determination."  *Id.* at 12.

The *Rooker-Feldman* doctrine "'is confined to cases of the kind from which [it] acquired its name:  cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'"  *Vuyanich v. Smithton Borough*, 5 F.4th 379, 384 (3d Cir. 2021) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). Courts in this Circuit apply a four-factor test to determine whether the *Rooker-Feldman* doctrine has been triggered:  "'(1) the federal plaintiff lost in state court;  (2) the plaintiff 'complains of injuries caused by the state-court judgments';  (3) those judgments were rendered before the federal suit was filed;  and (4) the plaintiff is inviting the district court to review and reject the state judgments.'"  *Id.* at 385 (quoting *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010) (quotation omitted)).  The Third Circuit has said that "[p]rongs 2 and 4" are the "'key requirements'";  nevertheless, "only meeting all four requirements prevents a district court from exercising jurisdiction under *Rooker-Feldman*."  *Id.* (quoting *Great W. Mining*, 615 F.3d at 166).

Importantly, our Court of Appeals has declined to apply *Rooker-Feldman* to cases in which a plaintiff's alleged injuries are traceable to a defendant's actions rather than "the state court orders those actions allegedly caused."  *B.S. v. Somerset Cty.*, 704 F.3d 250, 260 (3d Cir. 2013).  Indeed, as Plaintiffs note in their Omnibus Response, *B.S.* presents a roughly analogous set of circumstances to those at play in this litigation.  ECF No. 79 at 8–9.  Specifically, in *B.S.*, plaintiff-mother asserted claims on behalf of herself and her minor daughter against Somerset County Children and Youth Services and two of its social workers.  Crucially, however, the plaintiffs in *B.S.* did not seek to undo any state court judgments;  rather, they sought money damages for alleged violations of their federal substantive and procedural due process rights.  The same is true here:

Plaintiffs assert claims for damages based on a variety of alleged constitutional violations and alleged violations of state law.  Accordingly, the Court concludes that federal jurisdiction over this case is not barred under the *Rooker-Feldman* doctrine.

### B.    The *Younger* Abstention Doctrine Does Not Apply

Next, some Defendants argue that, under *Younger v. Harris,* 401 U.S. 37 (1971), the Court should abstain from exercising jurisdiction over this case.  *See, e.g,* ECF Nos. 47 at 5–10;  65 at 8–10;  and 73 at 3–5.

"Generally, 'a federal court's obligation to hear and decide a case is virtually unflagging.'" *PDX North, Inc. v. Comm'r N.J. DOL & Workforce Deve.,* 978 F.3d 871, 882 (3d Cir. 2020) (quoting *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (internal quotation omitted)). Abstention under *Younger* is a narrow exception to this general rule, and "applies when certain types of state proceedings are ongoing at the time a federal case is commenced."  *Id.*   Thus, *Younger* abstention is only appropriate "when federal litigation threatens to interfere with one of three classes of cases:  (1) state criminal prosecutions, (2) state civil enforcement proceedings, and (3) state civil proceedings involving orders in furtherance of the state courts' judicial function." *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014) (citing *Sprint*, 571 U.S. at 78 ("We have not applied *Younger* outside these three 'exceptional' categories, and today hold, in accord with [*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989)], that they define *Younger*'s scope.")).

If the underlying state proceedings fall into one of these categories, the court must then apply a three-factor test, first articulated by the Supreme Court in *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982).  *See PDX,* 978 F.3d at 883.  Applying the *Middlesex* factors, abstention under *Younger* is appropriate where (1) "there are 'ongoing judicial proceeding[s]'";  (2) "those 'proceedings implicate important state interests'";  and (3) "there is

'an adequate opportunity in the state proceeding to raise constitutional challenges.'" *Id.* (quoting *Middlesex*, 457 U.S. at 432).  With respect to the third *Middlesex* factor, "[e]ven where exercising jurisdiction over certain federal claims would implicate issues of extreme importance to the state, abstention would still be inappropriate if the precise claims raised to the federal court could not be litigated in the relevant ongoing state proceeding." *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 411 (3d Cir. 2005) (citing *Heritage Farms, Inc. v. Solebury Twp.*, 671 F.2d 743, 746–47 (3d Cir. 1982)).

In this case, while it appears that the underlying Family Court proceedings arguably fit within the third category defined by the Supreme Court in *Sprint*, and while the first two *Middlesex* factors appear to be satisfied, the Court concludes that the third *Middlesex* factor has not been met. Specifically, while it may be true that Plaintiffs could have raised certain federal constitutional challenges or defenses in the Family Court proceedings, they could not have asserted the particular claims for damages they assert here.  *See Mikhail v. Khan*, 991 F.Supp.2d 596, 633 (E.D. Pa. 2014) ("Plainly, Mr. Mikhail could not and cannot seek compensatory or punitive damages based on some of the claims he has raised in the custody proceedings.");  *see also Nellom v. Del Cnty. Domestic Rels. Section*, 145 F.Supp.3d 470, 480 (E.D. Pa. 2015) ("*Younger* does not apply to the compensatory relief sought by Plaintiff because *Younger* abstention applies only 'where the precise claims raised in federal court are available in the ongoing state proceedings.'") (quoting *Addiction Specialists*, 411 F.3d at 413)).  Accordingly, *Younger* abstention does not apply here.

### C.  Mother and Father May Represent the Minor Plaintiffs under Rule 17(c)

The County Defendants argue that Mother and Father lack "standing under Fed. R. Civ. P. 17(c) to present" claims on behalf of the Minor Plaintiffs.  ECF No. 65 at 6.  Although conceding that "a parent-guardian may sue on behalf of a minor pursuant to Fed. R. Civ. P. 17(c)," these Defendants maintain that the interests of Mother and Father are not "aligned" with those of the

Minor Plaintiffs, and further point out that, at the time this case was filed, (1) Mother and Father had legal custody of only one of the Minor Plaintiffs, S.P.;  (2) five of the Minor Plaintiffs were in the legal custody of OCYF;  and (3) D.B. was in the legal and physical custody of his biological father, T.B.  *See id.* at 7.  As a result, the County Defendants contend the Minor Plaintiffs' claims must be dismissed.  In opposition, Plaintiffs point out that "Mother and Father retain their rights as natural parents to all children."  ECF No. 79 at 51.

As an initial matter, Defendants appear to conflate "standing" with "capacity."  In short, standing issues are jurisdictional in nature and dictate whether a court may hear a case;  capacity, on the other hand, only touches on whether a party may litigate on his or her own behalf and, if not, whether a given representative may step into the shoes of the party to litigate on their behalf.  *See In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 2:13-md-02436, 2015 U.S. Dist. LEXIS 153971, at \*12–15 n. 26 (E.D. Pa. Nov. 13, 2015) (distinguishing concepts of "standing" and "capacity").  Indeed, even if the Court were to decide that Mother and Father lack capacity to represent the Minor Plaintiffs in this matter, the result would not be dismissal—which Defendants seek—but Court appointment of an appropriate "next friend" to represent the Minor Plaintiffs.  *See* Fed. R. Civ. P. 17(c)(2) (stating that a minor without "a duly appointed representative may sue by a next friend or by a guardian ad litem.  The court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor…who is unrepresented in an action.").

However, the Court need not take that step because we conclude that Mother and Father are capable under Rule 17 of representing the Minor Plaintiffs in this case.  "Under Rule 17(b), a representative's capacity to sue is determined 'by the law of the state where the court is located.'"  *T.A. v. Cty. of Del.*, No. 18-2141, 2019 U.S. Dist. LEXIS 42003, at \*9 (E.D. Pa. Mar. 14, 2019)

(quoting Fed. R. Civ. P. 17(b)(3)).  Furthermore, "[w]here the party is a minor, Rule 17(c)(1) provides that a representative, such as a general guardian, committee, conservator, or like fiduciary may sue on a minor's behalf."  *Id.* at *7–8.  Surveying Pennsylvania law on the subject, the court in *T.A.* noted: "'Although [an] agency usually obtains legal custody in foster family care, the child still legally "belongs" to the parents and the parent retains guardianship. . . . Only the parent can . . . represent him at law.'…If, however, the state court enters an order fully terminating parental rights, the parent is divested of 'any legal right to contest . . . who controls and can exercise the legal rights of the child.'"  *Id.* at *10 (quoting *In re Adoption of Crystal D.R.*, 480 A.2d 1146, 1150 n.20 (Pa. Super. Ct. 1984) and *Crawford v. Wash. County Children & Youth Servs.*, 2:06cv1698, 2008 U.S. Dist. LEXIS 6416, at *14 (W.D. Pa. Jan. 29, 2008)).  Applying these principles, the court concluded that plaintiff-mother—who lacked legal and physical custody of her minor daughter—could nevertheless sue on her child's behalf because her parental rights had not been terminated.  *Id.* at *11 ("Under Pennsylvania law, even if Mother did lose legal and physical custody of T.A. in August of 2017, her right and duty to represent T.A. at law remained intact.").

The same result obtains here.  Neither Mother's nor Father's parental rights with respect to their minor children have been terminated.  Mother's parental rights with respect to D.B. likewise remain intact.  As such, Mother and Father, either together or separately, have the capacity to sue on behalf of the Minor Plaintiffs.

### D.    Plaintiffs' Claims for Alleged Violations of the Pennsylvania Constitution (Counts XV–XVII) and for "Abuse of Power" (Count XXIV) Are Not Viable as a Matter of Law

Several Defendants argue that Plaintiffs' claims for alleged violations of the Pennsylvania Constitution (Counts XV–XVII) and their common law "abuse of power" claim are not viable.  *See, e.g.,* ECF No. 47 at 16–17;  ECF No. 65 at 24–26.  The Third Circuit has recognized that "Pennsylvania does not have a statutory equivalent to [42 U.S.C.] § 1983 and does not recognize

a private right of action for damages stemming from alleged violation of the state constitution." *Miles v. Zech*, 788 F. App'x 164, 167 (3d Cir. 2019) (citation omitted); *see also Balletta v. Spadoni*, 47 A.3d 183, 193 (Pa. Commw. Ct. 2012) (explaining that there is no basis for "an action for monetary damages based on a claimed violation of the state constitution" under Pennsylvania statutory or decisional law). Furthermore, Pennsylvania law does not recognize "abuse of power" as a cause of action. *See Williams v. Temple Univ.*, No. 04-831 (RBK), 2011 U.S. Dist. LEXIS 67569, at *30 n.5 (E.D. Pa. June 20, 2011) (noting that "there is no cause of action for 'abuse of power'…under Pennsylvania law."). Accordingly, because Counts XV, XVI, XVII, and XXIV attempt to assert claims that are not viable as a matter of law, they will be dismissed with prejudice.

### E.   The Applicable Two-Year Statute of Limitations Bars Claims for Any "Individually Actionable" Violation that Allegedly Occurred before January 18, 2019

The County Defendants argue that some of the acts on which Plaintiffs' claims are based fall outside the applicable statute of limitations and thus, to the extent any claims are based on those acts, such claims must be dismissed. *See* ECF No. 65 at 8.

"Actions brought under 42 U.S.C. § 1983 are governed by the personal injury statute of limitations of the state in which the cause of action accrued." *O'Connor v. City of Newark,* 440 F.3d 125, 126 (3d Cir. 2006) (citing *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir. 1989)); *see also Nguyen v. Pennsylvania,* 906 F.3d 271, 273 (3d Cir. 2018) ("Section 1983 has no statute of limitations of its own, but borrows the statute of limitations from state personal-injury torts.") (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)). Under Pennsylvania law, personal injury claims are subject to a two-year statute of limitations. *See Sameric Corp. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998) (citing 42 Pa. Cons. Stat. Ann. § 5524); *see also Williams v. Fedarko*, No. 17-313 Erie, 2019 U.S. Dist. LEXIS 27415, at *6 (W.D. Pa. Feb. 21,

2019) (Baxter, J.) (noting that, in Pennsylvania, "a § 1983 action must be filed no later than two years from the date the cause of action accrued").

The "continuing violation" theory permits otherwise untimely claims for violations that are not "individually actionable" to be bundled with timely claims "so long as they are linked in a pattern of actions which continues into the applicable limitations period." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). But "individually actionable" instances of alleged violations cannot be aggregated under the umbrella of a continuing violation to save otherwise untimely claims. *See, e.g., Cowell v. Palmer Twp.,* 263 F.3d 286, 294–95 (3d Cir. 2001); *Heath v. Shannon,* 442 F. App'x 712, 717–18 (3d Cir. 2011)*; Hunt v. Pa. Dep't of Corr.,* 289 F. App'x 507, 509 (3d Cir. 2008).

Here, although they attempt to frame their claims under the "continuing violation" doctrine, Plaintiffs concede that "the allegations within the Amended Complaint arise from two distinct events, one that occurred on or about January 15, 2019 and a second Childline report that occurred on February 6, 2019." ECF No. 79 at 51. In light of this concession, and because (1) the January 15, 2019 Childline Report and related investigation comprise a set of individually actionable events and (2) all of those actions were completed on January 15, 2019—*i.e.*, more than two years before Plaintiffs filed their Complaint in this case—it is clear from the Amended Complaint that such claims are time-barred. Accordingly, to the extent Plaintiffs' claims are directly related to the January 15, 2019 D.P. Report (including, for example, the alleged negligent transmission of the Childline Report to the NRJPB Defendants on January 15, 2019) such claims will be dismissed with prejudice. That said, because the timing of Det. Durzo's alleged actions following the allegedly negligent disclosure of the D.P. Report is not clear from the Amended Complaint, the Court cannot conclude that the claims related thereto are untimely.

**F.      Plaintiffs Fail to State Any Civil Rights Conspiracy Claims in Counts IX, X, and XI**

In Counts IX, X, and XI, Plaintiffs claim that Defendants (except for the NASD Defendants and the NRJPB Defendants for Counts IX and XI, only) conspired to violate their civil rights. Defendants assert various arguments in support of dismissal of these claims, that, at bottom, contend Plaintiffs have failed to allege with sufficient specificity the existence of any agreement among the Defendants to violate Plaintiffs' civil rights. *See, e.g.,* ECF No. 65 at 24 ("Plaintiffs present broad and conclusory language asserting that Defendants have conspired to deprive them of constitutional rights without identifying any conduct or act in furtherance of a conspiracy"); ECF No. 51 at 16 ("The allegations in the Complaint contain only general and conclusory language that AHN acted in a conspiracy with OCYF to deprive Plaintiffs of their constitutional rights"). Plaintiffs dispute that their conspiracy-related claims fail to allege a conspiracy with sufficient specificity. *See* ECF No. 79 at 45–47.

"Each of [the following statutes, 42 U.S.C. §§ 1983, 1985, and 1986] requires, at base, an agreement to deprive an individual of some legal right." *Khalil v. N.J. Div. of Child Prot. & Permanency*, 594 F. App'x 88, 91 (3d Cir. 2015) (affirming dismissal of conspiracy claims under § 1983, § 1985, and § 1986 "because the 'bare allegation of an agreement is insufficient to sustain a conspiracy claim.'") (citation omitted).  Civil rights conspiracy claims, furthermore, must be pled with specificity. *See Brown v. City of Phila.*, 199 F. App'x 107, 109 (3d Cir. 2006) (citing *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989)).  That is, to adequately plead a civil rights conspiracy claim, a plaintiff must set forth "specific facts in the complaint which tend to show a meeting of the minds and some type of concerted activity." *Mincy v. Klem*, No. 1:08-CV-0066, 2009 U.S. Dist. LEXIS 9379, at *13 (M.D. Pa. Feb. 9, 2009) (citing *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985).

Plaintiffs' claims of a conspiracy generally involving all of the Defendants fail to meet this standard. First, to the extent Plaintiffs' conspiracy claims are premised on coordination between certain groups of Defendants—i.e., OCYF, AFA, and TRAC—to present biased or prejudicial recommendations to the Family Court in the course of the dependency proceeding, such claims fail because the alleged deprivations (e.g., interference in the family unit) were ultimately the result of orders issued by the Family Court, and Plaintiffs do not anywhere claim that the Family Court participated in any alleged conspiracy against them. *See Khalil,* 594 F. App'x at 90–91. Next, Plaintiffs' conspiracy allegations against AHN are wholly conclusory as there is no reasonable inference of a "meeting of the minds" to be drawn from AHN allegedly disclosing information, pursuant to state law, related to an apparently valid child welfare investigation. *See* ECF No. 51 at 16. Finally, Plaintiffs' vague, boiler-plate allegations that each of the Defendants (with limited exceptions noted above) participated in the purported conspiracy is insufficient to allege with the required specificity the personal involvement of each Defendant. *See Cieniawa v. White,* No. 1:09-CV-2130, 2010 U.S. Dist. LEXIS 69610, at *10–11 (M.D. Pa. July 13, 2010) (noting that a civil rights claim requires allegations of personal involvement, which, in turn, at a minimum must be shown by allegations of contemporaneous, personal knowledge and acquiescence).

Accordingly, Counts IX–XI will be dismissed. Because Plaintiffs could conceivably plead facts sufficient to cure at least some of the deficiencies identified above, Plaintiffs will be given leave to amend.

## IV.    Specific Motions to Dismiss

### A.    The County Defendants (ECF No. 68)

The County Defendants consist of Allegheny County and various individuals who work in Allegheny County's Department of Human Services (the DHS Defendants) and Office of Children,

Youth and Families (the OCYF Defendants).  Plaintiffs assert claims against the County Defendants in every count of the Amended Complaint *except* Counts XIII–XIV (*Monell* claims against NASD and NJRPB, respectively) and XXX (breach of physician-patient confidentiality against AHN).  In support of their Motion, the County Defendants advance a variety of arguments and defenses;  because the Court concludes that Plaintiffs' claims should be dismissed, only those arguments the Court finds to be dispositive will be addressed.

       **1.**      **The Individual County Defendants are Entitled to Absolute Immunity from Plaintiffs' § 1983 Claims**

The County Defendants argue that the individual OCYF and DHS personnel named in the Amended Complaint are entitled to absolute immunity from Plaintiffs' § 1983 claims against them in Counts I–VII.  *See* ECF No. 65 at 12–14.  In addition to noting that, under Third Circuit precedent, social workers are entitled to prosecutorial immunity in certain circumstances, *see id.*, the County Defendants argue that other immunities apply in this case, to the extent Plaintiffs' claims are based on the individual County Defendants giving testimony in court proceedings (i.e., witness immunity) or acting pursuant to a court order.  *See id.* at 12–13.

Plaintiffs respond that the individual County Defendants are not entitled to immunity for Plaintiffs' "First and Fourteenth Amendment claims" because "[a]bsolute immunity is the 'rare exception,' and none of the acts complained of by Plaintiffs involve prosecutorial conduct, such as preparing for, initiating, and prosecuting dependency proceedings."  ECF No. 79 at 28.  While the Court notes that many of the factual allegations in the Amended Complaint appear to be directly related to "preparing for, initiating, and prosecuting dependency proceedings" (among other Family Court proceedings), *see, e.g.,* ECF No. 10 ¶ 113 ("The dependency petition as to minor-Plaintiffs H.P., D.B., D.P., A.P., F.P., and G.P. was not filed by OCYF until February 13, 2019.  M. Schmidt, in her supervisory capacity, signed the dependency petition.");  ¶¶ 147–155

(describing events leading up to and during the April 2019 Dependency Hearing), Plaintiffs clarify

in their Omnibus Response that their claims (at least with respect to the County Defendants):

> arise from the illegal entry into their home by Ms. Birdseye, the illegal search and
> seizure of the minor-children while on school property, the failure to provide a
> timely post-deprivation hearing, the decision by various individuals, to prohibit the
> minor-Plaintiffs to have contact with their parents, and OCYF's decision to "right
> the wrong" done to J.C. prior to returning the children to Mother and Father, and
> failing and refusing to return the minor-Plaintiffs to their parents for over two years.

ECF No. 79 at 28.

The absolute immunity analysis turns on "'what function (prosecutorial, administrative,

investigative, or something else entirely)'" an individual defendant was fulfilling relative to a

given claim or allegation. *B.S. v. Somerset Cnty*, 704 F.3d 250, 268 (3d Cir. 2013) (quoting

*Schneyder v. Smith*, 653 F.3d 313, 332 (3d Cir. 2011). Accordingly, "[s]ocial workers are entitled

to absolute immunity for their activities in 'petitioning for, initiating and prosecuting dependency

cases.'" *Livingston v. Allegheny Cty*., No. 07-1010, 2010 U.S. Dist. LEXIS 7000, at *13 (W.D.

Pa. Jan. 27, 2010) (Lenihan, M.J.) (quoting *Ernst v. Child and Youth Services of Chester County*,

108 F.3d 486, 493 (3d Cir.1997)). That is, "child welfare workers involved in the prosecution of

dependency proceedings" are entitled to absolute immunity because, like prosecutors, in that

function they "clearly serve 'as advocate for the State,'…in a capacity that is 'intimately associated

with the judicial phase of the [child protection] process.'" *Ernst*, 108 F.3d at 496 (quoting *Imbler

v. Pachtman*, 424 U.S. 409, 430–31 n.33, 430 (1976)). This immunity, while "broad enough to

include the formulation and presentation of recommendations to the court in the course of such

proceedings," does not extend to "investigative or administrative actions taken … outside the

context of a judicial proceeding." *Ernst*, 108 F.3d at 495, 497 n.7. As such, a social worker may

be liable for actions taken "during the investigative phase of a child custody proceeding." *Miller

v. City of Philadelphia*, 174 F.3d 368, 376 n. 6 (3d Cir.1999).

29

That said, "the presence of an investigative component to [a social worker's] conduct does not bar the application of absolute immunity when the function of her actions is still fundamentally prosecutorial in nature." *B.S.*, 704 F.3d at 269.  The Third Circuit has said that:

> absolute immunity protects not only caseworkers' presentations of their recommendations to a court, but also their "gathering and evaluation of information" to formulate those recommendations and to prepare for judicial proceedings.  To hold otherwise, we explained, would expose caseworkers to liability "for the observations and judgments that were the necessary predicate" for their protected recommendations, which would "eviscerate the immunity they did receive and undermine the purposes sought to be advanced by the grant of absolute immunity."

*Id.* (quoting *Ernst*, 108 F.3d at 498).

Applying these principles in *B.S. v. Somerset County*, the Third Circuit concluded that a social worker and her supervisor were entitled to absolute immunity for the plaintiffs' procedural due process claim and a portion of their substantive due process claim.  *B.S.*, 704 F.3d at 253. Much like this case, plaintiff-mother in *B.S.* filed suit against the social workers and the county based on the claim that they had wrongfully removed her young daughter from her care.  And, again much like this case, plaintiffs in *B.S.* alleged that the individual defendants had misrepresented certain facts in order to obtain court orders authorizing removal of the child from her mother.  Nevertheless, the Third Circuit found that the social worker and her supervisor were entitled to immunity for plaintiffs' procedural due process claim because "[i]n each of those meetings [between defendants and the state court judge], Eller, on behalf of the County and under Barth's supervision, recommended that the court issue an order depriving Mother of custody of Daughter.  Such actions are 'intimately associated with the judicial process in much the same way as are a prosecutor's actions in representing the state in criminal prosecutions.'" *Id.* at 266 (quoting *Ernst*, 108 F.3d at 496).

With regard to the plaintiffs' substantive due process claims, the Third Circuit again found that the defendant social worker was entitled to immunity—except for her actions "prior to the initiation of judicial proceedings." *Id.* at 267. As to the social worker's investigation of the case after judicial proceedings were initiated, the Third Circuit found that the social worker was entitled to immunity because her "investigation was thus conducted in the context of an open judicial proceeding, throughout which her overall role was analogous to that of a prosecutor." *Id.* at 269 (citing *Ernst*, 108 F.3d at 496 (establishing that caseworkers' actions are protected to the extent that they are "intimately associated with the judicial process in much the same way as are a prosecutor's actions in representing the state in criminal prosecutions" (internal quotation marks omitted))). As to the social worker's initial investigation, the court declined to reach the immunity question, holding instead that plaintiffs' substantive due process claim for acts before judicial proceedings commenced failed because the social worker's actions did not "shock the conscience." *Id.* at 267–68.

Although decided at summary judgment, the *B.S.* court's reasoning guides the Court's analysis here, and leads to much the same conclusion. Plaintiffs allege that Ms. Birdseye was the OCYF Caseworker responsible for the initial investigation of the H.P. Report. According to the Amended Complaint, Ms. Birdseye's investigation began when she visited the family home on the evening of February 6, 2019—the date the H.P. Report was made. During this visit, Ms. Birdseye spoke with the Plaintiffs. ECF No. 10 at ¶ 83. In the course of these conversations, (1) "Mother and Father related an incident in 2017 wherein H.P. was caught sending an explicit email to an unknown recipient," that H.P was unhappy with Mother's then-current pregnancy, and had asked if OCYF could "make people leave the house" and (2) H.P. "told another dramatically enhanced version of her allegations to [Ms.] Birdseye." ECF no 10 at ¶¶ 85–86. Mother and Father both

denied the allegations made by H.P.  *See id.* ¶¶ 87–88.  After conferring with Ms. M. Schmidt, and with the assistance of unnamed officers from the McCandless Township Police Department, Ms. Birdseye (1) obtained an Emergency Custody Authorization from a Family Court judge and (2) took custody of the Minor Plaintiffs.[14]  *See id.* at ¶¶ 92–94, 100.

Following the removal of the Minor Plaintiffs from the family home on February 6, 2019— and in light of the Emergency Custody Authorization, the February 8, 2019, Shelter Care Hearing, and the subsequent dependency proceedings, leading to the Family Court orders described above— the actions of the individual OCYF and DHS Defendants appear to have been inextricably linked to the ongoing Family Court proceedings, notwithstanding Plaintiffs' attempts to categorize those actions as "administrative" or "investigative."  *See B.S.*, 704 F.3d at 269 (noting that "immunity protects not only caseworkers' presentations of their recommendations to a court, but also their 'gathering and evaluation of information' to formulate those recommendations and to prepare for judicial proceedings," and concluding that immunity attached post-removal because "Eller undertook her investigation with the understanding that her conclusions would be considered in a subsequent custody determination.").

Plaintiffs vaguely allege that certain actions were taken in a given County Defendant's "administrative" capacity, but such allegations are undercut by the actual conduct alleged.  *See, e.g.,* ECF No. 10 ¶ 115 ("M. Schmidt and Snyder acted as OCYF policymakers when they approved the late filing of the petitions and scheduling of hearing dates.  Such activities were undertaken in an administrative capacity.").  Indeed, even where higher-level supervisors are concerned—i.e. individuals without day-to-day responsibility for carrying forward the dependency proceedings—Plaintiffs' allegations are directly tied to the handling of their case by caseworkers

---

[14] With the exception, of course, of S.P., who had not yet been born.

like Ms. Birdseye or Ms. S. Schmidt.  *See, e.g., id.* ¶¶ 172–82 (describing Plaintiffs' complaints to OCYF and DHS Supervisors regarding Ms. S. Schmidt's handling of their case and requesting a new case worker be assigned).

Because the Court concludes that the individual County Defendants are entitled to immunity, Plaintiffs' civil right claims against them in Counts I–VII will be dismissed.  However, because Plaintiffs may be able to facts sufficient to state a claim for which individual County Defendants would not be entitled to immunity, such dismissal will be with leave to amend.

> ### 2.     Plaintiffs Fail to Allege the Personal Involvement of OCYF and DHS Supervisors with Specificity

There is an additional basis for dismissal of OCYF and DHS Supervisors Mr. Cherna, Ms. Remele, Ms. Lee, Ms. Schlegel, and Ms. Hoover:  Plaintiffs' Amended Complaint fails to allege their personal involvement in the alleged constitutional violations with sufficient specificity.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."  *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981)).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."  *Id.* (citation omitted).  Thus, "a civil rights complaint is adequate where it states the conduct, time, place, and persons responsible."  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citing *Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75, 80 (3d Cir. 1980)) (affirming dismissal of complaint where plaintiff failed to allege that defendant had "contemporaneous, personal knowledge of [the alleged violation] and acquiesced in it.").  More recently, the Third Circuit has explained that

> Supervisory liability is available only if the supervisor (1) "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm,'" or (2) "'participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced' in the subordinate's unconstitutional conduct."

*Dinote v. Danberg*, 601 F. App'x 127, 131 (3d Cir. 2015) (quoting *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) *revd on other grounds sub. nom. Taylor v. Barkes,* 575 U.S. 822 (2015)).

Plaintiffs' allegations against Mr. Cherna, Ms. Lee, Ms. Remele, Ms. Schlegel, and Ms. Hoover are neatly summarized in the following paragraph from the Amended Complaint:

> Throughout the course of the foregoing events, Mother contacted the OCYF supervisors, DHS, Cherna, Zubryd, and the Director's Action Line on numerous occasions and advised them of much of the within described acts and omissions by OCYF. However, the OCYF supervisors, DHS, Cherna, and the Director's Action Line failed and refused to take any remedial action and, instead, knowingly acquiesced to the foregoing unconstitutional conduct by ignoring and leaving the matters to the unfettered discretion of OCYF employees, such as Snyder and S. Schmidt.

ECF No. 10 ¶ 198. In other words, Plaintiffs' claims against these County Defendants are premised on vague allegations that Plaintiffs raised "complaints" to OCYF and DHS Supervisors regarding the conduct of, for example, their caseworker Ms. S. Schmidt. This is insufficient to adequately allege the personal involvement of Ms. Cherna, Ms. Lee, Ms. Remele, Ms. Schlegel, and Ms. Hoover. Accordingly, even if the individual County Defendants did not appear to be entitled to immunity, the claims against these Defendants would be dismissed.[15] But, as noted above, because

---

[15] The County Defendants also argue that the claims against Ms. M. Schmidt and Ms. Snyder should also be dismissed for lack of personal involvement. *See* ECF No. 65 at 16. However, the Amended Complaint describes with the requisite particularity (1) Ms. M. Schmidt consulting with Ms. Birdseye regarding the initial removal of the Minor Plaintiffs, *see* ECF No. 10 ¶ 91 ("Birdseye placed a call to M. Schmidt outside of the family home. Birdseye also later completed several calls within the family home to M. Schmidt for guidance and direction. Upon information and belief, M. Schmidt directed Birdseye to illegally remove minor-Plaintiffs."); and (2) Ms. Snyder's alleged interactions with Mother. *See, e.g.,* ECF No. 10 ¶ 194 ("Snyder informed Mother that if Mother had an apartment and separated from Father, OCYF would return her children to her. Snyder further stated that if Mother stayed with Father, regardless of outcome of Father's criminal trial, OCYF would not give the kids back to her.").

Plaintiffs could conceivably state claims against these Defendants, Plaintiffs will be given leave to amend.

> ### 3.      The County Defendants are Entitled to Immunity from Plaintiffs' Pendent State Law Claims

The County Defendants next contend that Pennsylvania's Political Subdivision Tort Claims Act ("PTCA"), 42 Pa.C.S.A. §§ 8541 *et seq.* and Pennsylvania's Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. § 6318 immunize them against Plaintiffs' remaining state law claims (i.e., Counts XVIII–XXIII, XXV–XXIX, and XXXI).  *See* ECF No. 65 at 14, 25.  Plaintiffs do not respond to the County Defendants' assertion of immunity with respect to the state law claims, instead arguing only that the CPSL does not provide immunity against claims arising under federal law.  *See* ECF No. 79 at 34–35.

The County Defendants contend that, under the PTCA,

> Allegheny County is generally immune from suit.  The County may be held liable only for <u>negligent</u> acts, and those acts must fit within the following parameters:
> 1. There exists either a statutory or common law cause of action that would hold the County liable but for the Tort Claims Act. 42 Pa. C.S.A. § 8542(a)(1);
> 2. A County employee's action or inaction caused the plaintiff's harm. 42 Pa. C.S.A. § 8542(a)(2); and,
> 3. This action/inaction falls within one of eight categories. 42 Pa. C.S.A. § 8542(a)(2) and (b)(1-9).[16]

ECF No. 65 at 25 (emphasis original).  Pursuant to § 8542(b) of the PTCA, a negligent act will expose a political subdivision, local agency, or employee thereof to a claim for money damages under state law only if it relates to:  (1) vehicle liability;  (2) care, custody, or control of personal property;  (3) real property;  (4) trees, traffic controls, and street lighting;  (5) utility service

---

[16] Although the County Defendants refer to "eight categories" defined under § 8542, there appear to be nine categories.  *See* 42 Pa.C.S.A. § 8542(1)–(9).

facilities;  (6) streets;  (7) sidewalks;  and (8) care, custody, or control of animals;  and (9) sexual abuse.  42 Pa. C.S.A. § 8542(b)(1-9).

All but two of Plaintiffs' remaining state law claims, Counts XVIII–XXXI, assert intentional torts, the exceptions being Count XX (negligent infliction of emotional distress) and Count XXVII (negligence).  And of the acts allegedly forming the basis of Plaintiffs' negligence claims, *see* ECF No. 10 at ¶¶ 632 and 683, none fall within any of the exceptions delineated in the PTCA.  Accordingly, Plaintiffs' remaining state law claims against the County Defendants, Counts XVIII–XXIII, XXV–XXIX, and XXXI, will be dismissed with prejudice.

### 4.    The Amended Complaint Fails to Plead a Viable *Monell* Claim Against Allegheny County

The County Defendants note that, under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), to plead a claim under § 1983 against a municipality, a "Plaintiff [must] establish 1) a constitutional violation, 2) a policy or custom of the municipality, and 3) a causal connection between the two."  ECF No. 65 at 17 (citing *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000)).  Accordingly, they argue that because Plaintiffs have not identified either (1) a written policy or (2) a custom so pervasive as to have the force of law, the *Monell* claim against Allegheny County, *see* ECF No. 10 at Count XII, should be dismissed.[17]  In opposition, Plaintiffs contend that their *Monell* claim against Allegheny County should survive because "Defendants Cherna, Hoover, Schlegel, Remele, Lee, M. Schmidt, and Snyder are policymaking officials pursuant to Pennsylvania law and/or through delegation of authority" and, as such, their allegedly

---

[17] Because a *Monell* claim is the exclusive means of pleading a 42 U.S.C. § 1983 claim against a municipality, these arguments—and the Court's analysis—necessarily also apply to any other count in the Amended Complaint in which Plaintiffs (1) attempt to plead a § 1983 claim and (2) name Allegheny County itself as a defendant.  *See* Counts I–VIII.

unconstitutional acts (or ratification of the allegedly unconstitutional acts of their subordinates) are sufficient to render Allegheny County liable under § 1983.  ECF No. 79 at 23.

In general, a municipality like Allegheny County is liable under § 1983 "only if they have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"  *LaVerdure v. Cty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) (quoting *Monell*, 436 U.S. at 690).  Within this framework, the Third Circuit has said that

> [A] municipality may only be liable for the torts of its employees in one of three ways:  First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989);  second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986);  third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

*McGreevy v. Stroup,* 413 F.3d 359, 367 (3d Cir. 2005).  Importantly, for *Monell* liability to attach, an official must have *final* policy making authority.  *See LaVerdure,* 324 F.3d at 125 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("Only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.").  Thus, a plaintiff can establish the existence of a custom or policy "by showing either that the decision-maker possessing final authority to establish a municipal policy did so by issuing an official statement of policy or that a governmental custom developed when the official acquiesced to a course of conduct such that it operated as law."  *Rodriguez v. Montgomery Cty. Office of Children & Youth*, No. 15-6186, 2016 U.S. Dist. LEXIS 65233, at *14 (E.D. Pa. May 17, 2016) (citing *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007)).  Whether an official

is a final policymaker is a question of law. *See Santiago v. Warminster Twp.,* 629 F.3d 121, 135 n.11 (3d Cir. 2010) (citation omitted).

Plaintiffs' *Monell* claim against Allegheny County fails for two reasons. First, Plaintiffs fail to point to a formal policy or pervasive custom that caused their alleged injuries. Indeed, the relevant allegations in Count XII of the Amended Complaint appear to be little more than a conclusory recitation of Plaintiffs' allegations against the individual County Defendants with the words "policy" or "custom" appended. *See* ECF No. 10 ¶ 559(a)–(j) (alleging, for example, that Allegheny County had a "policy of removing children from their family and their homes without first obtaining a warrant when no exigency exists" or that Allegheny County had a "policy of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental rights, including those as to familial relations."). According to the Third Circuit, conclusory allegations of the existence of a custom or policy—such as those in the Amended Complaint—will not suffice. *See Bayer v. Monroe County Children and Youth Services*, 414 Fed.Appx. 431, 437 (3d Cir. 2011) (agreeing with district court that "plaintiffs' conclusory allegations are insufficient to support their contention that Monroe County/MCCYS has a policy, custom, or practice of 'seiz[ing] minor children from their parents without prior judicial authorization, and without any reasonable basis to believe such a seizure is necessary to protect children from imminent harm.'").

Second, Plaintiffs have not identified an individual with final policymaking authority. In the only instance where Plaintiffs potentially attribute final policymaking authority to any Allegheny County official, Plaintiffs state that

> Upon information and belief, Allegheny County, were, [sic] at all times relevant herein, possessed of final policymaking authority in that Allegheny County

> delegated such power and responsibility to them.  This authority included but was not limited to, the responsibility to set policies and priorities for DHS, OCYF and the supervision and management of staff performing all child welfare services.

ECF No. 10 ¶ 556.  Beyond failing to identify the individual (or body) with final policymaking authority, this allegation is conclusory.  Indeed, even construing this paragraph as referring to the DHS and OCYF Defendants, the allegation does not make sense because the Amended Complaint would then, for example, allege that "caseworkers are final policy-making officials, who would then be responsible for failing to supervise and train themselves."  *Lowe v. Lancaster Cty*., No. 5:20-cv-1413, 2020 U.S. Dist. LEXIS 229977, at *28 (E.D. Pa. Dec. 8, 2020).  Furthermore, even if the Court were to conclude that one (or more) of the DHS or OCYF supervisors—*e.g.* Mr. Cherna or Ms. Remele—had final policy making authority, as discussed above, Plaintiffs have not sufficiently alleged the personal involvement of those officials such that their alleged acts may be imputed to Allegheny County.

Finally, Plaintiffs' Amended Complaint fails to sufficiently allege a so-called "failure to train" claim.  "Ordinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'"  *Thomas v. Cumberland Cty*., 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).  That said, a "single incident" claim for failure to train may be viable where "'the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights' even without a pattern of constitutional violations."  *Id.* (quoting *City of Canton v. Harris,* 489 U.S. 378, 390 n.10 (1989) (internal quotations omitted)).  Here, Plaintiffs have not alleged any pattern of similar constitutional violations.  Furthermore, Plaintiffs have offered no well-pled factual allegations as to the training Allegheny County does

(or does not provide) to its case workers, such that the particular alleged deficiencies in training can be discerned.

Accordingly, Plaintiffs' *Monell* claim against Allegheny County, Count XII of the Amended Complaint, will be dismissed.  Plaintiffs will be given leave to amend to attempt to cure the deficiencies in Count XII identified here.

### 5. Plaintiffs' Sixth Amendment Claim Against Allegheny County Fails

Finally, the County Defendants argue that Plaintiffs' claim in Count VIII that Allegheny County violated H.P.'s right to counsel under the Sixth Amendment to the U.S. Constitution fails because the Sixth Amendment applies in criminal, not civil, proceedings.  *See* ECF No. 65 at 23. Plaintiffs offer no opposition to this argument in their Omnibus Response.  The Court concludes that the County Defendants are correct:  the Sixth Amendment right to counsel only attaches in criminal proceedings.  *See, e.g., Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 892 (3d Cir. 1999) (noting that while "[g]enerally, the Sixth Amendment right to counsel attaches 'only at or after the initiation of adversary judicial proceedings against the defendant,'" it may attach earlier; but, in any event, "the defendant is guaranteed the protection of counsel from the moment he 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'") (citations omitted).  Accordingly, even accepting as true Plaintiffs' vague allegation that OCYF "threatened" H.P. with "criminal charges," ECF No. 10 ¶ 520, the underlying Family Court proceedings were civil, not criminal, and there is no allegation that actual criminal proceedings against H.P. were ever initiated.  As such, Count VIII will be dismissed with prejudice.

### B.      Mr. Zubryd (ECF No. 42)

Mr. Zubryd[18] argues that the claims against him must be dismissed because (1) the Amended Complaint does not allege his personal involvement in any violation of federal rights sufficient to state a claim under 42 U.S.C. § 1983 (Counts I–VII) and (2) Plaintiffs' state law claims against Mr. Zubryd are barred by sovereign immunity and/or fail to allege facts sufficient to state a claim (Counts XVIII–XXII, XXV–XIX, and XXXI).  ECF No. 43.

### 1.      Plaintiffs' § 1983 Claims Against Mr. Zubryd Fail

The Court set out, above, the pleading standard applicable to a claim of supervisory liability under 42 U.S.C. § 1983.  In short, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs…Personal involvement can be shown through allegations of personal direction or actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207–08 (3d Cir. 1988).  Furthermore, a supervisory defendant must have had at least "contemporaneous, personal knowledge" of the alleged violation.  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).  Mr. Zubryd argues that Plaintiffs' allegations regarding his actions fail to meet this standard.

Plaintiffs maintain that they have sufficiently alleged Mr. Zubryd's personal involvement for purposes of their § 1983 claims because "to avoid having to repeat the names of each of the individual defendants numerous times throughout the Amended Complaint, Plaintiffs utilized…'DHS Defendants' to refer to John Zubryd."  ECF No. 79 at 26.  Thus, according to Plaintiffs, they have adequately stated Mr. Zubryd's personal involvement under § 1983 because "Defendants cite to no rule of law requiring that each name of each individual defendant be utilized

---

[18] As noted above, and per the parties' Stipulation, Mr. Zubryd is an employee of the Commonwealth of Pennsylvania DHS, not Allegheny County DHS.  *See* FN 6, *supra*.

throughout a complaint, and they cite to no rule of law prohibiting the collective reference to a group of individuals in a complaint." *Id.*

While it may be true, in a general sense, that there is "no rule of law prohibiting the collective reference to a group of individuals in a complaint," Plaintiffs' argument does not survive closer scrutiny. As an initial matter, the Amended Complaint defines "DHS Defendants" to include both Mr. Zubryd and Mr. Cherna.[19]  As such, there are allegations in the Amended Complaint where it is impossible to discern whether Plaintiffs are referring to Mr. Cherna or Mr. Zubryd. This is a problem, of course, because, as outlined above, pleading supervisory liability under § 1983 requires allegations of *personal* involvement. Vaguely attributing actions to a group of defendants is insufficient. *See Evancho* 423 F.3d at 353 (holding that "a civil rights complaint is adequate where it states the conduct, time, place, and persons responsible.").

Furthermore, even where the Amended Complaint does identify Mr. Zubryd by name, Plaintiffs fail to adequately allege personal involvement sufficient to survive a motion to dismiss. Plaintiffs attribute the following conduct to Mr. Zubryd:

- Plaintiffs claim that Mother contacted Mr. Zubryd concerning the allegedly "negligent disclosure" of the D.B. Report to the Northern Regional Police Department, that Mr. Zubryd apologized for the apparently improper dissemination of the report, and that Mr. Zubryd informed Mother that "DHS and OCYF couldn't control what Durzo [and NRPD] did with the…information." ECF No. 10 ¶¶ 78–79.

- Later, Mother contacted "DHS Regional Director Amber Kalp" regarding difficulties that she and Father were having with scheduling visits with the Minor Plaintiffs. Mr. Zubryd then allegedly followed-up with Mother via e-mail on February 25, 2019, informing her that she "was not an alleged perpetrator in this matter and that he could not account for the delay in setting up visits" for Mother. During a telephone call that same day, Mr. Zubryd allegedly "stated that [Ms.] Birdseye was terminated for her mishandling of

---

[19] Plaintiff's brief erroneously states that Marc Cherna is an "OCYF Defendant"; in the Amended Complaint Mr. Cherna is identified as a DHS Defendant. *Compare* ECF No. 79 at 26 *with* ECF No. 10 ¶ 13, 15.

Mother's case. [Mr.] Zubryd recommended that Mother 'do what OCYF wants' despite acknowledging that the case was mishandled, and Mother was not accused of any misconduct." Mother was then contacted by Ms. M. Schmidt, who "apologized for [Ms.] Birdseye's behavior, confirmed that [Ms.] Birdseye was terminated for her conduct related to Mother's case, and scheduled visitation with the children for Mother and Father." *Id.* ¶¶ 136–39.

- At various, non-specified times, Mother lodged complaints with "OCYF supervisors, DHS, Cherna, Zubryd, and the Director's Action Line" regarding acts or statements made by certain individual County Defendants. Plaintiffs allege that "OCYF supervisors, DHS, Cherna, and the Director's Action Line failed and refused to take any remedial action" and instead "acquiesced" to allegedly unconstitutional conduct "by ignoring and leaving the matters to the unfettered discretion of OCYF employees, such as Snyder and S. Schmidt." *Id.* ¶¶ 183, 198.

- At various times from late 2019 to early 2021, Plaintiffs allege that Mother was required to attend meetings at which J.C. was present. Mother objected to Ms. S. Schmidt and OCYF about joint meetings with J.C., and also raised these same concerns to Mr. Zubryd. Plaintiffs then note that after Mother involved Mr. Zubryd, "OCYF held separate meetings for Mother and J.C." and that Mr. Zubryd "informed Mother that he was assured by OCYF that there would be separate meetings." In June 2020, "Counsel for Mother reached out to Zubryd, requesting clarification on OCYF's policy related to domestic violence and teaming meetings." According to the Amended Complaint, "directed Mother to contact Zara Carroll, OCYF Manager of Policy and Practice. Ms. Carroll assured Mother that Ms. Carroll reviewed Mother's concerns and that all meetings would be separate." *Id.* ¶¶ 322–26.

Taken as true, these alleged facts establish that, at most, Mr. Zubryd learned of purported misconduct only after the fact. But, for a supervisory official to have "had knowledge of and acquiesced" in a subordinate's unconstitutional conduct, *Dinote*, 601 F. App'x at 131, the supervisor must have had actual, contemporaneous knowledge of the violation at issue. *See Reyes v. Gilmore,* Civil Action No. 18-746, 2020 U.S. Dist. LEXIS 25566 at *13–14 (W.D. Pa. Feb. 13, 2020) (Dodge, M.J.) (dismissing claim where plaintiff "failed to allege any personal involvement by [the supervisor] or contemporaneous knowledge of the incident"); *Taylor v. Commonwealth* , No. 17-3369, 2018 U.S. Dist. LEXIS 210370, at *66–67 (E.D. Pa. Dec. 12, 2018) (noting that

"'[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive.'") (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).

Thus, Plaintiffs' § 1983 claims against Mr. Zubryd fail because they do not adequately allege that he either participated in any alleged violation, or that he had contemporaneous knowledge of and acquiesced to any alleged violation. Because Plaintiffs could, conceivably, allege facts sufficient to overcome this deficiency, they will be given leave to amend.

### 2.      Plaintiffs' State Law Claims Against Mr. Zubryd Fail

Next, Mr. Zubryd argues that, "as a state employee, [he] is entitled to sovereign immunity." ECF No. 43 at 7. Relying on 42 Pa.C.S.A. § 8522, under which "[t]he General Assembly has waived sovereign immunity and consented to suit in only ten (10) limited circumstances," *id.* at 7 n.1, Mr. Zubryd contends that he is immune from Plaintiffs' state law claims to the extent they allege intentional torts. Additionally, Mr. Zubryd maintains that Plaintiffs' negligence claim "fails as it is unsupported by factual allegations." *Id.* at 7.

Echoing their argument with respect to their § 1983 claims, Plaintiffs assert that they have sufficiently pled a state law claim of negligence against Mr. Zubryd because "Zubryd was made aware of a myriad of problems and concerns regarding OCYF's handling of this case" and that "Zubryd, in his role of administrative overseer of OCYF, knew, or should have known, of the constitutional violations perpetrated by OCYF and their agents and employees." ECF No. 79. at 53. Plaintiffs conclude that "[i]t is a fair construction of the Amended Complaint to construe a duty on behalf of Zubryd to take efforts to stop these actions being committed by the OCYF Defendants when he became aware of them. His unwavering failure to do so has been outlined within the Amended Complaint and within this Response." *Id.* That said, Plaintiffs do not

address—let alone dispute—that Mr. Zubryd, an employee of the Commonwealth of Pennsylvania Department of Human Services, is entitled to immunity from Plaintiffs' state law claims.

The Court has already outlined the contours of the immunity provided to local agencies and employees under the PTCA.  While the immunity afforded to Commonwealth agencies and their employees ultimately derives from a different source than the statutory immunity provided to local agencies and officials under the PTCA—sovereign immunity flows from the Pennsylvania Constitution, with exceptions codified by statute in 42 Pa.C.S.A. § 8522—the result is much the same in practice.  That is, state agencies and officials are immune from suit for damages unless an alleged cause of action (1) sounds in negligence and (2) falls within one of 10 categories of defined exceptions under 42 Pa. C.S.A. § 8522.  Accordingly, because Plaintiffs' intentional tort claims against Mr. Zubryd—i.e., Counts XVIII–XIX, XXI–XXIII, XXV–XXVI, XXVIII–XXIX, and XXXI—do not appear to fall within any defined exception to sovereign immunity under Pennsylvania law, those counts cannot survive Mr. Zubryd's Motion to Dismiss.  Similarly, Plaintiffs' negligence claims, Counts XX (negligent infliction of emotional distress) and XXVII (negligence) against Mr. Zubryd fails for the same reason their negligence claims against the individual County Defendants, discussed above, also fail.  That is, even if Mr. Zubryd's alleged conduct was negligent (a question which the Court does not reach), taken as true, the allegations regarding Mr. Zubryd in the Amended Complaint do not fit within any of the exceptions to sovereign immunity defined under Pennsylvania law.  *See* 42 Pa. C.S.A. §8522(b).  Accordingly, Plaintiffs' remaining state law claims against Mr. Zubryd, Counts XVIII–XXIII, XXV–XXIX, and XXXI, will be dismissed with prejudice.

### C.    AFA Defendants (ECF Nos. 45 and 90)

In general, Plaintiffs allege that the AFA Defendants—AFA and Dr. O'Hara—conspired with OCYF to prepare biased and retaliatory psychological evaluations and reports for the Family

Court to further OCYF's alleged scheme to keep the Minor Plaintiffs from being returned to the custody and care of Mother and Father. *See, e.g.* ECF No. 10 ¶¶ 307–08. Plaintiffs allege that OCYF had an arrangement to refer cases to AFA, who then assigned Dr. O'Hara to Plaintiffs' case. *See id.* ¶¶ 291–93. Once their case was assigned to him, Plaintiffs allege that Dr. O'Hara coordinated with OCYF to produce reports supporting OCYF's preferred outcome. *See id.* ¶¶ 294–306.

Before turning to AFA's and Dr. O'Hara's motions, the Court notes that AFA submitted an exhibit that purports to show that Dr. O'Hara resigned his employment with AFA in September 2017. If true, AFA's exhibit would show that Dr. O'Hara (who is the only purported AFA-affiliated individual named in the Amended Complaint) and AFA severed their relationship more than a year before the events alleged in the Amended Complaint, and almost two years prior to Dr. O'Hara's involvement in the case began. Indeed, the Court notes that AFA's only alleged connection to this case appears to be through Dr. O'Hara's involvement. However, because the e-mail communications contained in AFA's exhibit do not fall within any category of materials that a court may consider in deciding a motion to dismiss, the Court cannot, and does not, rely on AFA's exhibit in resolving the AFA Defendants' Motions. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (in resolving a motion to dismiss, the court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.").

### 1.    Dr. O'Hara is Entitled to Quasi-Judicial Immunity

Dr. O'Hara maintains that he is entitled to judicial immunity for the Plaintiffs' federal claims in Counts II, IV, V, and VII and witness immunity for Plaintiffs' state law claims in Counts XIX–XX, XXVI–XXVIII, and XXXI. ECF No. 47 at 10–16. Specifically, Dr. O'Hara argues

that he "provided opinions to the state court judge as court-appointed expert who responded to the needs of OCYF and at the direction of the state court judge as communicated through OCYF or directly to the judge presiding over the state court proceedings." *Id.* at 10.  Dr. O'Hara notes that his involvement in the underlying proceedings began when OCYF requested that he perform evaluations of the Plaintiffs, which the Plaintiffs participated in voluntarily.  *See id.* at 12 (citing ECF No. 10 ¶ 293).  After that initial series of evaluations, Dr. O'Hara argues that "a fair reading of the Amended Complaint makes clear that Dr. O'Hara's ongoing involvement was at the direction of the Court" such that "every task performed by Dr. O'Hara was for the purpose of submitting reports to the state court judge and testifying in the state court proceedings." *Id.* (citing ECF No. 10 ¶¶ 189, 191–92, 258, 261, 292, 298–300, 303, 314, 330, and 387).

Plaintiffs dispute that Dr. O'Hara is entitled to immunity.  In so arguing, Plaintiffs attempt to draw a distinction, relying on *Russell v. Richardson*, 905 F.3d 239, 247 (3d Cir. 2018), between "claims based upon the actions actually authorized by court order and those based upon the manner in which the Court order is enforced."  ECF No. 79 at 33.  That is, although Plaintiffs appear to concede that Dr. O'Hara acted pursuant to a court order, *see id.* ("OCYF Defendants privately retained Dr. O'Hara prior *to the Court ordering psychological evaluations of the parties*.") (emphasis added), they maintain that he cannot be afforded immunity because his conduct exceeded (or was outside of) the scope of his court-ordered duties.  *See id.* ("It is Dr. O'Hara's conduct once OCYF requested that he prepare recommendations that is the issue in this matter and not his actual report.").

While Plaintiffs are correct that, under Third Circuit precedent, the "manner" in which a court order is enforced may place a defendant beyond the scope of the quasi-judicial immunity the order in question might afford them, Plaintiffs' argument ultimately elides the core of the immunity

analysis—i.e. "the 'functional' approach to immunity." *Russell*, 905 F.3d at 274 (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)).  Under the "functional" approach, "'we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.'" *Id.* (quoting *Forrester*, 484 U.S. at 224).  This "functional" analysis is crucial because it establishes the boundaries of the immunity that a particular defendant may be afforded.  Absent this analysis, the immunity promised to individuals entrusted with carrying out duties assigned to them by a court would be of little value— in other words, the "manner" in which an order is carried out will always be subject to attack unless the boundaries of the discretion entrusted to a given function are somehow defined.

In applying this "functional" approach, the Third Circuit has held that defendants in cases such as *Hughes v. Long*, 242 F.3d 121 (3d Cir. 2001) and *McArdle v. Tronetti*, 961 F.2d 1083 (3d Cir. 1992)—who, like the Defendants here, allegedly participated in a conspiracy to violate plaintiffs' rights in the context of judicial proceedings, *see Hughes,* 242 F.3d at 123–24; *McArdle*, 961 F.2d at 1084—are entitled to quasi-judicial immunity, whereas the defendant in *Russell* was not.  The defendants in the former group of cases were doctors, psychologists, and custody evaluators, tasked with formulating and making recommendations to the court.  *See Hughes*, 242 F.3d at 127 (defendants were directed "to gather information, conduct an evaluation, and make a recommendation to aid the custody determination"); *McArdle*, 961 F.2d at 1085 ("Tronetti made his psychiatric examination of McArdle at the request of and furnished a written report of that evaluation to" the court).

Far different circumstances were at play in *Russell*.  There, the defendant, a Virgin Islands Superior Court Marshal, shot a 15-year-old boy in the course of attempting to bring him before the

court for violating an order to "follow the reasonable rules of his mother while living with her."
905 F.3d at 244.  The Third Circuit concluded that the fact the marshal was executing a court order
did not entitle him to immunity from plaintiff's excessive force claim because "the use of excessive
force in the performance of [the marshal's] functions is neither 'at the direction of the judge,' nor
a 'dut[y] incident to' the execution of the judge's order."  *Id.* at 251 (citations omitted).

The allegations at issue here appear to place Dr. O'Hara squarely within the scope of the
quasi-judicial immunity recognized in the *Hughes/McArdle* line of cases.  As noted above, the
Plaintiffs appear to concede that Dr. O'Hara was ordered to conduct psychological evaluations of
the Plaintiffs and present his findings and recommendations to the Family Court.  *See* ECF No. 79
at 33.  And, while Plaintiffs do allege that Dr. O'Hara consulted with OCYF in developing his
report and recommendations, *see* ECF No. 10 ¶ 294 ("Dr. O'Hara solicited questions for his
evaluations from only OCYF.  These referral questions were not provided by the Court."), their
claim that "Dr. O'Hara was engaged as OCYF's expert and issued reports as such," ECF No. 79
at 33, is contradicted by numerous allegations in the Amended Complaint putting OCYF and Dr.
O'Hara at odds.  *See, e.g.,* ECF No. 10 ¶ 191 ("Following the initial evaluations by Dr. O'Hara,
Dr. O'Hara recommended J.C. undergo anger management therapy.  Despite this recommendation,
OCYF requested that the Court not order anger management for J.C. OCYF also requested that
the Court order Mother to non-offender's counselling, despite Dr. O'Hara not recommending it
for Mother.") and ¶ 258 ("During the August 2020 permanency review hearing, S. Schmidt
testified that, despite Dr. O'Hara's multiple recommendations for anger management related to
J.C., it did not appear to OCYF Defendants that he needed anger management.").

In short, stripped of legal conclusions and drawing reasonable inferences in Plaintiffs'
favor, the allegations in the Amended Complaint appear to describe Dr. O'Hara conducting

evaluations, preparing a report, and providing recommendations to the Family Court to aid the court in adjudicating Plaintiffs' case. Accordingly, the Court concludes that Dr. O'Hara is entitled to quasi-judicial immunity for the federal claims against him.

Furthermore, the witness immunity analysis for Plaintiffs' state law leads to the same result. The Third Circuit in *Hughes* noted that, under Pennsylvania law, "communications which are 'issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought' are immune from civil liability." *Hughes,* 242 F.3d at 129 (quoting *Post v. Mendel*, 510 Pa. 213, 221 (Pa. 1986)). The Third Circuit went on to explain that the underlying considerations supporting witness immunity are similar to those supporting quasi-judicial immunity. *See id.* at 130 "(Because they work on behalf of the court rather than any one party, court-appointed experts provide unbiased, neutral information and recommendations and aid the court in its decision-making process. This neutral information is essential to the court, which cannot make necessary observations and gather relevant facts without assistance."). Accordingly, the court concluded that because the defendants in *Hughes* were court-appointed and the claims against them did not sound in negligence, they were entitled to immunity against the plaintiff's state law claims. *Id.* Here, as noted above, the Amended Complaint appears to assert that Dr. O'Hara was appointed by the Family Court to assist it in its adjudication of Plaintiffs' case. As such, Dr. O'Hara is entitled to witness immunity.

However, as noted above with respect to other defendants, because Plaintiffs may be able to plead allegations sufficient to state viable claims, their claims against Dr. O'Hara will be dismissed with leave to amend.

### 2.      Plaintiffs Fail to State a Federal Claim Against AFA

Next, AFA argues that Plaintiffs have not alleged sufficient facts to state a plausible claim against it.  The Court agrees.  Besides vague and conclusory allegations—e.g., that AFA "trains its psychologists to author biased reports in favor of the desired outcome set forth in OCYF's referral questions" and that "AFA Defendants, including Dr. O'Hara, retaliate against parents who question the relationship between AFA and OCYF," ECF No. 10 ¶¶ 297, 305—Plaintiffs' claims against AFA are all premised on conduct attributed to Dr. O'Hara.  Indeed, the only AFA "employee" identified in the Amended Complaint is Dr. O'Hara and, furthermore, there are no facts alleged that would support the inference that Dr. O'Hara held any kind of management or final policymaking responsibility for AFA.  Thus, the Amended Complaint attempts to establish federal claims against AFA purely on the basis of *respondeat superior*.  This is not a legally cognizable basis for Plaintiffs' federal civil rights claims;  as such, Plaintiffs' federal claims in Counts II, IV, V, and VII against AFA will be dismissed.

AFA next argues that "they are absolutely immune for all pendent state claims as they are provided judicial privilege providing immunity for communications which are made in the regular course of judicial proceedings and are material to the relief sought."  ECF No. 91 at 4.  The Court understands AFA to be asserting its entitlement to the same kind of witness immunity as Dr. O'Hara for Plaintiffs' state law claims.  Because Plaintiffs' claims against AFA are based on acts attributed to Dr. O'Hara, and because the Court has already concluded Dr. O'Hara is entitled to immunity from Plaintiffs' state law claims, the Court will likewise dismiss the state law claims against AFA in Counts XIX–XX, XXVI–XXVIII, and XXXI.  As with the claims against Dr. O'Hara, Plaintiffs will be given leave to amend.

### D.      TRAC Defendants (ECF No. 72)

According to the Amended Complaint, TRAC is "an agency providing foster and adoption services to Allegheny County."  ECF No. 10 ¶ 27.  The individual TRAC Defendants, Ms. Ward and Mr. Ryan-Schmidt, are therapists employed by TRAC.  *See id.* ¶¶ 28–29.  As with the other Defendants, Plaintiffs assert a variety of federal and state claims against the TRAC Defendants; those claims appear at Counts IV–V and VII (federal claims) and Counts XVIII–XXII, XXVI–XXVIII, and XXXI (state law claims).

The Amended Complaint states that the TRAC Defendants were appointed by the Family Court to provide "reunification therapy."   ECF No 10. ¶ 243 ("At the insistence of OCYF, reunification therapy was ordered by the Court to occur at TRAC between J.C., H.P., A.P., and D.P.").  In addition, the Amended Complaint asserts that the TRAC Defendants participated in the OCYF Defendants' conspiracy to throw up obstacles in Mother's and Father's path to reunification with the Minor Plaintiffs by providing allegedly false and retaliatory reports and recommendations to the Family Court.  *See, e.g.*, *id.* ¶ 256 ("On March 13, 2020, immediately prior to a Permanency Review Hearing, OCYF produced a 25-page written report from TRAC.  Despite only meeting Mother on one occasion while Mother was filing a complaint against Ward, and having never spoken or met with Father, Ryan-Schmidt issued a retaliatory report making numerous treatment recommendations regarding Mother and Father.").  The ultimate objective of this conspiracy, according to Plaintiffs, was to deprive Mother and Father custody of Minor Plaintiffs A.P., D.P., and H.P., in favor of their biological father, J.C.:

> TRAC Defendants further requested that the Court remove A.P. and D.P. from Mother and all maternal family members and place A.P., D.P., and H.P. into foster care so that J.C. could obtain custody of H.P., A.P. and D.P. …S. Schmidt represented to the Court that TRAC Defendants conducted an evaluation of J.C. as to his need for anger management and found that he did not require anger management therapy. Ryan-Schmidt later testified that she never evaluated J.C.,

but the couple times she met with him he "seemed fine." In furtherance of their conspiracy, Ryan-Schmidt and S. Schmidt agreed to, and did, recommend that J.C. be relieved from future treatment.

*Id.* ¶¶ 257–58.  Like the other groups of Defendants, Plaintiffs assert claims against the TRAC Defendants under § 1983 for alleged violations of their federal constitutional rights.  *See id.* at Counts IV, V, and VII.  Plaintiffs also assert a variety of state law claims against the TRAC Defendants.  *See id.* at Counts XVIII–XXII, XXVI–XVIII.

### a.    The TRAC Defendants are Entitled to Judicial Immunity

Relying on *Hughes v. Long*, 242 F.3d 121 (3d Cir. 2001), the TRAC Defendants argue that they are entitled to judicial immunity as to all of the claims against them.  *See* ECF No. 73 at 6–7.  In short, and as discussed in more detail above, the *Hughes* court held that the defendants, court-appointed custody evaluators, were entitled to judicial immunity.  *See* 242 F.3d at 127.  In support of this conclusion, the court found that the "functions [of a custody evaluator] are intimately related and essential to the judicial process because they aid and inform the court in its discretionary duties.  In the absence of the extensive fact-finding and recommendations of child-custody evaluators, courts would be required to make custody recommendations with little, if any, unbiased information about the family."  *Id.*

Accordingly, the TRAC Defendants maintain that:

In the case at bar, it is clear that Plaintiffs' Amended Complaint sets forth the facts that the TRAC Defendants performed child custody evaluations and reunification services pursuant to an order of court.  These tasks were performed at the behest and for the edification of the Common Pleas Court judge so that he or she could fairly and faithfully execute his or her duties as the fact-finder in this custody matter.  Merely because Plaintiffs are dissatisfied with the results of the TRAC Defendants' evaluation does not provide a basis for the validity of their claims.  Therefore, Three Rivers Adoption County, Lynetta Ward and Kelly Ryan-Schmidt are protected by judicial immunity and it is appropriate for the Court to dismiss all causes of action against TRAC and the TRAC Defendants.

ECF No. 73 at 7.

Although they do not dispute that the TRAC Defendants were ordered by the Family Court to provide "child custody evaluations and reunification services," *id.*, Plaintiffs maintain that the TRAC Defendants are not entitled to immunity because the claims against them "arise from TRAC Defendants['] conduct with OCYF Defendants outside of the Court proceedings, when they were acting in a non-judicial, administrative capacity." ECF No. 79 at 33. Specifically, Plaintiffs argue that their allegations demonstrate that the "TRAC Defendants and OCYF Defendants conspired against Mother to deprive her of her constitutionally guaranteed rights through telephone conferences and email exchanges, far outside of the scope of a judicial immunity." *Id.*

As discussed above, the "'functional approach'" to the analysis of claims for absolute immunity "looks to the nature of the function performed, not the identity of the actor who performed it and evaluates the effect that exposure to particular forms of liability would likely have on the appropriate exercise of that function." *Hughes,* 242 F.3d at 125. Furthermore, "[t]he official seeking immunity bears the burden of showing that it is justified by the function in question." *Id.*

Here, it appears that the TRAC Defendants were ordered by the Family Court to provide custody evaluations and reunification services. *See* ECF No. 10 ¶ 243 ("At the insistence of OCYF, reunification therapy was ordered by the Court to occur at TRAC between J.C., H.P., A.P., and D.P."); *id.* ¶ 257 ("TRAC Defendants further requested that the Court remove A.P. and D.P. from Mother and all maternal family members and place A.P., D.P., and H.P. into foster care so that J.C. could obtain custody of H.P., A.P. and D.P."); *see also* ECF No. 64-7 (Family Court order for "TRACK [sic] Reunification"). Furthermore, all of Plaintiffs' allegations against the TRAC Defendants—*e.g.*, that they "conspired" with OCYF regarding reunification of Minor Plaintiffs' A.P., D.P., and H.P. with J.C.; that they authored allegedly retaliatory reports against

Mother and Father by recommending they complete additional requirements;  that Ms. Ryan-Schmidt made "slanderous statements regarding Mother *in an effort to convince the Court* to remove A.P. and D.P. from Mother" (emphasis added), ECF No. 10 ¶ 262—fit within the context of the TRAC Defendants' function as court-appointed evaluators and therapists.  Indeed, Plaintiffs' chief complaint against TRAC—as highlighted in their response, that "S. Schmidt intentionally excluded counsel for Mother and Father from the emails between herself and TRAC Defendants, while including Ramsey [Counsel for J.C.] and Myhers [Guardian ad Litem for the Minor Plaintiffs]"—appears to be squarely within the context of providing court-ordered reunification services.  ECF No. 10 ¶ 247.

And, as the Third Circuit found in *Hughes*, allowing court-appointed evaluators and therapists to be sued for money damages would considerably impinge upon the ability of these third-party professionals to provide court-ordered services—including neutral, expert evaluations for the court's benefit.  This is especially the case in the context of family court proceedings like those at issue here, where the court's imperative is to determine the "best interests" of the child.  The threat of litigation by a party who disapproves of the evaluator's recommendations—even if such litigation proves unsuccessful—would, at the least, cause such professionals to hedge their recommendations to avoid exposing themselves to suit and, at worst, encourage some professionals to decline to perform such services for the court entirely.

Accordingly, the Court concludes that, because Plaintiffs' allegations attribute conduct to the TRAC Defendants within the context of their function as court-appointed evaluators and providing court-ordered reunification services, the TRAC Defendants are entitled to quasi-judicial immunity for purposes of Plaintiffs' federal claims.  And, like Dr. O'Hara above, the TRAC Defendants are also entitled to immunity from Plaintiffs' state law claims.  That said, like other

Defendants who are entitled to immunity, because Plaintiffs could conceivably allege facts that would state viable claims, Plaintiffs will be given leave to amend their claims against the TRAC Defendants—*i.e.*, Counts IV–V and VII (federal claims) and Counts XVIII–XXII, XXVI–XXVIII, and XXXI (state law claims).

### E.      NASD Defendants (ECF No. 52)

The NASD Defendants are a school district and three school administrators, each sued in her "official capacity."  ECF No. 10 ¶¶ 32–35.  Plaintiffs allege that the NASD Defendants unlawfully permitted Ms. Birdseye to interview Minor Plaintiffs on school grounds regarding the D.P. Report;  turned over Minor Plaintiff school records to Ms. Birdseye in connection with her investigation of the D.P. Report;  permitted OCYF personnel to interview H.P. at school, including removing H.P. from class to allow the interview to occur;  and permitted a TRAC therapist, Ms. Ryan-Schmidt, to conduct a therapy session with D.P. and A.P. on school grounds.  The particular causes of action asserted against the NASD Defendants appear in Counts IV, VII, XIII (federal claims) and XVIII–XXII, XXVI–XXVIII, and XXXI (state law claims).

### 1.      Plaintiffs' § 1983 Claims Against the NASD Defendants Fail

The NASD Defendants argue that Plaintiffs' § 1983 claims fail because the Amended Complaint fails to adequately allege either a custom/policy or failure to train claim under *Monell*.

As a threshold matter, the Court notes that "official capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Matrajt v. United States Prob. Office*, Civil Action No. 2: 20-cv-1660, 2021 U.S. Dist. LEXIS 178300, at *16–17 (W.D. Pa. Sep. 20, 2021) (Dodge, M.J.) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  Accordingly, Plaintiffs' claims against Ms. Matheison, Ms. Crimone, and Ms. Jenkins are duplicative of the claims against NASD, and will be dismissed without prejudice.  *See, e.g., Rulli v. City of Pittsburgh,* Civil Action No. 2:20-cv-965, 2021 U.S. Dist. LEXIS 55919, at *14

(W.D. Pa. Mar. 23, 2021) (Lenihan, M.J.) (dismissing claims against mayor sued in his official capacity) (citing *Hafer v. Melo*, 502 U.S. 21 (1991)).

Next, "[t]o establish a '*Monell* claim,' a plaintiff must: '[I]dentify the constitutional right at issue, identify the policy or custom at issue, identify the policymaker, demonstrate deliberate indifference or evidence of knowledge and acquiescence by the policymaker and demonstrate causation.'" *Long v. City of Phila.*, No. 15-00202, 2016 U.S. Dist. LEXIS 5169, at *8–9 (E.D. Pa. Jan. 15, 2016) (quoting *Glass v. City of Philadelphia*, 455 F. Supp. 2d 302, 342 (E.D. Pa. 2006). And, as noted above, a plaintiff may show this in one of three ways: (1) that the employee acted pursuant to a formal policy or pervasive custom; (2) that the act(s) complained of were undertaken by an official with final policymaking authority, such that the official's actions constitute official policy; or (3) that an official with final policymaking authority ratifies the unconstitutional conduct of a subordinate. *See McGreevy v. Stroup,* 413 F.3d 359, 367 (3d Cir. 2005).

Plaintiffs allege that "it is the policy, practice, and/or custom of NASD to permit OCYF workers and/or other third parties to interview students without parental consent or notice and over minor-children's objections." ECF No. 10 ¶¶ 59, 568. Plaintiffs further allege that these purported "polic[ies], practice[s], and/or custom[s]" caused violations of Plaintiffs' First, Fourth, and Fourteenth Amendment rights. *See id.* ¶ 567. Because the Court has already determined that Plaintiffs' claims related to the incidents on January 15, 2019—*i.e.* Ms. Birdseye's investigation of the D.P. Report, which included interviewing the Minor Plaintiffs at school and obtaining their school records—are time-barred, the only allegations relevant to the Court's analysis here pertain to the alleged conduct of the NASD Defendants in the context of the H.P. Report, the subsequent dependency proceedings, and related orders of the Family Court.

Taken as true and viewed in the light most favorable to Plaintiffs, the Court concludes that the relevant allegations in the Amended Complaint fail to state a viable *Monell* claim against NASD. First, Plaintiffs fail to identify in anything but conclusory fashion the existence of a formal policy or that a final policymaker had knowledge of, and acquiesced in, the alleged unlawful conduct. Indeed, Plaintiffs assert, "[u]pon information and belief," that Ms. Mathieson, Ms. Crimone, and Ms. Jenkins were "possessed of final policymaking authority." ECF No. 10 ¶¶ 556, 569. However, under Pennsylvania law, school principals (let alone vice principals) are not final policymakers. Such authority is vested in a school district's superintendent and school board. *See E.N. v. Susquehanna Twp. Sch. Dist.,* No. 1:09-CV-1727, 2010 U.S. Dist. LEXIS 124193, at *25 (M.D. Pa. Nov. 23, 2010) (noting "[t]he final policy maker for the school district is typically the school board, or the superintendent.") (citing 24 Pa. Stat. §§ 5-508, 5-510, 5-514, 10-1081 (superintendent duties), and *McGreevy*, 413 F.3d at 369). And, Plaintiffs fail to allege any supporting facts showing that NASD in fact had "delegated" final policymaking authority to the individual NASD Defendants with respect to, as relevant here, participating or cooperating in child abuse investigations and matters related to dependency proceedings.

Furthermore, and even more fundamentally, the Amended Complaint fails to adequately allege that any of NASD's alleged practices caused a violation of Plaintiffs' rights. In sum, Plaintiffs allege that NASD (through the individual NASD Defendants) permitted the Minor Plaintiffs to be interviewed by OCYF and third-party individuals (*i.e.*, TRAC Defendant Ms. Ryan-Schmidt) on school property. However, there is no allegation that the Minor Plaintiffs were subjected to any "actual compulsion" by any NASD Defendant; that is, "[i]n order to compel the exercise … of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *C. N.*

*v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005) (citation omitted). Indeed, there is no allegation that the NASD Defendants did anything more than permit OCYF and other individuals to interview the Minor Plaintiffs on school grounds. Furthermore, Plaintiffs have not sufficiently articulated how, in light of the dependency proceeding and Family Court orders directing that Minor Plaintiffs receive therapy, *see, e.g.I* ECF No. 68-7 (May 23, 2019 Orders of Adjudication and Disposition requiring, in relevant part, that Minor Plaintiffs have "individual therapy") and ECF No. 68-10 (December 9, 2020 Permanency Review Orders requiring that Minor Plaintiffs "continue with individual therapy"), the NASD Defendants permitting any such interview or therapy session to occur on school grounds violated any rights secured under the Fourth or Fourteenth Amendment.

As such, Plaintiffs' § 1983 claims against the NASD Defendants will be dismissed. Because, however, Plaintiffs could conceivably plead facts to overcome the deficiencies identified by the Court here, such dismissal will be with leave to amend.

## 2. Plaintiffs' Remaining State Law Claims Fail as to the NASD Defendants

The Court has already outlined the contours of the immunity provided to state agencies and employees under the PTCA. Accordingly, because Plaintiffs' intentional tort claims against the NASD Defendants do not appear to fall within any recognized exception to the PTCA's grant of immunity, those counts cannot survive the NASD Defendants' Motion to Dismiss. Similarly, Plaintiffs' negligence claim against the NASD Defendants fails for the same reason their negligence claims against other state defendants fail, as discussed above. That is, even if the NASD Defendants' alleged conduct was negligent (a question which the Court does not reach), taken as true, the allegations regarding the NASD Defendants in the Amended Complaint do not fit within any of the exceptions to immunity defined under the PTCA. *See* 42 Pa. C.S.A. §8542(b).

Accordingly, Plaintiffs' state law claims against the NASD Defendants will be dismissed with prejudice.

### F.      NRJPB Defendants (ECF No. 54)

The NRJPB Defendants consist of:  (1) an agency, the Northern Regional Joint Police Board, which is responsible for providing police services to certain municipalities within Allegheny County, through the Northern Regional Police Department;  and (2) Det. Durzo, an officer employed by NRJPD.  ECF No. 10 ¶¶ 37–38.  Plaintiffs allege that, after Ms. Birdseye "negligently forwarded the D.P. Childline to the Northern Regional Police Department," Det. Durzo disclosed information about the D.P. Report to his daughter (who was a schoolmate of H.P.'s), instructed his daughter not to speak with H.P., and then "appeared at H.P.'s school in order to monitor the contact between H.P. and G.D."  ECF No. 10 ¶¶ 70–75.  According to the Amended Complaint, "H.P. felt harassed and stalked by Durzo's appearances at the school."  *Id.* ¶ 76.  Neither Det. Durzo nor the NRJPB were ever involved in investigating the D.P. Report.  *See id.* ¶ 77.  Plaintiffs' remaining claims against the NRJPB Defendants appear in Counts IV, VII and XIV (federal claims) and XIX–XX, XXVI–XXVIII, and XXXI (state law claims).

#### 1.      Det. Durzo is Entitled to Qualified Immunity

The NRJPB Defendants argue that Det. Durzo is entitled to qualified immunity because (1) the Amended Complaint fails to adequately allege that Det. Durzo's actions violated any right secured under federal law and (2) even if it did, any such right was not clearly established.  *See* ECF No. 55 at 17.  In responding to the NRJPB Defendants' qualified immunity argument, Plaintiffs contend that

> The allegations against Detective Durzo are that he appeared at H.P.'s school for the sole purpose of harassing and intimidating her.  A police officer's stalking and harassment of a child on school property clearly shocks the conscience and arises to a violation of H.P.'s constitutional right to be free from government intrusion.  Further, Detective Durzo's intentional dissemination of a confidential childline

[sic] report for the explicit purpose of ensuring that his daughter knew of and avoided H.P. is clearly an abuse of power on his part.

ECF No 79 at 31.   The Court has already addressed—and will dismiss with prejudice—Plaintiffs' purported "abuse of power" claim as it is not a viable cause of action.   Nonetheless, the Court construes Plaintiffs' response, given its reference to the "shocks the conscience" standard, as arguing that Det. Durzo's alleged conduct violated H.P.'s clearly established right under the substantive due process clause of the 14th Amendment "to be free from government intrusion."

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Phoenician Mediterranean Villa, LLC v. Swope*, 872 F.3d 138, 143 (3d Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted)).   Accordingly, government officials are entitled to qualified immunity for alleged violations of a plaintiff's civil rights "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d. Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In addressing a claim of qualified immunity, courts analyze "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right;  and (2) whether the right was clearly established at the time of the alleged misconduct." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).   Further, "district courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191–92 (3d Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223,236 (2009)).

For a right to be "clearly established," it "must be so apparent that 'every reasonable official would understand that what he is doing is unlawful.'" *Hira Educ. Servs. N. Am. v. Augustine*, 991 F.3d 180, 190 (3d Cir. 2021) (quoting *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020)).

Furthermore, "the right must be defined with a 'high "degree of specificity"' before [courts] consider that right clearly established." *Hira*, 991 F.3d at 190–91 (quoting *D.C. v. Wesby*, 138 S.Ct. 577, 590 (2018)).  Thus, "[t]he legal principle established in a precedential case must 'clearly prohibit the offic[ial's] conduct in the particular circumstances before him.'"  *Id*. at 191 (quoting *Wesby*, 138 S.Ct. at 581).

The Court concludes that the Amended Complaint fails to show that Det. Durzo violated any of Plaintiffs' constitutional rights.  The Court notes that the Amended Complaint alleges that Det. Durzo (1) informed his daughter about the D.P. Report and instructed her not to speak with H.P.;  (2) "appeared at H.P.'s school in order to monitor the contact between H.P. and G.D.";  and (3) that "H.P. felt harassed and stalked by Durzo's appearances at the school." ECF No. 10 ¶¶ 71– 77.  Thus, the Amended Complaint appears to allege violations of H.P.'s substantive due process rights (as further suggested in Plaintiffs' Omnibus Response).

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience."  *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).  And, "[w]hat 'shocks the conscience' is 'only the most egregious official conduct.'"  *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 285 (3d Cir. 2004) (quoting *UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003)).  Indeed, courts in this Circuit have found conduct such as verbal harassment to fall short of the "shocks the conscience" standard.  *See Tozer v. Darby, Pa. ,* No. 13-2005, 2014 U.S. Dist. LEXIS 29846, at *13-14 (E.D. Pa. Mar. 6, 2014) (finding that while defendant repeatedly calling plaintiff at home "can be characterized as intrusive and offensive, this conduct is insufficient to give rise to a substantive due process claim");  *see also Robinson v. Hicks*, 450 F. App'x 168, 174 (3d Cir. 2011) (negligent statement by defendant

"was not so 'egregiously unacceptable' or 'inhumane' to be reasonably viewed as conduct that 'shocks the conscience.'") (citation omitted).  Here, Plaintiffs allege that Det. Durzo disclosed some undefined information about the D.P. Report to his daughter, instructed her not to speak with H.P., and then "appeared" at H.P.'s school.  Accepting these facts as true, the Court concludes that the conduct attributed to Det. Durzo does not rise to the level of egregiousness required to state a substantive due process claim.

Accordingly, the Court concludes that Det. Durzo appears to be entitled to qualified immunity.  However, because Plaintiffs may be able to allege facts sufficient to show Det. Durzo is not entitled to immunity, they will be given leave to amend.

### 2. Plaintiffs' *Monell* Claim Against NRJPB Fails

The Court has already discussed the pleading standards applicable to *Monell* claims and will not repeat them here.  Plaintiffs' *Monell* claim in Count XIV against NRJPB fails because, even assuming Det. Durzo's conduct was unlawful, the Amended Complaint fails to allege, in anything but conclusory fashion, the existence of formal policies related to Det. Durzo's allegedly unlawful conduct.[20]  *See* ECF No. 10 ¶ 582(f)–(g) (alleging NRJPB had "[a] policy, procedure and/or custom of discussing confidential information with unaffiliated third parties;  and [a] policy, procedure and/or custom of allowing police officers to stalk, and/or harass, and/or defame individuals under investigation and/or otherwise involved with police activity.").  Nor do Plaintiffs identify an official with final policymaking authority who had knowledge of and acquiesced in Det. Durzo's alleged actions.

---

[20] As noted above with regard to Allegheny County, because a *Monell* claim is the exclusive means of pleading a 42 U.S.C. § 1983 claim against a municipality, the Court's analysis here necessarily also applies to any other count in the Amended Complaint in which Plaintiffs (1) attempt to plead a § 1983 claim and (2) name NRJPB itself as a defendant.  *See* Counts IV and VII.

Accordingly, Plaintiffs' *Monell* claim against NRJPB will be dismissed.  But, because Plaintiffs could conceivably make additional allegations regarding NRJPB and Det. Durzo so as to overcome the deficiencies described here, such dismissal will be with leave to amend.

### 3.    Plaintiffs' Remaining State Law Claims Fail

Plaintiffs' remaining state law claims against the NRJPB Defendants will also be dismissed.  Those claims consist of:  Count XIX (intentional infliction of emotional distress), Count XX (negligent infliction of emotional distress), Count XXVI (invasion of privacy), Count XXVIII (civil conspiracy), and XXXI (loss of consortium).  Like the County Defendants, the NRJPB Defendants are entitled to immunity from state law claims for intentional torts under the PTCA.  And, as discussed above, an individual or agency protected by the PTCA is immune from negligence-based claims unless a such a claim fits within one of the PTCA's defined exceptions.  Because Plaintiffs' state law claims against the NRJPB Defendants either (1) are intentional torts or (2) do not fall within any exception to the PTCA, such claims will be dismissed with prejudice.

### G.    AHN Defendants (ECF No. 72)

Plaintiffs' claims against AHN—Counts III–V and VII (federal claims) and Counts XIX–XX, XXVI–XXVIII, and XXX–XXXI—stem from AHN's allegedly unlawful disclosure of Mother's prescription drug use to OCYF shortly after the birth of Minor S.P.  Specifically, the Amended Complaint alleges that, following S.P.'s birth, "Mother disclosed to the hospital that she took a prescription anxiety medication prior to the birth.  The hospital confirmed that Mother had a prescription noted in her medical chart and there were no concerns regarding Mother's use of the prescription."  ECF No. 10 ¶ 201.  Approximately two days later, Ms. S. Schmidt allegedly "contacted AHN and requested Mother's confidential medical information from hospital personnel without Mother's permission."  *Id.* ¶ 202.  Plaintiffs claim that "AHN violated Mother's rights by disclosing to S. Schmidt that Mother took a prescription anxiety medication without Mother's

consent or court-order.  At no point in time did AHN call in a Childline report to OCYF because there were no concerns about Mother's use of her prescribed medication." *Id.* ¶ 203.  Following this disclosure, Ms. S. Schmidt "obtained an Emergency Custody Authorization ("ECA"), allowing her to take S.P. from Mother and Father's custody." *Id.* ¶ 206.  As such, Plaintiffs claim that "[b]ecause of AHN's illegal disclosure of Mother's confidential medical records, S.P. was removed from the custody of Mother and Father." *Id.* ¶ 207.  Plaintiffs further allege that AHN's disclosure of Mother's health information is part of a larger scheme by which "AHN will provide OCYF with information related to pregnant women's narcotic use, even if it is legal and through a valid prescription. Such a practice leads to intrusive and unconstitutional investigations of women, in the absence of any valid child abuse investigation." *Id.* ¶ 205.

Because Plaintiffs' Amended Complaint fails to establish that AHN was a state actor, the federal claims against AHN, Counts III–V and VII, will be dismissed with leave to amend.  With regard to Plaintiffs' state law claims, AHN has immunity under Pennsylvania's Child Services Protection Law ("CPSL").  Because, as discussed below, Plaintiffs could conceivably amend their allegations in such a way as to rebut the presumption of good faith under the CPSL, Plaintiffs' state law claims against AHN will be dismissed without prejudice.

### 1.    AHN was not a State Actor

AHN argues that Plaintiffs' federal civil rights claims against it fail because Plaintiffs have not sufficiently alleged that AHN was a state actor.  In sum, AHN maintains that the Amended Complaint fails to allege facts sufficient to show that AHN "'may fairly be said to be a state actor.'" ECF No. 51 at 12 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

Generally speaking, courts apply three tests to determine whether a private entity can be considered to be a state actor for purposes of a claim under 42 U.S.C. § 1983:

65

(1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state";  (2) whether the private party has acted with the help of or in concert with state officials";  and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)).  In short, "[t]he necessary 'close nexus'" between a private entity and the state "exists where the state exercises coercive power or provides 'such significant encouragement, either overt or covert,'" that the private entity's conduct can be deemed state action.  *Glunk v. Noone*, 186 F. Supp. 3d 453, 460 (E.D. Pa. 2016) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

In opposition, Plaintiffs appear to claim that the Amended Complaint's allegations satisfy the second test.  Specifically, Plaintiffs argue that they "have alleged that AHN's policy or practice of surreptitious drug testing and reporting of positive results to OCYF was integral to the violation of plaintiffs' Fourteenth Amendment rights and that AHN knew its policy or practice would result in the violation of plaintiffs' constitutional rights."  ECF No. 79 at 38.  Plaintiffs rely principally on two district court cases in support of their position.  Plaintiffs argue that the courts in those cases, reviewing similar allegations to those pled here, found that "a constitutional conspiracy claim had been properly pled because Jameson [the hospital] allegedly worked closely with Lawrence County CYS to establish the testing program; played an integral role in testing and reporting; and knew that Lawrence County CYS would act to sever custody without undertaking any other investigation."  *Bower v. Lawrence Cty. Children & Youth Servs*., No. 2:11-cv-931, 2011 U.S. Dist. LEXIS 130877, at *21-22 (W.D. Pa. Nov. 14, 2011) (McVerry, J.) (citing *Rodriguez v. Lawrence Cty. Children & Youth Servs*., No. 2:10cv1438, 2011 U.S. Dist. LEXIS 98338, at *17–18 (W.D. Pa. Aug. 31, 2011)).  As such, Plaintiffs conclude that "[v]iewed as a whole and taken

as true, the allegations that AHN had a policy or practice of surreptitiously drug testing pregnant patients for the sole purpose of identifying and investigating new mothers who may have used drugs while pregnant" is sufficient to state a claim.  ECF No. 79 at 41.

However, viewed in the light most favorable to Plaintiffs, the allegations of AHN's and OCYF's interactions in the Amended Complaint do not rise to the level necessary to render AHN a state actor.  First, while superficially similar, the facts in *Bower* and *Rodriguez* differ in important ways from the facts pled in the Amended Complaint.  In particular, the allegations in *Bower* and *Rodriguez* included claims that (1) the hospital "worked closely" with the state agency to develop a testing program for new mothers and (2) that the hospital knew the state agency would use drug testing information to take custody of children without any further investigation.  Here, Plaintiffs allege that Mother "disclosed" her prescription drug use to AHN, that Ms. S. Schmidt requested Mother's medical information, and that AHN provided it.  *See* ECF No. 10 ¶¶ 200–207.  Indeed, aside from conclusory claims about the existence of an "agreement" between AHN and OCYF and AHN's policies and practices, these are the only facts alleged about AHN's conduct.  *See, e.g., id.* ¶ 463 ("Upon information and belief, Defendants AHN and OCYF, acting in concert with one another entered into an agreement or understanding to violate Mother's Fourteenth Amendment substantive due process right to privacy in her confidential personal medical records.") and ¶ 464 ("Defendant AHN had a policy specifically requiring its employees to report to OCYF positive urine drug test results under circumstances where it was not privileged or legally required to do so, even in the absence of a Childline report.").  Accordingly, once Plaintiffs' conclusory allegations are disregarded, the factual matter contained in their Amended Complaint is insufficient to show the "necessary 'close nexus'" to survive AHN's Motion.

Plaintiff's federal civil rights claims against AHN therefore will be dismissed.  However, because Plaintiffs could plead facts sufficient to establish, at this stage of the case, AHN's status as a state actor, they will be given leave to amend.

### 2. AHN is Entitled to Immunity Under the CPSL from Plaintiffs' State Law Claims

Next, AHN argues that it has immunity from Plaintiffs' state law claims under Pennsylvania's CPSL.  ECF No. 511 at 4–10; *see* 23 Pa.C.S.A. § 6318.  Specifically, AHN maintains that, as a so-called "mandated reporter," the CPSL renders it immune from claims for damages for "[c]ooperating or consulting with an investigation under this chapter" in good faith. 23 Pa.C.S.A. § 6318(a)(2).  Furthermore, the good faith of mandated reporters is presumed under the statute.  23 Pa.C.S.A. § 6318(c).  Therefore, AHN contends that, because Plaintiffs have not alleged sufficient facts to overcome this presumption of good faith, Plaintiffs' state law claims must be dismissed.

Plaintiffs respond that the CPSL does not require reporting of maternal drug use unless the substance at issue is "illegal."  ECF No. 79 at 36;  23 Pa. C.S.A. § 6386.  From this, they conclude that AHN's alleged disclosure of Mother's drug screen results to OCYF is not protected by the CPSL's grant of immunity.  ECF No. 79 at 36.

Plaintiffs' argument in opposition fails for at least two reasons.  First, Plaintiffs are simply incorrect that the version of the CPSL in effect at the time AHN disclosed Mother's test results limited such mandated reporting to "illegal" substances.  Pursuant to 2018 Pa. Laws 54 (2017 Pa. HB 1232), the CPSL was amended to remove the word "illegal" from 23 Pa.C.S.A. § 6386, effective October 1, 2018.  According to the Amended Complaint, S.P. was born on June 22, 2019. *See* ECF No. 10 ¶ 201.  Thus, as of the date of S.P.'s birth, the relevant portion of § 6386 provided that a health care provider must give notice if the provider determines that a child under one year

of age in its care "was born affected by…substance use or withdrawal symptoms resulting from prenatal drug exposure." 23 Pa.C.S.A. § 6386(a)(1).

Second, and more importantly, AHN is not asserting its entitlement to immunity under § 6318(a)(1)—*i.e.* for making a report of suspected abuse—but for cooperating in OCYF's investigation under § 6318(a)(2). Indeed, as Plaintiffs state in more than one place in the Amended Complaint, no ChildLine or other report of suspected abuse was ever field by AHN. Rather, the Amended Complaint plainly alleges that AHN simply disclosed information at the request of OCYF. And, notwithstanding Plaintiffs' argument that no investigation or other proceeding was then underway regarding S.P., it is beyond dispute that the Amended Complaint describes the Plaintiffs as being enmeshed in ongoing dependency proceedings. Without additional factual material to rebut the presumption of good faith for mandated reporters, Plaintiffs' allegations are simply insufficient to pierce the immunity provided to entities like AHN.

Accordingly, as currently pled, AHN is immune from Plaintiffs' state law claims, pursuant to 23 Pa.C.S.A. § 6318(a)(2). Those claims will be dismissed with leave to amend, however, because Plaintiffs could conceivably amend their allegations in such a way as to rebut the presumption of good faith under the CPSL.

## V.     The Court Will Decline to Exercise Supplemental Jurisdiction

Because the Court will dismiss all of Plaintiffs' federal claims, to the extent any of Plaintiffs' pendent state law claims will not also be dismissed with prejudice, the Court will decline to retain jurisdiction over any such surviving state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if…the district court has dismissed all claims over which it has original jurisdiction."). That said,

because Plaintiffs will be given leave to amend many of their federal claims, Plaintiffs may reassert

their state law claims, as appropriate, in their Second Amended Complaint.

**VI.    Conclusion**

      For the reasons set forth above, Plaintiffs Amended Complaint will be dismissed.  Plaintiffs

will be given leave to amend, as set forth in the accompanying order, except to the extent that a

given claim or defendant, as discussed above, will be dismissed with prejudice.


      DATED this 31st day of January, 2022.


      BY THE COURT:


                    /s/ Christy Criswell Wiegand
                    CHRISTY CRISWELL WIEGAND
                    United States District Judge


      cc (via ECF email notification):

      All Counsel of Record